## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MONIQUE O'NEAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-CV-02172-JAR-KGS |
| | ) | |
| CENTENE MANAGEMENT | ) | |
| COMPANY, LLC D/B/A SUNFLOWER | ) | |
| HEALTH PLAN, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT CENTENE MANAGEMENT COMPANY LLC'S
## MEMORANDUM IN SUPPORT OF ITS MOTION
## FOR SUMMARY JUDGMENT

ARMSTRONG TEASDALE LLP

BY:  _s/ Dione C. Greene_
    Dione C. Greene       KS #23010
    2345 Grand Blvd., Suite 1500
    Kansas City, Missouri   64108
    816.221.3420
    816.221.0786 (facsimile)
    dgreene@armstrongteasdale.com

ATTORNEYS FOR DEFENDANT

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .........................................................................................ii

I.      NATURE OF THE MATTER ...........................................................................1

II.     STATEMENT OF UNCONTROVERTED MATERIAL FACTS ............................2

III.    QUESTIONS PRESENTED ............................................................................14

IV.     ARGUMENT.................................................................................................14

        A.      Summary Judgment Standard ...................................................14

        B.      Disability Claim..........................................................................14

                1.      Plaintiff cannot make a *prima facie* case of disability
                        discrimination because she cannot show she is disabled..................14

                2.      Even if plaintiff could establish a *prima facie* case for
                        disability discrimination, she cannot show that Centene's
                        reasons for terminating her are pretextual. ........................................17

        C.      FMLA Interference Claim. .........................................................18

                1.      Plaintiff's FMLA interference claim fails because she
                        cannot show that Centene's action to terminate her
                        interfered with her right to take FMLA leave....................................19

                2.      Plaintiff's FMLA claim fails because she would have been
                        terminated regardless of her taking FMLA leave. ............................19

        D.      Plaintiff's ADA and FMLA Retaliation Claims fail.....................20

V.      CONCLUSION..............................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016)................................. 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) .......................................... 14

*Carter v. Pathfinder Energy Services, Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011).................... 17

*Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014).......................................... 15, 16

*Grimes v. Fox & Hound Rest. Group*, 984 F. Supp.2d 1125, 1138 (D. Kan. 2013)......... 18, 19, 20

*Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) ................................. 21

*Peterson v. Garmin Int'l*, 833 F. Supp.2d 1299, 1311 (D. Kan. 2011)........................... 19

*Poulsen v. Humana Ins. Co.*, No. 14-2477-JAR, 2016 WL 1030038, at *9 (D. Kan. Mar. 10, 2016) ........................................................................................... 16

*Reinhardt v. Albuquerque Public Schs. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010) ...... 21

*Russell v. Phillips 66*, 687 Fed. Appx. 748, 753 (10th Cir. 2017)........................................... 15, 16

*Sabourin v. Univ. of Utah*, 676 F.3d 950, 958 (10th Cir. 2012) ....................................... 18, 20

*Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014) ........................... 15

*Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir.2007) ........................ 21

*Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir. 1993) ................................. 14

*Williams v. FedEx Corp.*, 849 F.3d 889, 898 (10th Cir. 2017)................................. 17

**Statutes and Rules**

29 C.F.R. § 1630.2(j)(1)(ii)................................................................................. 16, 17

Fed. R. Civ. P. 56 ............................................................................................ 14

# I.   NATURE OF THE MATTER

This case arises from the termination of plaintiff Monique O'Neal's employment due to chronic dishonesty and unprofessionalism.  In June 2013, Centene hired plaintiff to primarily answer phone calls from medical providers.  Within 90 days of her employment, plaintiff's co-workers complained about "how they feel it's unfair and how the environment is hostile because every time they say something to [plaintiff] . . . it's confrontational . . . and I am tired of working really hard so [plaintiff] can slack off and talk all day."

In June 2015, plaintiff left work early, falsely representing that her aunt was in the hospital.  Plaintiff was disciplined.  Nevertheless, she continued to make misrepresentations throughout her employment.  Her co-workers continued to complain that plaintiff was argumentative, unprofessional, and that plaintiff would hide in the hallway and talk on her cell phone excessively during work hours.

In May 2016, plaintiff requested and was granted bereavement leave, representing that her "aunt" died.  Instead of attending the funeral, plaintiff went to Las Vegas.  While plaintiff was in Las Vegas, plaintiff's manager, Terie Beverlin, listened to plaintiff's recorded work phone calls to resolve an issue involving plaintiff and a medical provider.  When listening to the calls, Ms. Beverlin heard plaintiff on personal calls "speaking about sexual encounters, masturbation, cuss words, [and] talking about drugs" instead of servicing providers.  Plaintiff was given a final warning.  After the final warning, plaintiff continued to engage in unprofessional behavior and was terminated.

No reasonable jury could render a verdict for plaintiff on her disability discrimination, FMLA interference, and retaliation claims.  She cannot show that she was terminated for unlawful reasons.  Summary judgment should be granted in favor of Centene as a matter of law on all of plaintiff's claims.

## II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.     Centene provides healthcare related services to patients and medical providers. *See, e.g,* Ex. 1, Pl. Dep., 15:23-16:13; Ex. 2, Beverlin Dep., 9:24-11:7.

2.     In June 2013, Centene hired plaintiff as a referral specialist.  *See* Pretrial Order, doc. 37, p. 2.

3.     The job duties of referral specialists include communicating by telephone with medical providers (e.g., doctors/nurses) who are requesting authorization to provide specific and often time sensitive medical services to a patient.   The medical provider gives the referral specialist information such as the patient name, diagnosis and the anticipated medical procedure for which the authorization is sought.   The referral specialist then "builds the authorization" by inputting the information into a data management software system called "TruCare," and then sends the authorization to a nurse/doctor at Centene for approval.  *See* Ex. 1, Pl. Dep., 16:23-21:18; Ex. 2, Beverlin Dep., 14:9-17.

4.     Plaintiff's work hours were from 8:00 a.m. to 5:00 p.m.  She was entitled to an hour lunch break and two 15 minute breaks each day.  When she was not on a break, she was expected to work as efficiently as possible.  *See* Ex. 1, Pl. Dep., 44:6-19, 46:1-47:6, 59:23-60:1.

### Complaints about Plaintiff's Conduct Prior to FMLA Leave

5.     Prior to plaintiff taking leave under the Family Medical Leave Act, complaints were made that she was "on her personal cell excessively throughout the day."  It was reported that there "are times she leaves her desk with[out] informing the IM group that she is on lunch or break."  *See* Ex. 3-A, Monique Performance Discussions (Def. 0468), attached to Beverlin Declaration; Ex. 4, Thomas Dec., ¶¶ 5-8.

6.      Instant message (IM), also called "team chat," was used by referral specialists to communicate with others if they were available to take calls.  *See* Ex. 9, Meeting Minutes (Def. 0106-0113); Ex. 1, Pl. Dep., 30:3-21.

7.      Plaintiff's co-workers complained about "how they feel it's unfair and how the environment is hostile because every time they say something to [plaintiff] . . . it's confrontational;" that plaintiff "is not a team player and . . . she has made it an extremely hostile place to work;" and "I am tired of working really hard so [plaintiff] can slack off and talk all day. I want to transfer to a different department.  I don't feel comfortable working around [plaintiff]." *See* Ex. 3-B, attached to Beverlin Dec. (Def. 0222-0223); Ex. 4, Thomas Dec., ¶¶ 5-8.

## FMLA Use

8.      Centene's FMLA application, approval, denial, and usage process was handled by a third-party administrator, Liberty Mutual.  Centene managers and supervisors had no involvement in the FMLA process other than receiving notice when an employee took leave.  *See* Ex. 5, Mak Dep., 78:4-79:19.

9.      In July 2014, plaintiff began taking intermittent FMLA leave for "generalized anxiety disorder," "gastroesophageal reflux disease" (GERD) and her son's asthma.  *See* Ex. 6, Pl. FMLA Forms (O'Neal 000030-32); Ex. 1, Pl. Dep., 138:10-13; 218:7-8.

10.     Plaintiff does not recall ever communicating to any manager or supervisor that she had anxiety disorder.  *See* Ex. 1, Pl. Dep., 212:12-16.

11.     Terie Beverlin (manager) did not know what GERD was or how it affected plaintiff.  Ms. Beverlin did not know or perceive that plaintiff had any disability.  *See* Ex. 3, Beverlin Dec., ¶ 8.

12.     According to plaintiff, GERD "causes acid reflux, it causes digestive issues within your stomach.  It causes you an issue with eating and keeping food down."  But she was able to perform her job duties despite GERD, "constantly walk," and she never asked for an accommodation.  *See* Ex. 1, Pl. Dep., 192:5-16; 214:2, 217:22-218:1.

13.     Whenever plaintiff experienced general anxiety or GERD at work, she left for the entire day.  According to plaintiff: "Anytime a disability restricted me from doing anything within my job, I would go home for the day."  *See* Ex. 1, Pl. Dep., 214:18-20; 217:14-17.

<u>Unprofessionalism and Dishonesty</u>

14.     In July 2014, a nurse complained about the "behavior of employee Monique O'Neal and the way she conducts the daily activities," that she "doesn't seem interested in being a team player" and "becomes argumentative during any discussion of the process."  In August 2014, plaintiff was counsel for "argumentative behavior."  *See* Beverlin Dec., Ex. 3-C, (Def. 0466; 0467).

15.     On June 8, 2015, plaintiff requested to leave work early, representing that her "aunt" was in the hospital.  Plaintiff was allowed to leave work early to visit her "aunt."  *See* Ex. 7, Harris Dep., 55:21-56:10; Ex. 3-D Beverlin Dec., (first aunt email (Def. 0284-0285)).

16.     The person allegedly hospitalized was not plaintiff's real aunt.  The person hospitalized was really the "aunt" of a "gentleman who got killed" who fathered three children with plaintiff's sister.  *See* Ex. 1, Pl. Dep., 254:9-21.

17.     Plaintiff's sister, Gregshima O'Neal, told supervisor Ms. Bobbie Harris, that it was her (Gregshima's) mother-in-law that is in the hospital and "not their aunt."  Ms. Harris believed that plaintiff was dishonest and reported her conduct to Scott Mak (human resources

manager).[1]   *See* Ex. 7, Harris Dep., 55:21-56:10; Ex. 3-D, First Aunt Email (Def. 0284-0285), attached to Beverlin Declaration.

18.     On or about June 10, 2015, Mr. Mak met with plaintiff to discuss her unprofessionalism and because she "made some statements that just aren't true" regarding the "aunt." He told plaintiff to be honest, professional and at her desk to focus on her job.  He also informed plaintiff that her leaving work early on June 8 would count against her attendance.  *See* Ex. 20, Mak Dec., ¶ 8; Ex. 20.1, Mak Notes (Def. 0117).

19.     On June 11, Mr. Mak communicated with management about giving plaintiff opportunities "to correct her demeanor" and to "permanently change her behavior" going forward.  On June 12, 2015, plaintiff was issued "Written Disciplinary Action."  *See* Exs. 3-E and 3-F, attached to Beverlin Dec., Written Discipl. Action, (Def. 0168, 0215).

20.     In September 2015, Terie Beverlin became plaintiff's manager.  Upon becoming manager, Pattie Counter (plaintiff's prior manager) and Ms. Harris informed Ms. Beverlin about plaintiff's past dishonesty, past unprofessionalism and history of excessive cell phone use.  *See* Ex. 2, Beverlin Dep., 20:15-22, 60:19-22, 97:1-3; Ex. 3, Beverlin Dec., ¶ 5.

21.     On January 4, 2016, Ms. Beverlin was informed that plaintiff called in that morning, representing that she was taking FMLA for her son, and plaintiff stated she would come into work later that day.  Plaintiff never came to work.  Ms. Beverlin believed that plaintiff was dishonest by representing she would come into work and reported her conduct to HR.  *See* Ex. 3, Beverlin Dec., ¶ 10; Ex. 3-G, Beverlin Email (Def. 0694), attached to Beverlin Dec.

---

[1] Apparently, this first "aunt" issue was not the first time plaintiff was dishonest with Centene.  Plaintiff represented in her employment application with Centene that she voluntarily left her prior employer, Truman Medical Center, for "personal family issues."  That representation was false.  Plaintiff was actually terminated by Truman Medical Center.  *See* Ex. 1, Pl. Dep., 258:20-260:15.

Department Expectations Meeting

22.     On March 22, 2016, Terie Beverlin and the human resources department held a meeting with the referral specialist group, which included plaintiff.  *See* Ex. 1, Pl. Dep., 128:8-16.

23.     The referral specialists were told: "Effective immediately there will be no ear buds/cell phone allowed."  *See* Ex. 9, Meeting Minutes (Def. 0107).

24.     Referral specialists, including plaintiff, were also instructed at this meeting and subsequent meetings to (1) take lunches (one hour) and breaks (15 minutes) on time and return on time, (2) accurately document notes of conversations with providers in Centene's medical data management system, TruCare, (3) and to enter time in the team chat when you leave and return to your desk because you "can't just get up and leave your desk."  *See* Ex. 9, Meeting Minutes (Def. 0106-0113); Ex. 1, Pl. Dep., 80:13-16, 83:4-11, 84:20-85:16, 87:9-21.

25.     On March 28, 2016, Ms. Harris learned from productivity reports that plaintiff was not documenting any notes of conversations with medical providers as she was instructed in the March 22 meeting.  Ms. Harris sent plaintiff an email stating there were "no notes entered by you" on the authorizations plaintiff built.  While plaintiff acknowledged that her "productivity is low," she represented that she did in fact enter notes in TruCare.  *See* Ex. 3-H, Harris Emails (Def. 0698, 707-708), attached to Beverlin Declaration.

26.     Ms. Harris randomly selected three authorizations that plaintiff built.  She then emailed plaintiff: "I randomly picked 3 members from one of our spreadsheets and there are no notes/documentation entered by you for any of the 3 members below on any of their authorizations."  *See* Ex. 3-H, Harris Emails (Def. 0698, 707-708).

27.     Ms. Harris believed that plaintiff was dishonest about documenting notes and reported her conduct to Ms. Beverlin.  *See* Ex. 7, Harris Dep., 54:12-55:19.

28.     On or about April 22, 2016, plaintiff's co-workers, including Nicole Richardson, complained to Bobbie Harris that plaintiff was argumentative, unprofessional and offensive.  Ms. Harris reported Ms. Richardson's complaint to Ms. Beverlin.  Ms. Beverlin believed that plaintiff was unprofessional and disrupting the workplace.  *See* Ex. 8, Harris Dec., ¶ 4; Ex. 10, Nicole Richardson Dec., ¶ 9; *Cf.* Ex. 11, Hicks Dec., ¶ 13; Ex. 12 Johnson Dec., ¶ 15.

<u>Personal Phone Calls and Second "Aunt" Issue</u>

29.     On May 18, 2016, plaintiff informed Ms. Harris that "my Aunt passed away yesterday from a short battle of cancer."  Plaintiff requested and was granted paid bereavement leave.  *See* Ex. 3-I, Email on Aunt (Dev. 0550) attached to Beverlin Dec.; Ex. 1, Pl. Dep., 93:10-24.

30.     Plaintiff did not attend the funeral.  Instead, she went to Las Vegas.  Ex. 1, Pl. Dep., 94:9-13.

31.     On May 24, while plaintiff was in Las Vegas, Ms. Beverlin attempted to resolve an issue with a medical provider regarding an authorization that plaintiff previously worked on.  Ms. Beverlin listened randomly to plaintiff's phone calls recorded on the work phone to locate the call and resolve the issue.  *See* Ex. 3-J, Beverlin Notes (Def. 0645-46); Beverlin Dep., 75:7-77:10.

32.     When listening to the calls, Ms. Beverlin "started coming across all the personal phone calls . . . the first three or four calls that [Ms. Beverlin] clicked on to listen to were personal phone calls" by plaintiff.  *See* Ex. 2, Beverlin Dep., 75:7-76:6.  Ex3-J, Beverlin Notes (Def. 0645-46).

33.     In one phone call, plaintiff stated that the person for whom she took bereavement leave was not her aunt.  *See* Ex. 1, Pl. Dep., 112:23-113:2; Ex. 2, Beverlin Dep., 23:15-24:6.

34.     On some of the phone calls, Ms. Beverlin heard plaintiff "speaking about sexual encounters, masturbation, cuss words, [and] talking about drugs" in general.  *See* Ex. 2, Beverlin Dep., 139:9-10.

35.     Some health care providers wait to provide medical services to a patient until the authorization process is complete.  *See* Ex. 1, Pl. Dep., 21:9-22.

36.     Plaintiff placed one medical provider seeking a medical authorization on hold for an extended period of time while plaintiff took a personal phone call on the company phone.  *See* Ex. 3, Beverlin Dec., ¶ 21.

37.     Ms. Beverlin believed that plaintiff was grossly unprofessional because of the "conversations [plaintiff] was having during these personal phone calls on the business phone, the nature of them, speaking about masturbation, alcohol consumption that could be overheard by her coworkers potentially, putting providers on hold, just unprofessional in general, putting a provider on hold to have a personal phone call."  *See* Ex. 2, Beverlin Dep., 96:14-20.

38.     Ms. Beverlin also believed that plaintiff was dishonest again by misrepresenting that she took funeral leave for an aunt.  Ms. Beverlin believed that plaintiff now lied twice about having an ill or deceased "aunt" in order to miss work.  *See* Ex. 3, Beverlin Dec., ¶ 23.

39.     Ms. Beverlin believed that plaintiff's conduct warranted immediate termination. However, she accepted Human Resources' advice to instead put plaintiff on a "Last Chance Agreement."  Ex. 15, Last Chance Agreement; Ex. 3, Beverlin Dec., ¶ 24.

<u>Last Chance Meeting</u>

40.     On June 1, after plaintiff returned from her trip to Las Vegas, she had a meeting with Ms. Beverlin, Jacqueline Rolf (Human Resources Specialist), and Lori Howard (Director of Utilization).  According to plaintiff, she was "being characterized as a liar."  *See* Ex. 1, Pl. Dep., 98:5-25, 104:18-21.

41.     Plaintiff was told "you were lying;" management was "very aggressive" and played the phone calls.  *See* Ex. 1, Pl. Dep., 105:22-25, 97:14-15.

42.     Plaintiff now admits that it was reasonable for management to believe she was lying.  *See* Ex. 1, Pl. Dep., 113:3-17.

43.     Plaintiff was also accused of discussing "a drug transaction" on the company phone.  Plaintiff does not dispute discussing marijuana on the company phone.  *See* Ex. 1, Pl. Dep., 116:21-24, 119:16-20.

44.     According to plaintiff:  "My integrity was questioned, my character was questioned" at the meeting.  *See* Ex. 1, Pl. Dep., 160:12-14.

45.     Plaintiff told management, "I do understand the circumstances that brought this about;" she understood that if she signed the agreement, it was her last chance to remain employed by Centene.  She has now further acknowledged that it was the "bereavement that I had taken, and personal phone calls" that led to the final warning.  *See* Ex. 1, Pl. Dep., 159:16-22, 157:1-5; 91:8-14, 90:19-24.

46.     After plaintiff was placed on the Last Chance Agreement, she allegedly made an anonymous complaint about co-worker Geraldine Thomas and Ms. Harris.  Scott Mak investigated the complaint, found that it contained multiple inaccuracies, and concluded it was without merit.  *See* Ex. 1, Pl. Dep., 198:1-11; *see also* Ex. 5, Mak Dep. 145:2-149:5.

<u>Post-Last Chance Issues</u>

47.     About a week after plaintiff signed her Last Chance Agreement, Ms. Beverlin received reports that plaintiff "was consistently being gone from her area, her supervisor didn't know where she was, [and] she wasn't following the process" put in place for her.  *See* Ex. 2, Beverlin Dep., 26:11-27:10.

48.     Ms. Beverlin again spoke with plaintiff about plaintiff "not being at her desk." *See* Ex. 2, Beverlin Dep., 40:15-21.

49.     Plaintiff does not dispute exceeding her break time.  *See* Ex. 1, Pl. Dep., 243:4-8.

50.     Plaintiff also admits that she "didn't practice" letting others know when she returned to her desk, and that "sometimes I didn't let them know when I was leaving as well." *See* Ex. 1, Pl. Dep., 249:15-23; *see also* Ex. 2, Beverlin Dep., 107:10-21.

<u>More Dishonesty and Cell Phone Issues</u>

51.     Plaintiff's former co-worker, Veronica Johnson, complained to management about plaintiff.  Ms. Johnson observed that plaintiff "talked on her cell phone daily during work hours when she was at work; she frequently went into the hallway and talked on her cell phone during work hours," and on occasion, "Monique O'Neal would hide in the hallway during work hours to talk on her cell phone."  Ms. Johnson also "observed Monique O'Neal working on her tax returns during work hours."  *See* Ex. 12, Johnson Dec., ¶¶8, 10, 11, 15.

52.     Plaintiff's former co-worker, Clint Hicks, observed that "Monique O'Neal wore a hat and blanket at times covering her head with ear buds in her ear while having a personal conversation on her cell phone during work hours."  And when "I asked her questions during work hours, I would see her on her cell phone."  Mr. Hicks complained about plaintiff to management. *See* Ex. 11, Hicks Dec., ¶ 8-13.

53.     Plaintiff's co-workers, Nicole Richardson, Mary Franco, and Merrie Carmack also observed plaintiff engage in various forms of misconduct.  *See generally* Exs. 10, 13, 14.

54.     On or about June 14, 2016, Ms. Harris received complaints from plaintiff's co-workers that plaintiff was using her cell phone, disappearing from her desk and not doing her job.  Ms. Harris emailed Ms. Beverlin that "Monique has been taking frequent breaks throughout the day" and was "observed using her cell phone at her desk texting today."  *See* Ex. 3-K, Harris Email (Def. 0542), attached to Beverlin Dec.; Ex. 7, Harris Dep., 82:13-83:1, 29:8-16, 49:6-18.

55.     On June 22, Ms. Beverlin spoke with plaintiff about "her being away from her desk and being seen on her cell phone and disappearing," and that "this is getting to be an issue again."  Plaintiff responded, "I get it, I'll do better."  *See* Ex. 2, Beverlin Dep., 79:1-15.

56.     On June 23, plaintiff sent Ms. Beverlin an email stating she had a doctor's appointment on July 6 for her "FML paper work, at that time I will see if he will provide me with a Dr. Excuse [sic] for my excessive bathroom usage . . . I just want to cover myself."  Ms. Beverlin did not understand plaintiff to be disclosing any major issue; rather, she understood plaintiff's email as "her trying to cover herself."  *See* Ex. 16, Pl. Email (Def. 0747); Ex. 2, Bev. Dep., 79:1-21.

57.     On June 23, Ms. Harris learned that plaintiff previously represented that she missed work for FMLA reasons.  However, plaintiff did not report her FMLA usage to the third-party FMLA administrator, as was required.  Ms. Harris believed that plaintiff was dishonest by representing to Centene she was on FMLA leave for time when she had not informed the FMLA administrator.  Ms. Harris reported her conduct to Ms. Beverlin.  Ex. 7, Harris Dep., 52:9-16; Ex. 3-L, Harris Email (Def. 0647) attached to Ex. 3, Beverlin Dec.; Ex. 2, Beverlin Dep., 104:11-105:12.

58.     On June 30, Ms. Beverlin received further complaints that plaintiff was "away from her desk" outside of her allotted break time, and that this "happens during the workday almost everyday." Ms. Beverlin believed that plaintiff was disappearing from her desk to talk on her cell phone. *See* Ex. 3, Beverlin Dec., ¶ 30; Ex. 3-M, Email (Def. 0543).

59.     Plaintiff adamantly testified that she never used her personal cell phone during work hours. *See* Ex. 1, Pl. Dep., 164:15-17.

60.     Plaintiff's cell phone records, however, show that on June 30, between 8:00 a.m. and 5:00 p.m., plaintiff talked on her cell phone 20 times during work hours. *See* Ex. 17, Pl. Cell Phone Records (Def. 1366-67).

61.     On July 1, Ms. Thomas reported to management that she "observed Monique O'Neal sitting at her desk with one earbud in her ear along with a hat on her head." Ms. Thomas further reported that plaintiff took excessive breaks and was using her cell phone. *See* Ex. 3-N, G. Thomas Email (Def 0584, 0656, 0657).

62.     On July 1, at about 4:30 p.m., it was reported to Ms. Beverlin that plaintiff represented that she was going to the restroom, but was instead seen "going up [the] stairwell to the 4th floor." Ms. Beverlin noted that plaintiff "has been caught on the fourth floor stairwell before talking on her cell phone when she should be working . . . she goes there to hide." *See* Ex. 3, Beverlin Dec., ¶ 32.

63.     Though plaintiff denies ever using her cell phone records at work, her cell phone records show that on July 1, between 8:00 and 5:00, plaintiff talked on her cell phone 30 times during work hours. Ms. Beverlin had "multiple discussions about [plaintiff] being on her cell phone a lot." *See* Ex. 17, Pl. Cell Phone Records (1367-69); Ex. 2, Beverlin Dep., 95:12-14.

64.     In addition to the cell phone use, Plaintiff admits: "There is no telling what I was doing if I wasn't at my desk."  See Ex. 1, Pl. Dep., 244:24-25.

Decision to Terminate

65.     On July 1, Ms. Beverlin made the decision to terminate plaintiff.  Ms. Beverlin sent an email to human resources with an attached excel spreadsheet documenting plaintiff's conduct.  She also sent a "Termination Review Form" to human resources seeking approval to terminate plaintiff.   Based on plaintiff's history, Ms. Beverlin believed that plaintiff was excessively using work time to talk on her cell phone and was engaging in other unprofessional conduct.  *See* Ex. 3, Beverlin Dec., ¶ 33; Ex. 3-O, Email and Excel Chart; Ex. 3-P, Termination Form; Ex. 2, Beverlin Dep., 91:19-92:24, 138:16-141:21.

66.     On July 5, 2016, Ms. Beverlin hoped to meet with plaintiff in the morning to terminate her.   However, before Ms. Beverlin arrived at work, plaintiff left work early, representing that she was leaving for FMLA reasons.  *See* Ex. 3, Beverlin Dec., ¶ 34.  Ex. 1, Pl. Dep., 169:22-24.

67.     Plaintiff alleged to the Kansas Commission on Human Rights that she took FMLA leave on July 5 "to take my son to the doctor" for asthma.  When asked to identify the "doctor" in interrogatories however, plaintiff admitted that she did not take her son to the doctor on July 5.  *Compare* Ex. 18, Pl. KHRC Charge (O'Neal 000136-137) *with* Ex. 19, Pl. Int. Responses to No. 9.

68.     Plaintiff has now testified that: "I don't remember that particular date or circumstances" for taking FMLA leave, nor could she remember what information she received to warrant her taking FMLA leave on July 5.  *See* Ex.  1, Pl. Dep., 169:16-170:5.

69.     On July 6, Ms. Beverlin terminated plaintiff because she had a history of dishonesty and unprofessionalism and Ms. Beverlin believed that plaintiff continued to be dishonest and unprofessional.  *See* Ex. 3, Beverlin Dec., ¶ 36; Ex. 2, Beverlin Dep., 19:23-21:2; 90:17-19.  Ms. Beverlin affirmatively denies terminating plaintiff due to FMLA use.  *See* Ex. 3, Beverlin Dec., ¶ 36.

### III.     QUESTIONS PRESENTED

1.     Can plaintiff make a *prima facie* case of unlawful discrimination, retaliation or interference?

2.     If plaintiff can establish a *prima facie* case on her claims, can she show that Centene's reasons terminating her were pretextual or otherwise unlawful?

### IV.     ARGUMENT

**A.     Summary Judgment Standard**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *See* FED. R. CIV. P. 56; *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir. 1993).

**B.     Disability Claim.**

In the Pretrial Order, plaintiff asserts that she "was discriminated against based on her disability or perceived disability" in violation of the American with Disabilities Act.  *See* Pretrial Order, doc. 37, p. 8.

**1.     Plaintiff cannot make a *prima facie* case of disability discrimination because she cannot show she is disabled.**

To establish a *prima facie* case of discrimination under the ADA (or ADAAA), plaintiff must present evidence that (1) she is disabled within the meaning of the ADA; (2) she is

qualified to perform the essential functions of her job with or without accommodations; and (3) she suffered an adverse employment action under circumstances which give rise to an inference of disability discrimination. *See Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014). To be disabled, a plaintiff must show either "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *See id.* (quoting 42 U.S.C. § 12102(1)).

To succeed on a claim under paragraph (A), the plaintiff "must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014). To show the impairment substantially limits a major life activity under subparagraph (3), the plaintiff must show "both that [her condition] caused the limitation and that the limitation was significant." *Russell v. Phillips 66*, 687 Fed. Appx. 748, 753 (10th Cir. 2017). Further, plaintiff must show that she is substantially limited in her ability to perform the major life activity "as compared to most people in the general population." *See Poulsen v. Humana Ins. Co.*, No. 14-2477-JAR, 2016 WL 1030038, at *9 (D. Kan. Mar. 10, 2016); 29 C.F.R. § 1630.2(j)(1)(ii).

In *Felkins*, the plaintiff suffered from "avascular necrosis," a bone disease that results in the "death of bone tissue" due to the lack of blood supply to the bone. 774 F.3d at 648. The plaintiff contended that she "could not walk normally and her major bodily functions of normal cell growth and blood circulation were also substantially impaired." *See id*. The plaintiff further contended that "her condition also substantially affected her lifting, walking, and standing." *See id*. Affirming summary judgment on plaintiff's ADA claim, the Tenth Circuit found that

plaintiff presented no evidence from a physician that detailed "the degree to which it affects her major life activities." *See id*.  Summary judgment was proper because the plaintiff failed to present medical evidence that avascular necrosis caused her claimed limitations. *See id*.

In this case, as a threshold matter, plaintiff cannot make a *prima facie* case of disability discrimination.  First, neither GERD nor "generalized anxiety disorder" are recognized impairments in the Tenth Circuit.  Second, even assuming that plaintiff has recognized impairments, there is no evidence, let alone admissible *medical evidence*, that her GERD or generalized anxiety disorder either (a) "causes" plaintiff any limitation, *or* (b) that her limitations are significant.  While plaintiff contends that her conditions "affect her ability to walk, sleep and breathe (see Pretrial Order, p. 3), she has not actually proffered any admissible medical evidence that her limitations were significant *or* caused by her alleged impairments. *See Russell v. Phillips 66*, 687 Fed. Appx. 748, 753 (10th Cir. 2017) (plaintiff must show "both that [her condition] caused the limitation and that the limitation was significant"); *Felkins*, 774 F.3d at 650 ("None of the medical evidence . . . details the degree to which it affects her major life activities").

Moreover, there is no evidence that plaintiff was substantially limited in any major life activity "as compared to most people in the general population." *See Poulsen v. Humana Ins. Co.*, No. 14-2477-JAR, 2016 WL 1030038, at *9 (D. Kan. Mar. 10, 2016); 29 C.F.R. § 1630.2(j)(1)(ii).  Plaintiff testified that she could "constantly walk" at times during work, and that she could perform her job without any accommodation. *See* SOF, ¶12.

Plaintiff also cannot also show that Centene "regarded her" as disabled.  Under the ADAAA, for a plaintiff to show that the employer regarded her as having an impairment, the plaintiff must show that (1) she has an actual or perceived impairment, (2) that impairment is

neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action. *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016). In this case, plaintiff does not recall informing anyone at Centene that she had "generalized anxiety disorder." *See* SOF, ¶ 10. Neither Ms. Beverlin (or any supervisor or manager) knew or perceived that plaintiff had a disability, knew what GERD was, or had any preconceived ideas about its nature, duration or severity, or even how it impacted plaintiff. *See Williams v. FedEx Corp.*, 849 F.3d 889, 898 (10th Cir. 2017) ("ADA liability cannot be based on actions taken when FedEx was unaware of Mr. William's disability"). Accordingly, plaintiff's disability claim fails.

>   **2.    Even if plaintiff could establish a *prima facie* case for disability discrimination, she cannot show that Centene's reasons for terminating her are pretextual.**

Even if the plaintiff is able to establish a *prima facie* case, the inquiry does not end then but the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *Carter v. Pathfinder Energy Services, Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011). Centene's burden is "exceedingly light." *See Williams v. FedEx Corp*, 849 F.3d 889, 900 (10th Cir. 2017). In this case, Centene has clearly met this burden not merely by "articulating" that it terminated plaintiff because it believed she was dishonest and unprofessional, but by providing overwhelming evidence of the same.

Plaintiff then bears the ultimate burden of showing that the defendant's proffered reason is in fact a pretext designed to mask discrimination. *Id.* A plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief. *See id.*

In this case, plaintiff cannot establish that Centene's reasons for terminating her are pretextual. Plaintiff had a long track record with multiple complaints made about her unprofessionalism and which questioned her honesty. *See* generally SOF, ¶¶ 14-69. Plaintiff admits that she made contradictory statements twice about an ill/deceased "aunt" to miss work, and she was caught excessively using work time to attend to personal needs such as discussing masturbation, drugs, and alcohol use. *See* SOF, ¶ 16, 37-43. Plaintiff admits that it was reasonable for management to believe she was dishonest. *See* SOF, ¶ 42. Ms. Beverlin believed that she was also dishonest about documenting notes in TruCare and that she disappeared from her desk excessively to talk on her cell phone during work hours. *See* SOF, ¶¶ 27, 62. Plaintiff even cavalierly admits: "There is no telling what I was doing if I wasn't at my desk." *See* SOF, ¶ 64. Because plaintiff cannot establish that Centene's reasons for terminating her are pretextual, her claim fails as a matter of law.

## C.      FMLA Interference Claim.

Plaintiff claims that Centene "unlawfully interfered with her rights under the FMLA." Pretrial Order, doc. 37, p. 9. To prevail on an FMLA interference claim, plaintiff must show that she was entitled to FMLA leave and that some action by the employer, such as termination, interfered with her right to take that leave. *See Grimes v. Fox & Hound Rest. Group*, 984 F. Supp.2d 1125, 1138 (D. Kan. 2013). To establish an FMLA interference claim, plaintiff bears the burden of demonstrating: (1) that she was entitled to FMLA leave, (2) that some adverse action was taken by the defendant that interfered with her right to take FMLA leave, and (3) the defendant's action was related to the exercise or attempted exercise of plaintiff's FMLA rights. *See id*. "Even if the employee shows these elements, the employer will still prevail if it shows that the employee would have been dismissed regardless of her request for, or taking of, FMLA leave." *Sabourin v. Univ. of Utah*, 676 F.3d 950, 958 (10th Cir. 2012).

1. **Plaintiff's FMLA interference claim fails because she cannot show that Centene's action to terminate her interfered with her right to take FMLA leave.**

It is undisputed that Centene's FMLA approval process was handled by a third-party administrator.  Centene neither approved/denied plaintiff taking FMLA leave.  *See* SOF, ¶ 8. Plaintiff has no evidence that Centene ever denied her taking FMLA leave, and she was not terminated before or during FMLA leave.  *Cf. Peterson v. Garmin Int'l*, 833 F. Supp.2d 1299, 1311 (D. Kan. 2011) (plaintiff showed interference when employer terminated her "the day before her FMLA leave was to commence, thus interfering with her exercise or attempted exercise of her FMLA rights").  In this case, plaintiff cannot even establish that she was entitled to take FMLA leave on July 5, 2016.  At her deposition, while she could not remember that "particular date or circumstances" for taking leave, she does admit that the reason she did offer for taking that time off – to take her son to the doctor – wasn't true.  *See* SOF, ¶ 67.  Because plaintiff cannot show that Centene interfered with her right take FMLA leave, her interference claim should be dismissed as a matter of law.

2. **Plaintiff's FMLA claim fails because she would have been terminated regardless of her taking FMLA leave.**

The FMLA is "not a strict liability statute."  *See Grimes v. Fox & Hound Rest. Group*, 984 F. Supp.2d 1125, 1138 (D. Kan. 2013).  An employee may be terminated as long as the employee would have been terminated regardless of the request for leave.  *See id*.  The employer has the burden of demonstrating that "an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave."  *See id*.

In this case, the uncontroverted evidence shows that Centene terminated plaintiff because it believed that she continued to be dishonest and unprofessional.  The reasons for her termination were longstanding, with Centene showing remarkable patience rather than

impulsively acting in response to utilization of FMLA.  Countless complaints were made that plaintiff was "on her personal cell excessively throughout the day," that there "are times she leaves her desk with[out] informing the IM group,"  that plaintiff "is not a team player and . . . she has made it an extremely hostile place to work;" and "I am tired of working really hard so [plaintiff] can slack off and talk all day."  *See* SOF, ¶¶ 5-7.  Plaintiff lied twice about an ill/deceased "aunt" to miss work.  *See* SOF, ¶¶ 16-17, 33, 42.  Plaintiff admitted that it was reasonable for management to believe that she was lying.  *See* SOF, ¶ 42.  She was caught continuing to attend to personal phone calls during work hours, even placing a medical provider on hold to discuss masturbation, drugs, and alcohol use.  *See* SOF, ¶¶ 32-37.  She was dishonest about documenting notes in TruCare.  *See* SOF, ¶ 27.  She was placed on a Last Chance Agreement.  Management and plaintiff's co-workers –  and confirmed by her cell phone records – all show that plaintiff continued to talk excessively on her cell phone during work hours immediately prior to her termination.  *See* SOF, ¶¶ 60, 63.  And as stated above, plaintiff admits: "There is no telling what I was doing if I wasn't at my desk."  *See* SOF, ¶ 64.  Because plaintiff would have been terminated regardless of her taking FMLA leave, summary judgment should be granted.  *See Sabourin v. Univ. of Utah*, 676 F.3d 950, 958 (10th Cir. 2012) (employee properly terminated while on FMLA leave for his disloyal and obstructive conduct).

**D.     Plaintiff's ADA and FMLA Retaliation Claims fail.**

ADA and FMLA retaliation claims are analyzed under the *McDonnell Douglas* framework.  *See Reinhardt v. Albuquerque Public Schs. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010); *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012).  To make a *prima facie* case for retaliation, plaintiff must show (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment

action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *See Reinhardt*, 595 F.3d at 1131.

If plaintiff establishes a *prima facie* case, the burden shifts to defendant to articulate a facially nonretaliatory reason for its actions. *See id*. If defendant articulates a legitimate nonretaliatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief." *See id.*

As discussed above, Centene terminated plaintiff because it believed she was unprofessional and dishonest. For the same reasons set forth above in sections VI. B.2 and C.2, she cannot show pretext. Because plaintiff has no evidence demonstrating pretext, summary judgment should be granted as a matter of law on her retaliations claims under the ADA and FMLA.

## V.  CONCLUSION

Plaintiff was terminated because of her ongoing dishonesty and unprofessionalism. No reasonable jury could render a verdict for her. Centene should be granted summary judgment on each of plaintiff's claims.

Respectfully Submitted,

ARMSTRONG TEASDALE LLP

BY:  *s/ Dione C. Greene*
     Robert A. Kaiser,         MO #31410
     7700 Forsyth Blvd., Suite 1800
     St. Louis, Missouri 63105
     314.621.5070
     314.621.5065 (facsimile)
     rkaiser@armstrongteasdale.com

     Dione C. Greene         KS #23010
     2345 Grand Blvd., Suite 1500
     Kansas City, Missouri   64108
     816.221.3420
     816.221.0786 (facsimile)
     dgreene@armstrongteasdale.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

     This is to certify that on April 23, 2018, a true and accurate copy of the above and foregoing was e-filed with the Court using the CM/ECF system which sent notification to all parties entitled to service.

     *s/ Dione C. Greene*