# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MONIQUE O'NEAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-CV-02172-JAR-KGS |
| | ) | |
| CENTENE MANAGEMENT | ) | |
| COMPANY, LLC D/B/A SUNFLOWER | ) | |
| HEALTH PLAN, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SUBMITTED BY:
M. Shaun Stallworth
HOLMAN SCHIAVONE, LLC
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Facsimile: 816.283.8739
Email: sstallworth@hslawllc.com

ATTORNEY FOR PLAINTIFF

### TABLE OF CONTENTS

TABLE OF CONTENTS...……………………………………………………………..I

EXHIBITS……………………………………………………………………………....III

TABLE OF AUTHORITIES...…………....……………………………………………...IV

INTRODUCTION AND FACTUAL BACKGROUND…………………………………….1

DEFENDANT'S STATEMENT OF MATERIAL FACTS………..…………….…………..…2

PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS……..…………….....27

ARGUMENT and AUTHORITIES………………………………………………...45

I.      SUMMARY JUDGMENT STANDARD……………………...…………………45

II.     SUBSTANTIAL EVIDENCE SUPPORTS PLAINTIFF'S CLAIMS OF INTERFERENCE WITH HER FMLA RIGHTS..…………………………………46

        A.     Defendant Interfered with Plaintiff's Right to take FMLA leave…………...47

        B.     Defendant attempted to restrain, and ultimately denied, Plaintiff's right to take FMLA leave…………………………………………………………48

III.    SUBSTANTIAL EVIDENCE SUPPORTS PLAINTIFF'S CLAIMS OF DISCRIMINATORY TREATMENT………………………………..………....…50

        A.     Under the ADA, Plaintiff was disabled…..………………………………51

             1.     Actual Disability……………………………………………...51

             2.     Perceived Disability……………………………………………51

        B.     Plaintiff was qualified to perform the essential functions of her job………..52

        C.     Plaintiff was discriminated against because of her disability…………………53

IV.    SUBSTANTIAL EVIDENCE SUPPORTS PLAINTIFF'S CLAIMS OF RETALIATION UNDER THE FMLA AND ADA………………………………55

        A.     Due to Plaintiff exercising her rights under the law, Defendant engaged in retaliatory and hostile behavior……………………………………………55

       1.       After taking approved FMLA leave, Plaintiff was disciplined by Centene in 2015……………………………………………………56

       2.       Plaintiff complained of discrimination on multiple occasions in June 2015……………………………………………………………..57

       3.       Plaintiff complained of discriminatory acts by her supervisor Bobbie Harris………………………………………………....…58

       4.       Following Plaintiff's request for accommodations, and subsequent use of approved medical leave, Plaintiff was disciplined by Centene in 2016……………………………………………………59

    B.      DEFENDANT'S STATED REASONS FOR ITS DISCIPLINARY ACTIONS AGAINST PLAINTIFF ARE REALLY PRETEXT FOR DISCRIMINATION…………………………………………………...60

       1.       The disciplinary actions that form the basis for Plaintiff's Last Chance Agreement are without merit…………………………………...61

       2.       Defendant's ultimate reasoning for Plaintiff's termination does not hold water when considering the inconsistent nature that it applies discipline……………………………………………………..62

V.      CONCLUSION……………………………………………………...66

II

**EXHIBITS**

1.     O'Neal Deposition
2.     Mak Deposition
3.     Beverlin Deposition
4.     Harris Deposition
5.     EEO Policy
6.     Harassment Policy
7.     Telephone Policy
8.     Performance and Compensation Policy
9.     Yearly Salary
10.    FMLA Certification of Health Care Provider
11.    2016 FMLA Report
12.    Harris Investigation Notes
13.    O'Neal's June 15, 2015 Email Complaint
14.    June 23, 2015 Email Complaint
15.    June 23, 2016 Email to Beverlin
16.    July 5, 2016 Thomas Email
17.    O'Neal's July 5, 2016 Email
18.    O'Neal's Termination Letter
19.    Termination Review Form
20.    June 29, 2016 Harris Email
21.    Supervisor's Log of O'Neal's 2016 FMLA
22.    May-June 2016 Daily Team Chat
23.    FMLA Policy
24.    June 14, 2016 Screen Shot
25.    June 14, 2016 Harris Email
26.    October 20, 2016 Harris Email
27.    Hadi Last Chance Agreement
28.    2015 (Leave) Disciplinary Log
29.    2015 (Leave) Entitlement Report
30.    June 8, 2015 Mak Email
31.    Monique O'Neal Declaration

## TABLE OF AUTHORITIES

Cases                                                                    Page(s)

*Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014)……………………………………45

*Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)……………………………45

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)………………………………………………………………………………45

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).45, 46

*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006)…….46, 50, 55

*Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)…………48, 49, 56

*Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1227 (10th Cir. 2012)………………………….........49

*Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1253 (10th Cir. 2001)………………50

*McKenzie v. Dovala*, 242 F.3d 967, 969 (10th Cir. 2001)………………………………………50

*Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014)…………………………………51

*Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011)…………………51

*Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1158 (10th Cir.2002)…………………………………51

*Adair v. City of Muskogee*, 823 F.3d 1297, 1305 (10th Cir. 2016)………………………………52

*Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016)………………………………………52

*Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015)……………………52

*Rascon v. U.S. West Communications, Inc.* 143 F.3d 1324, 1333–34 (10th Cir. 1998)…………53

*Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996)………………………53

*Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002)……………54, 56

*E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1167 (10th Cir. 2006)……………………..…………54

*Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1207–08 (10th Cir. 2007)……...…………..…55

*Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014)………………………..……55

*Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)………………………………55

*Williams v. W.D. Sports, N.M., Inc*. 497 F. 3d 1079, 1091 (10th Cir. 2007)………..…………….59

*Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1227 (10th Cir. 2000)……..…………..……59

*Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 91 (2d Cir.1996)…………………………59

*Monroe v. City of Lawrence*, 2014 WL 289463 (D.Kan. 2014)………………………………………60

*Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008)…………………………60

*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)………………………………………60

*Olson v. General Elec. Astrospace*, 101 F.3d 947, 951–52 (3rd Cir .1996)………………………60

*E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038-1039 (10th Cir. 2011)………………..…60

*Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004)………………………………………60

*Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000)……………………61

*Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007)………………63

*Mohammed v. Callaway*, 698 F.2d 395, 401 (10th Cir. 1983)…..…………………………………63

*Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003)………….65

IV

Statutes and Federal Regulations                                                    Page(s)

29 U.S.C. § 2601, *et seq.*..…………………………………………………………1, 46
42 U.S.C. § 12112(a), *et seq.*..…………………………………………………………1, 50
Fed.R.Civ.P. 56(c)..…………………………………………………………………45
29 U.S.C. § 2612(a)..…………………………………………………………………46
29 C.F.R. §§ 825.200 and 202..………………………………………………………46
29 U.S.C. § 2615(a)(1)..………………………………………………………………46
42 U.S.C. § 12102(1)..…………………………………………………………………51
29 C.F.R. § 1630.2(j)(4)(i)..……………………………………………………………51
42 U.S.C. § 12102(3)(A)..………………………………………………………………52
42 U.S.C. § 12102(3)(B)..………………………………………………………………52
29 C.F.R. § 1630.2(n)(1) (2015)..………………………………………………………53
29 U.S.C. § 2615(a)(2)..…………………………………………………………………55
29 C.F.R. § 825.220(c)..…………………………………………………………………55

COMES NOW Plaintiff, by and through her undersigned counsel, and hereby responds in Opposition to Defendant's Motion for Summary Judgment ("MSJ"). In support thereof, Plaintiff states the following:

**INTRODUCTION AND FACTUAL BACKGROUND**

Plaintiff Monique O'Neal brings this suit against Defendant Centene Management Company, LLC D/B/A Sunflower Health Plan ("Centene" or "Defendant") for unlawfully interfering, and ultimately terminating, her employment in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.,* as well as the Americans with Disabilities Act, 42 U.S.C. § 12112(a), *et seq.* Though Defendant attempts to "muddy the waters" by providing self-serving declarations and newly-minted complaints against Plaintiff, the facts will show summary judgment is unwarranted and should be denied.

Plaintiff has provided sufficient evidence to establish her claim for: (1) FMLA violations, wherein Defendant interfered, disciplined, then terminated Plaintiff for exercising her FMLA rights, (2) disparate treatment due to her disability and (3) retaliation against Plaintiff following multiple complaints of unfair treatment by her supervisors and the Human Resources Manager. Though Defendant will argue that its decision to terminate Plaintiff's employment was due to Plaintiff's "unprofessional behavior and dishonesty," the facts will show that neither Defendant's customers, or employees, made contemporaneous complaints against Plaintiff and there is no evidence that Plaintiff was not doing her job. Rather, with respect to the primary basis for Plaintiff's termination—alleged failure to document her activity in the group instant message portal—the evidence is clear that similarly situated individuals were not held to the same standard as Plaintiff. Quite the opposite, Plaintiff's co-workers got a "pass," despite similar or worse behavior than Plaintiff and despite Plaintiff's complaints of unfair scrutiny by her supervisors.

In its MSJ, Defendant improperly ask this Court to step into the shoes of a jury and weigh, then decide the evidence. Yet, genuine issues of material fact exist in this case. Consequently, it is well-settled that questions of material fact and determinations of reasonableness are not questions of law but instead are for a jury to decide. Indeed, there are genuine disputes as to the claims alleged by Plaintiff, and sufficient evidence supporting her claims that could allow a reasonable jury to find in her favor. As such, and based on the following arguments, Defendant's MSJ should be denied.

## DEFENDANT'S STATEMENT OF MATERIAL FACTS

1. Centene provides healthcare related services to patients and medical providers. *See, e.g*, Ex. 1, Pl. Dep., 15:23-16:13; Ex. 2, Beverlin Dep., 9:24-11:7.

**Response: Undisputed.**

2. In June 2013, Centene hired plaintiff as a referral specialist. *See* Pretrial Order, doc. 37, p. 2.

**Response: Undisputed. Plaintiff further states that Plaintiff also corrected off-air authorizations, waiver authorizations and submitted denial letters. O'Neal Depo., Exh. 1, at p. 16:10-25, 37:6-39:12.**

3. The job duties of referral specialists include communicating by telephone with medical providers (e.g., doctors/nurses) who are requesting authorization to provide specific and often time sensitive medical services to a patient. The medical provider gives the referral specialist information such as the patient name, diagnosis and the anticipated medical procedure for which the authorization is sought. The referral specialist then "builds the authorization" by inputting the information into a data management software system called "TruCare," and then sends the authorization to a nurse/doctor at Centene for approval. *See* Ex. 1, Pl. Dep., 16:23-21:18; Ex. 2, Beverlin Dep., 14:9-17.

**Response: Undisputed.**

4.      Plaintiff's work hours were from 8:00 a.m. to 5:00 p.m.  She was entitled to an hour lunch break and two 15 minute breaks each day.  When she was not on a break, she was expected to work as efficiently as possible.  *See* Ex. 1, Pl. Dep., 44:6-19, 46:1-47:6, 59:23-60:1.

**Response: Undisputed.**

Complaints about Plaintiff's Conduct Prior to FMLA Leave

5.      Prior to plaintiff taking leave under the Family Medical Leave Act, complaints were made that she was "on her personal cell excessively throughout the day."  It was reported that there "are times she leaves her desk with[out] informing the IM group that she is on lunch or break."  *See* Ex. 3-A, Monique Performance Discussions (Def. 0468), attached to Beverlin Declaration; Ex. 4, Thomas Dec., ¶¶ 5-8.

**Response: Disputed. Centene has a group message portal, known as the "Daily Team Chat," where it allegedly requires employees to indicate when they leave and return to their desk; e.g., for restroom or lunch breaks. Mak Corp. Rep. Depo., Exh. 2, at p. 101:22-102:11; O'Neal Depo., Exh. 1, at pp. 30:22-31:15. The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. No other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23, 231:10-233:2; Beverlin Depo, Exh. 2, at p. 28:23-29:5. Further, after reviewing one (1) day of employees' activity in the Daily Team Chat (June 14, 2016), there were numerous instances of other employees failing to log their activity in the Daily Team Chat, taking extended lunch breaks, extended 15-minute breaks or extended periods away from their desk. *See* June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25.**

6.      Instant message (IM), also called "team chat," was used by referral specialists to communicate with others if they were available to take calls.  *See* Ex. 9, Meeting Minutes (Def. 0106-0113); Ex. 1, Pl. Dep., 30:3-21.

**Response: Disputed. Centene has a group message portal, known as the "Daily Team Chat," where it allegedly requires employees to indicate when they leave and return to their desk; e.g., for restroom or lunch breaks. Mak Corp. Rep. Depo., Exh. 2, at p. 101:22-102:11; O'Neal Depo., Exh. 1, at pp. 30:22-31:15. The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak**

3

**Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. No other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23, 231:10-233:2; Beverlin Depo, Exh. 2, at p. 28:23-29:5. Further, after reviewing one (1) day of employees' activity in the Daily Team Chat (June 14, 2016), there were numerous instances of other employees failing to log their activity in the Daily Team Chat, taking extended lunch breaks, extended 15-minute breaks or extended periods away from their desk.** *See* **June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25.**

7.    Plaintiff's co-workers complained about "how they feel it's unfair and how the environment is hostile because every time they say something to [plaintiff] . . . it's confrontational;" that plaintiff "is not a team player and . . . she has made it an extremely hostile place to work;" and "I am tired of working really hard so [plaintiff] can slack off and talk all day. I want to transfer to a different department.  I don't feel comfortable working around [plaintiff]." *See* Ex. 3-B, attached to Beverlin Dec. (Def. 0222-0223); Ex. 4, Thomas Dec., ¶¶ 5-8.

**Response: Disputed. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. At no point in Plaintiff's 2015 Performance review, did it indicate she displayed a history of untruthfulness or was disruptive in any manner. Plaintiff's Yearly Compensation Report, Ex. 9, at pp. 2-3; Mak Corp. Rep. Depo., Exh. 2, at pp. 121:12-122:13. There are no complaints by employees of disruptive or inappropriate behavior by Plaintiff. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17.**

<u>FMLA Use</u>

8.    Centene's FMLA application, approval, denial, and usage process was handled by a third-party administrator, Liberty Mutual.  Centene managers and supervisors had no involvement in the FMLA process other than receiving notice when an employee took leave.  *See* Ex. 5, Mak Dep., 78:4-79:19.

**Response: Undisputed, in part. Undisputed, to the extent that Centene's FMLA application, approval, denial, and usage process was handled by a third-party administrator, Liberty Mutual. Disputed, to the extent that Centene managers and supervisors were involved in the FMLA process by disciplining Plaintiff for exercising her FMLA rights. Plaintiff's FMLA June 23, FMLA Complaint, Exh. 14.**

4

9.     In July 2014, plaintiff began taking intermittent FMLA leave for "generalized anxiety disorder," "gastroesophageal reflux disease" (GERD) and her son's asthma. *See* Ex. 6, Pl. FMLA Forms (O'Neal 000030-32); Ex. 1, Pl. Dep., 138:10-13; 218:7-8.

**Response: Undisputed.**

10.     Plaintiff does not recall ever communicating to any manager or supervisor that she had anxiety disorder. *See* Ex. 1, Pl. Dep., 212:12-16.

**Response: Undisputed, in part. Undisputed, to the extent that Plaintiff does not recall communicating to any manager or supervisor that she had anxiety disorder. Disputed, to the extent that this statement implies that it was necessary for Plaintiff to communicate her need for FMLA to a manager or supervisor.**

11.     Terie Beverlin (manager) did not know what GERD was or how it affected plaintiff. Ms. Beverlin did not know or perceive that plaintiff had any disability. *See* Ex. 3, Beverlin Dec., ¶ 8.

**Response: Disputed. Plaintiff informed Ms. Beverlin that she was diagnosed with GERD.** *See* **O'Neal Depo., Exh. 1, at p. 192:14-193:7.**

12.     According to plaintiff, GERD "causes acid reflux, it causes digestive issues within your stomach. It causes you an issue with eating and keeping food down." But she was able to perform her job duties despite GERD, "constantly walk," and she never asked for an accommodation. *See* Ex. 1, Pl. Dep., 192:5-16; 214:2, 217:22-218:1.

**Response: Disputed, in part. Plaintiff stated that: GERD causes acid Reflux digestive issues in the stomach, causing severe pain and effecting Plaintiff's ability to eat and walk. O'Neal Depo., Exh. 1, at p. 192:3-13, 213:2-9. With respect to anxiety disorder, Plaintiff experienced breathing issues, which increased her heart rate and caused numbness in her limbs. O'Neal Depo., Exh. 1, at p. 211:6-212:2. Despite her disability, Plaintiff could still perform the essential functions of her job duties. O'Neal Depo., Exh. 1, at p. 192:8-16.**

13.     Whenever plaintiff experienced general anxiety or GERD at work, she left for the entire day. According to plaintiff: "Anytime a disability restricted me from doing anything within my job, I would go home for the day." *See* Ex. 1, Pl. Dep., 214:18-20; 217:14-17.

**Response: Undisputed.**

<u>Unprofessionalism and Dishonesty</u>

14.     In July 2014, a nurse complained about the "behavior of employee Monique O'Neal and the way she conducts the daily activities," that she "doesn't seem interested in being a team player" and "becomes argumentative during any discussion of the process." In August 2014, plaintiff was counsel for "argumentative behavior." *See* Beverlin Dec., Ex. 3-C, (Def. 0466; 0467).

**Response: Disputed. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. At no point in Plaintiff's 2015 Performance review, did it indicate she displayed a "history" of untruthfulness or was disruptive in any manner. Plaintiff's Yearly Compensation Report, Ex. 9, at pp. 2-3; Mak Corp. Rep. Depo., Exh. 2, at pp. 121:12-122:13. There are no complaints by employees of disruptive or inappropriate behavior by Plaintiff. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17.**

15.     On June 8, 2015, plaintiff requested to leave work early, representing that her "aunt" was in the hospital. Plaintiff was allowed to leave work early to visit her "aunt." *See* Ex. 7, Harris Dep., 55:21-56:10; Ex. 3-D Beverlin Dec., (first aunt email (Def. 0284-0285)).

**Response: Undisputed, but an immaterial fact with respect to whether Defendant interfered with Plaintiff's FMLA rights.**

16.     The person allegedly hospitalized was not plaintiff's real aunt. The person hospitalized was really the "aunt" of a "gentleman who got killed" who fathered three children with plaintiff's sister. *See* Ex. 1, Pl. Dep., 254:9-21.

**Response: Undisputed, but an immaterial fact with respect to whether Defendant interfered with Plaintiff's FMLA rights.**

17.     Plaintiff's sister, Gregshima O'Neal, told supervisor Ms. Bobbie Harris, that it was her (Gregshima's) mother-in-law that is in the hospital and "not their aunt." Ms. Harris believed

that plaintiff was dishonest and reported her conduct to Scott Mak (human resources manager).[1]

*See* Ex. 7, Harris Dep., 55:21-56:10; Ex. 3-D, First Aunt Email (Def. 0284-0285), attached to

Beverlin Declaration.

**Response: Disputed, to the extent this alleged "material" fact suggest Plaintiff is
dishonest. Gregshima O'Neal, in a contemporaneous statement, indicated that Monique
considers her (Gregshima's) mother-in-law like an aunt.** *See* **Exh. 3-D, First Aunt Email
(Def. 0284-0285).**

18.     On or about June 10, 2015, Mr. Mak met with plaintiff to discuss her

unprofessionalism and because she "made some statements that just aren't true" regarding the

"aunt." He told plaintiff to be honest, professional and at her desk to focus on her job.  He also

informed plaintiff that her leaving work early on June 8 would count against her attendance.  *See*

Ex. 20, Mak Dec., ¶ 8; Ex. 20.1, Mak Notes (Def. 0117).

**Response: Disputed, to the extent this alleged "material" fact suggest Plaintiff is
dishonest. Gregshima O'Neal, in a contemporaneous statement, indicated that Monique
considers her (Gregshima's) mother-in-law like an aunt. See Exh. 3-D, First Aunt Email
(Def. 0284-0285). Further, Mr. Mak informed Plaintiff that she would be given a
disciplinary action for attendance for leaving early, even though Plaintiff had approved
Intermittent FMLA leave for June 8.** *See* **Exh. 30, 2015 Leave Entitlement Report.**

19.     On June 11, Mr. Mak communicated with management about giving plaintiff

opportunities "to correct her demeanor" and to "permanently change her behavior" going forward.

On June 12, 2015, plaintiff was issued "Written Disciplinary Action."   *See* Exs. 3-E and 3-F,

attached to Beverlin Dec., Written Discipl. Action, (Def. 0168, 0215).

**Response: Disputed. Plaintiff was being given disciplinary actions for attendance
violations while she was on approved FMLA leave. Plaintiff's June 15, 2015 FMLA
Complaint, Exh. 13. Notably, Plaintiff was still given a one (1) point disciplinary action on
June 16, 2015 and a one (1) point disciplinary action on June 17, 2015, respectively, even**

---

[1] Apparently, this first "aunt" issue was not the first time plaintiff was dishonest with Centene.  Plaintiff represented
in her employment application with Centene that she voluntarily left her prior employer, Truman Medical Center,
for "personal family issues."  That representation was false.  Plaintiff was actually terminated by Truman Medical
Center.  *See* Ex. 1, Pl. Dep., 258:20-260:15.
**Response: Disputed. Plaintiff sued TMC for sexual harassment. The basis for Plaintiff's termination was resolved
in a confidential settlement. O'Neal Corp. Rep. Depo., Exh. 1, at pp. 258:20-262:22.**

**though Plaintiff was on approved FMLA leave from Liberty Mutual.** *See* **Exh. 28, 2015 Attendance Disciplinary Log; Exh. 29, 2015 Leave Entitlement Report.**

20.     In September 2015, Terie Beverlin became plaintiff's manager.  Upon becoming manager, Pattie Counter (plaintiff's prior manager) and Ms. Harris informed Ms. Beverlin about plaintiff's past dishonesty, past unprofessionalism and history of excessive cell phone use.  *See* Ex. 2, Beverlin Dep., 20:15-22, 60:19-22, 97:1-3; Ex. 3, Beverlin Dec., ¶ 5.

**Response: Disputed. Ms. Beverlin has no contemporaneous documents to prove that Ms. Counter ever informed her of Plaintiff's alleged history of dishonesty, professionalism or excessive cell phone use. Beverlin Depo., Exh. 3, at pp. 60:17-61:2.**

21.     On January 4, 2016, Ms. Beverlin was informed that plaintiff called in that morning, representing that she was taking FMLA for her son, and plaintiff stated she would come into work later that day.  Plaintiff never came to work.  Ms. Beverlin believed that plaintiff was dishonest by representing she would come into work and reported her conduct to HR.  *See* Ex. 3, Beverlin Dec., ¶ 10; Ex. 3-G, Beverlin Email (Def. 0694), attached to Beverlin Dec.

**Response: Disputed. Plaintiff testified that when FMLA was needed for her medical issues, she would typically go home for the day. O'Neal Depo., Exh. 1, at p. 214:18-20.**

<u>Department Expectations Meeting</u>

22.     On March 22, 2016, Terie Beverlin and the human resources department held a meeting with the referral specialist group, which included plaintiff.  *See* Ex. 1, Pl. Dep., 128:8-16.

**Response: Undisputed.**

23.     The referral specialists were told: "Effective immediately there will be no ear buds/cell phone allowed."  *See* Ex. 9, Meeting Minutes (Def. 0107).

**Response: Undisputed.**

24.     Referral specialists, including plaintiff, were also instructed at this meeting and subsequent meetings to (1) take lunches (one hour) and breaks (15 minutes) on time and return on time, (2) accurately document notes of conversations with providers in Centene's medical data

management system, TruCare, (3) and to enter time in the team chat when you leave and return to your desk because you "can't just get up and leave your desk." *See* Ex. 9, Meeting Minutes (Def. 0106-0113); Ex. 1, Pl. Dep., 80:13-16, 83:4-11, 84:20-85:16, 87:9-21.

**Response: Disputed, to the extent this fact suggests the instructions provided at the meeting were enforced. Rather, multiple employees did not follow the lunch/break policy or log their activity in the Daily Team Chat. June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25. Further, no other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23, 231:10-233:2; Beverlin Depo, Exh. 2, at p. 28:23-29:5.**

25.     On March 28, 2016, Ms. Harris learned from productivity reports that plaintiff was not documenting any notes of conversations with medical providers as she was instructed in the March 22 meeting.  Ms. Harris sent plaintiff an email stating there were "no notes entered by you" on the authorizations plaintiff built.  While plaintiff acknowledged that her "productivity is low," she represented that she did in fact enter notes in TruCare.  *See* Ex. 3-H, Harris Emails (Def. 0698, 707-708), attached to Beverlin Declaration.

**Response: Disputed. Plaintiff testified that she was originally trained to not put notes in the Trucare system. However, after the March 22, 2015 meeting, Plaintiff indicated that she was unsure whether notes needed to be provided for every waiver authorization and requested further clarification from Ms. Beverlin. O'Neal Depo., Exh. 1, at pp. 252:9-253:16.**

26.     Ms. Harris randomly selected three authorizations that plaintiff built.  She then emailed plaintiff: "I randomly picked 3 members from one of our spreadsheets and there are no notes/documentation entered by you for any of the 3 members below on any of their authorizations."  *See* Ex. 3-H, Harris Emails (Def. 0698, 707-708).

**Response: Disputed. Plaintiff testified that she was originally trained to not put notes in the Trucare system. However, after the March 22, 2015 meeting, Plaintiff indicated that she was unsure whether notes needed to be provided for every waiver authorization and requested further clarification from Ms. Beverlin. O'Neal Depo., Exh. 1, at pp. 252:9-253:16.**

27.     Ms. Harris believed that plaintiff was dishonest about documenting notes and reported her conduct to Ms. Beverlin.  *See* Ex. 7, Harris Dep., 54:12-55:19.

**Response: Disputed. Plaintiff testified that she was originally trained to not put notes in the Trucare system. However, after the March 22, 2015 meeting, Plaintiff indicated that she was unsure whether notes needed to be provided for every waiver authorization and requested further clarification from Ms. Beverlin. O'Neal Depo., Exh. 1, at pp. 252:9-253:16.**

28.     On or about April 22, 2016, plaintiff's co-workers, including Nicole Richardson, complained to Bobbie Harris that plaintiff was argumentative, unprofessional and offensive.  Ms. Harris reported Ms. Richardson's complaint to Ms. Beverlin.  Ms. Beverlin believed that plaintiff was unprofessional and disrupting the workplace.  *See* Ex. 8, Harris Dec., ¶ 4; Ex. 10, Nicole Richardson Dec., ¶ 9; *Cf.* Ex. 11, Hicks Dec., ¶ 13; Ex. 12 Johnson Dec., ¶ 15.

**Response: Disputed. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. At no point in Plaintiff's 2015 Performance review, did it indicate she displayed a "history" of untruthfulness or was disruptive in any manner. Plaintiff's Yearly Compensation Report, Ex. 9, at pp. 2-3; Mak Corp. Rep. Depo., Exh. 2, at pp. 121:12-122:13. There are no complaints by employees of disruptive or inappropriate behavior by Plaintiff. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17.**

<u>Personal Phone Calls and Second "Aunt" Issue</u>

29.     On May 18, 2016, plaintiff informed Ms. Harris that "my Aunt passed away yesterday from a short battle of cancer."  Plaintiff requested and was granted paid bereavement leave.  *See* Ex. 3-I, Email on Aunt (Dev. 0550) attached to Beverlin Dec.; Ex. 1, Pl. Dep., 93:10-24.

**Response: Undisputed.**

30.     Plaintiff did not attend the funeral.  Instead, she went to Las Vegas.  Ex. 1, Pl. Dep., 94:9-13.

**Response: Disputed, to the extent this paragraph implies Plaintiff lied about attending the funeral and instead went to Vegas. Under the bereavement policy, an**

10

employee is not required to attend the funeral; rather, bereavement leave may be used to simply plan funeral services and spend time with family. Mak Depo., Exh. 2, at p. 70:18-72:6.

31.    On May 24, while plaintiff was in Las Vegas, Ms. Beverlin attempted to resolve an issue with a medical provider regarding an authorization that plaintiff previously worked on.  Ms. Beverlin listened randomly to plaintiff's phone calls recorded on the work phone to locate the call and resolve the issue.  *See* Ex. 3-J, Beverlin Notes (Def. 0645-46); Beverlin Dep., 75:7-77:10.

**Response: Disputed, to the extent that Ms. Beverlin stated that she was searching to resolve an issue with a medical provider regarding an authorization by Plaintiff. Rather, Ms. Beverlin stated she was unsure whether the issue was a result of Plaintiff's actions. Beverlin Depo., Exh. 3, at pp. 77:21-78:4.**

32.    When listening to the calls, Ms. Beverlin "started coming across all the personal phone calls . . . the first three or four calls that [Ms. Beverlin] clicked on to listen to were personal phone calls" by plaintiff.  *See* Ex. 2, Beverlin Dep., 75:7-76:6.  Ex3-J, Beverlin Notes (Def. 0645-46).

**Response: Undisputed, but an immaterial fact. With respect to telephone usage, Centene's policy allows employees to use the business telephone for personal phone calls. Telephone Usage Policy, Exh. 7; Harris Depo., Exh. 4, at p. 28:3-9. There are no complaints by employees of disruptive or inappropriate behavior by Plaintiff, while using the telephone. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17. No customers or medical providers have ever complained that Plaintiff behaved in an unprofessional manner over the phone. Beverlin Depo., Exh. 2, at p. 97:12-18, 100:14-101:1.**

33.    In one phone call, plaintiff stated that the person for whom she took bereavement leave was not her aunt.  *See* Ex. 1, Pl. Dep., 112:23-113:2; Ex. 2, Beverlin Dep., 23:15-24:6.

**Response: Undisputed, but an immaterial fact. Regarding bereavement leave, Plaintiff scheduled to take PTO days for her birthday in late May 2016; specifically, Plaintiff scheduled Friday, May 27, 2016 and Monday, May 30, 2016 for a trip to Las Vegas. O'Neal Depo., Exh. 1, at p. 92:4-93:1; O'Neal Dec., Exh. 31, at ¶ 5. The trip was planned several months in advance. O'Neal Depo., Exh. 1, at p. 107:24-108:10; O'Neal Dec., Exh. 31, at ¶ 6. On May 17, 2016, several days before she left for vacation, Rhonda Miller—a woman Plaintiff had known all her life—passed away. O'Neal Depo., Exh. 1, at pp. 95:1-3; O'Neal Dec., Exh. 31, at ¶ 7. Though Centene recorded a phone conversation on Monday, May 17, 2016, wherein Plaintiff indicated that Rhonda Miller was not her aunt,**

that evening Plaintiff discovered that Rhonda Miller was her father's sister—a previously
unknown fact. O'Neal Depo., Exh. 1, at p. 96:18-25, 107:3-23. O'Neal Dec., Exh. 31, at ¶¶ 8-
9. The following day, Wednesday, May 18, 2016, Plaintiff requested bereavement to grieve
the loss of her aunt with family and friends. O'Neal Dec., Exh. 31, at ¶ 10.

34.     On some of the phone calls, Ms. Beverlin heard plaintiff "speaking about sexual

encounters, masturbation, cuss words, [and] talking about drugs" in general.  *See* Ex. 2, Beverlin

Dep., 139:9-10.

**Response: Disputed. Plaintiff never engaged in making any statement about sexual
encounters, masturbation, cuss words, and/or talking about drugs. O'Neal depo., Exh. 1, at
p. 116:25-119:15, 121:3-11.**

35.     Some health care providers wait to provide medical services to a patient until the

authorization process is complete.  *See* Ex. 1, Pl. Dep., 21:9-22.

**Response: Undisputed.**

36.     Plaintiff placed one medical provider seeking a medical authorization on hold for

an extended period of time while plaintiff took a personal phone call on the company phone.  *See*

Ex. 3, Beverlin Dec., ¶ 21.

**Response: Disputed. On occasion, Plaintiff would be required to place a provider on
hold for a variety of reasons including, but not limited to: the information provided to
Sunflower is not accepted into the system, there must be a determination of whether an
authorization is necessary and it may be necessary to build the authorization. O'Neal
Depo., Exh. 1, at pp. 48:12-49:3.**

37.     Ms. Beverlin believed that plaintiff was grossly unprofessional because of the

"conversations [plaintiff] was having during these personal phone calls on the business phone, the

nature of them, speaking about masturbation, alcohol consumption that could be overheard by her

coworkers potentially, putting providers on hold, just unprofessional in general, putting a provider

on hold to have a personal phone call."  *See* Ex. 2, Beverlin Dep., 96:14-20.

**Response: Disputed. Plaintiff never engaged in making any statement about sexual
encounters, masturbation, cuss words, and/or talking about drugs. O'Neal depo., Exh. 1, at
p. 116:25-119:15, 121:3-11. There are no complaints by employees of disruptive or**

inappropriate behavior by Plaintiff, while using the telephone. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17. Further, no customers or medical providers have ever complained that Plaintiff behaved in an unprofessional manner over the phone. Beverlin Depo., Exh. 2, at p. 97:12-18, 100:14-101:1.

38.     Ms. Beverlin also believed that plaintiff was dishonest again by misrepresenting that she took funeral leave for an aunt.  Ms. Beverlin believed that plaintiff now lied twice about having an ill or deceased "aunt" in order to miss work.  *See* Ex. 3, Beverlin Dec., ¶ 23.

**Response: Disputed. Regarding bereavement leave, Plaintiff scheduled to take PTO days for her birthday in late May 2016; specifically, Plaintiff scheduled Friday, May 27, 2016 and Monday, May 30, 2016 for a trip to Las Vegas. O'Neal Depo., Exh. 1, at p. 92:4-93:1; O'Neal Dec., Exh. 31, at ¶ 5. The trip was planned several months in advance. O'Neal Depo., Exh. 1, at p. 107:24-108:10; O'Neal Dec., Exh. 31, at ¶ 6. On May 17, 2016, several days before she left for vacation, Rhonda Miller—a woman Plaintiff had known all her life—passed away. O'Neal Depo., Exh. 1, at pp. 95:1-3; O'Neal Dec., Exh. 31, at ¶ 7. Though Centene recorded a phone conversation on Monday, May 17, 2016, wherein Plaintiff indicated that Rhonda Miller was not her aunt, that evening Plaintiff discovered that Rhonda Miller was her father's sister—a previously unknown fact. O'Neal Depo., Exh. 1, at p. 96:18-25, 107:3-23. O'Neal Dec., Exh. 31, at ¶¶ 8-9. The following day, Wednesday, May 18, 2016, Plaintiff requested bereavement to grieve the loss of her aunt with family and friends. O'Neal Dec., Exh. 31, at ¶ 10.**

39.     Ms. Beverlin believed that plaintiff's conduct warranted immediate termination. However, she accepted Human Resources' advice to instead put plaintiff on a "Last Chance Agreement." Ex. 15, Last Chance Agreement; Ex. 3, Beverlin Dec., ¶ 24.

**Response: Disputed. Regarding bereavement leave, Plaintiff scheduled to take PTO days for her birthday in late May 2016; specifically, Plaintiff scheduled Friday, May 27, 2016 and Monday, May 30, 2016 for a trip to Las Vegas. O'Neal Depo., Exh. 1, at p. 92:4-93:1; O'Neal Dec., Exh. 31, at ¶ 5. The trip was planned several months in advance. O'Neal Depo., Exh. 1, at p. 107:24-108:10; O'Neal Dec., Exh. 31, at ¶ 6. On May 17, 2016, several days before she left for vacation, Rhonda Miller—a woman Plaintiff had known all her life—passed away. O'Neal Depo., Exh. 1, at pp. 95:1-3; O'Neal Dec., Exh. 31, at ¶ 7. Though Centene recorded a phone conversation on Monday, May 17, 2016, wherein Plaintiff indicated that Rhonda Miller was not her aunt, that evening Plaintiff discovered that Rhonda Miller was her father's sister—a previously unknown fact. O'Neal Depo., Exh. 1, at p. 96:18-25, 107:3-23. O'Neal Dec., Exh. 31, at ¶¶ 8-9. The following day, Wednesday, May 18, 2016, Plaintiff requested bereavement to grieve the loss of her aunt with family and friends. O'Neal Dec., Exh. 31, at ¶ 10.**

Last Chance Meeting

40.     On June 1, after plaintiff returned from her trip to Las Vegas, she had a meeting

with Ms. Beverlin, Jacqueline Rolf (Human Resources Specialist), and Lori Howard (Director of

Utilization).  According to plaintiff, she was "being characterized as a liar."  *See* Ex. 1, Pl. Dep.,

98:5-25, 104:18-21.

**Response: Undisputed.**

41.     Plaintiff was told "you were lying;" management was "very aggressive" and played

the phone calls.  *See* Ex. 1, Pl. Dep., 105:22-25, 97:14-15.

**Response: Undisputed.**

42.     Plaintiff now admits that it was reasonable for management to believe she was

lying.  *See* Ex. 1, Pl. Dep., 113:3-17.

**Response: Disputed. Regarding bereavement leave, Plaintiff scheduled to take PTO days for her birthday in late May 2016; specifically, Plaintiff scheduled Friday, May 27, 2016 and Monday, May 30, 2016 for a trip to Las Vegas. O'Neal Depo., Exh. 1, at p. 92:4-93:1; O'Neal Dec., Exh. 31, at ¶ 5. The trip was planned several months in advance. O'Neal Depo., Exh. 1, at p. 107:24-108:10; O'Neal Dec., Exh. 31, at ¶ 6. On May 17, 2016, several days before she left for vacation, Rhonda Miller—a woman Plaintiff had known all her life—passed away. O'Neal Depo., Exh. 1, at pp. 95:1-3; O'Neal Dec., Exh. 31, at ¶ 7. Though Centene recorded a phone conversation on Monday, May 17, 2016, wherein Plaintiff indicated that Rhonda Miller was not her aunt, that evening Plaintiff discovered that Rhonda Miller was her father's sister—a previously unknown fact. O'Neal Depo., Exh. 1, at p. 96:18-25, 107:3-23. O'Neal Dec., Exh. 31, at ¶¶ 8-9. The following day, Wednesday, May 18, 2016, Plaintiff requested bereavement to grieve the loss of her aunt with family and friends. O'Neal Dec., Exh. 31, at ¶ 10.**

43.     Plaintiff was also accused of discussing "a drug transaction" on the company phone.

Plaintiff does not dispute discussing marijuana on the company phone.  *See* Ex. 1, Pl. Dep., 116:21-

24, 119:16-20.

**Response: Disputed. Plaintiff never engaged in making any statement about sexual encounters, masturbation, cuss words, and/or talking about drugs. O'Neal depo., Exh. 1, at p. 116:25-119:15, 121:3-11. There are no complaints by employees of disruptive or inappropriate behavior by Plaintiff, while using the telephone. Mak Corp. Rep. Depo., Exh.**

14

**2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17. No customers or medical providers have ever complained that Plaintiff behaved in an unprofessional manner over the phone. Beverlin Depo., Exh. 2, at p. 97:12-18, 100:14-101:1.  Further, following an investigation, if Centene believed that an employee was engaging in illegal conduct in the workplace, such as abusing alcohol or drugs, Centene could require an employee submit to a drug test. Mak Corp. Rep. Depo., Exh. 2, at pp. 58:22-59:2.**

44.     According to plaintiff: "My integrity was questioned, my character was questioned" at the meeting.  *See* Ex. 1, Pl. Dep., 160:12-14.

**Response: Undisputed.**

45.     Plaintiff told management, "I do understand the circumstances that brought this about;" she understood that if she signed the agreement, it was her last chance to remain employed by Centene.  She has now further acknowledged that it was the "bereavement that I had taken, and personal phone calls" that led to the final warning.  *See* Ex. 1, Pl. Dep., 159:16-22, 157:1-5; 91:8-14, 90:19-24.

**Response: Disputed. Plaintiff stated that she understood there were questions regarding the circumstances of her bereavement leave and telephone use; however, Plaintiff did not agree with being placed on a Last Chance Agreement. O'Neal Depo., Exh. 1, at p. 160:1-161:4.**

46.     After plaintiff was placed on the Last Chance Agreement, she allegedly made an anonymous complaint about co-worker Geraldine Thomas and Ms. Harris.  Scott Mak investigated the complaint, found that it contained multiple inaccuracies, and concluded it was without merit. *See* Ex. 1, Pl. Dep., 198:1-11; *see also* Ex. 5, Mak Dep. 145:2-149:5.

**Response: Disputed. Plaintiff made what she believed was an anonymous complaint to the corporate hotline in June 2016, regarding the harassment and discrimination issues she was experienced with Bobbie Harris and Geraldine Thomas. O'Neal Depo., Exh. 1, at p. 198:1-7, 222:21-24. Scott Mak claims that when the company received an anonymous complaint, such as the one regarding Ms. Harris, he would perform an investigation; particularly, speaking to relevant employees and reviewing relevant documents. Mak Corp. Rep. Depo., Exh. 2, at pp. 142:22-144:17. Terie Beverlin, the Director of Plaintiff's department, has never participated in any investigation by Mr. Mak regarding the anonymous complaints made against Bobbie Harris, despite the fact that Ms. Beverlin was Ms. Harris' direct supervisor. Beverlin Depo., Exh. 2, at p. 38:9-38:2; 40:4-11; 70:14-18.**

15

**Plaintiff was never interviewed by Mr. Mak because Plaintiff was FMLA leave that day. Bobbie Harris Investigation, Exh. 12, at p. 4; Mak Corp. Rep. Depo., Exh. 2, at pp. 149:17-23. Though Mr. Mak claims he wanted to handle the complaint in a timely manner, the complaint was received, processed, "investigated" and closed on the same day, without Plaintiff's input. Bobbie Harris Investigation, Exh. 12, at pp. 4-5; Mak Corp. Rep. Depo., Exh. 2, at pp. 149:19-151:8. Mr. Mak claims that he spoke to individuals, such as Terie Beverlin, regarding the complaints of discrimination against Bobbie Harris. Bobbie Harris; however, Ms. Beverlin admits that Mr. Mak never spoke to her. Investigations, Exh. 12, at p. 4; Beverlin Depo., Exh. 2, at p. 38:9-38:2; 40:4-11. Bobbie Harris claims she was never even aware that anonymous complaints of discrimination had been made against her. Harris Depo., Exh. 4, at p. 38:16-24. Scott Mak never spoke to Bobbie Harris regarding complaints of discrimination against her. Harris Depo., Exh. 4, at p. 38:25-39:3.**

<u>Post-Last Chance Issues</u>

47.    About a week after plaintiff signed her Last Chance Agreement, Ms. Beverlin received reports that plaintiff "was consistently being gone from her area, her supervisor didn't know where she was, [and] she wasn't following the process" put in place for her.  *See* Ex. 2, Beverlin Dep., 26:11-27:10.

**Response: Disputed. Without any factual support, Defendant alleges Plaintiff was not at her desk performing her duties." Mak Corp. Rep. Depo., Exh. 2, at pp. 7:24-8:13. The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24.**

48.    Ms. Beverlin again spoke with plaintiff about plaintiff "not being at her desk."  *See* Ex. 2, Beverlin Dep., 40:15-21.

**Response: Disputed. Centene has a group message portal, known as the "Daily Team Chat," where it allegedly requires employees to indicate when they leave and return to their desk; e.g., for restroom or lunch breaks. Mak Corp. Rep. Depo., Exh. 2, at p. 101:22-102:11; O'Neal Depo., Exh. 1, at pp. 30:22-31:15. The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5. Indeed, Plaintiff always understood this "work process" to be more of a courtesy, rather than a requirement. Harris Depo., Exh. 4, at p. 30:19-25, 36:2-15. Plaintiff is the only individual that was being monitored, with respect to tracking their activities in the Daily Team Chat. Beverlin Exh. 2, at p. 105:3-12. No other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23; 231:10-233:2; Beverlin Depo, Exh. 2, at p. 28:23-29:5. Further, there is no indication that Plaintiff was not performing her work duties as a referral specialist.**

Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. **In fact, there were numerous instances of other employees failing to log their activity in the Daily Team Chat, taking extended lunch breaks, extended 15-minute breaks or extended periods away from their desk.** *See* **June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25; Beverlin Depo., Exh. 2, at p. 109:24-119:25.**

49.     Plaintiff does not dispute exceeding her break time.  *See* Ex. 1, Pl. Dep., 243:4-8.

**Response: Disputed. Centene has a group message portal, known as the "Daily Team Chat," where it allegedly requires employees to indicate when they leave and return to their desk; e.g., for restroom or lunch breaks. Mak Corp. Rep. Depo., Exh. 2, at p. 101:22-102:11; O'Neal Depo., Exh. 1, at pp. 30:22-31:15. The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5. Indeed, Plaintiff always understood this "work process" to be more of a courtesy, rather than a requirement. Harris Depo., Exh. 4, at p. 30:19-25, 36:2-15. Plaintiff is the only individual that was being monitored, with respect to tracking their activities in the Daily Team Chat. Beverlin Exh. 2, at p. 105:3-12. No other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23; 231:10-233:2; Beverlin Depo, Exh. 2, at p. 28:23-29:5. Further, there is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. In fact, there were numerous instances of other employees failing to log their activity in the Daily Team Chat, taking extended lunch breaks, extended 15-minute breaks or extended periods away from their desk.** *See* **June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25.**

50.     Plaintiff also admits that she "didn't practice" letting others know when she returned to her desk, and that "sometimes I didn't let them know when I was leaving as well." *See* Ex. 1, Pl. Dep., 249:15-23; *see also* Ex. 2, Beverlin Dep., 107:10-21.

**Response: Disputed. Centene has a group message portal, known as the "Daily Team Chat," where it allegedly requires employees to indicate when they leave and return to their desk; e.g., for restroom or lunch breaks. Mak Corp. Rep. Depo., Exh. 2, at p. 101:22-102:11; O'Neal Depo., Exh. 1, at pp. 30:22-31:15. The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5. Indeed, Plaintiff always understood this "work process" to be more of a courtesy, rather than a requirement. Harris Depo., Exh. 4, at p. 30:19-25, 36:2-15. Plaintiff is the only individual that was being monitored, with respect to tracking their activities in the Daily Team Chat. Beverlin Exh. 2, at p. 105:3-12. No other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23; 231:10-233:2; Beverlin Depo, Exh. 2, at p. 28:23-29:5. Further, there is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. In fact, there were numerous instances of**

other employees failing to log their activity in the Daily Team Chat, taking extended lunch breaks, extended 15-minute breaks or extended periods away from their desk. *See* **June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25.**

<u>More Dishonesty and Cell Phone Issues</u>

51.     Plaintiff's former co-worker, Veronica Johnson, complained to management about plaintiff. Ms. Johnson observed that plaintiff "talked on her cell phone daily during work hours when she was at work; she frequently went into the hallway and talked on her cell phone during work hours," and on occasion, "Monique O'Neal would hide in the hallway during work hours to talk on her cell phone." Ms. Johnson also "observed Monique O'Neal working on her tax returns during work hours." *See* Ex. 12, Johnson Dec., ¶¶8, 10, 11, 15.

**Response: Disputed. Without any factual support, Defendant alleges Plaintiff was not at her desk performing her duties." Mak Corp. Rep. Depo., Exh. 2, at pp. 7:24-8:13. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. There are no complaints by employees of disruptive or inappropriate behavior by Plaintiff, while using the telephone. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17. No customers or medical providers have ever complained that Plaintiff behaved in an unprofessional manner over the phone. Beverlin Depo., Exh. 2, at p. 97:12-18, 100:14-101:1.**

52.     Plaintiff's former co-worker, Clint Hicks, observed that "Monique O'Neal wore a hat and blanket at times covering her head with ear buds in her ear while having a personal conversation on her cell phone during work hours." And when "I asked her questions during work hours, I would see her on her cell phone." Mr. Hicks complained about plaintiff to management. *See* Ex. 11, Hicks Dec., ¶ 8-13.

**Response: Disputed. Without any factual support, Defendant alleges Plaintiff was not at her desk performing her duties." Mak Corp. Rep. Depo., Exh. 2, at pp. 7:24-8:13. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. There are no complaints by employees of disruptive or inappropriate behavior by Plaintiff, while using the telephone. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17. No customers or medical providers have ever complained that Plaintiff behaved in an unprofessional manner over the phone. Beverlin Depo., Exh. 2, at p. 97:12-18, 100:14-101:1.**

53.   Plaintiff's co-workers, Nicole Richardson, Mary Franco, and Merrie Carmack also observed plaintiff engage in various forms of misconduct.  *See generally* Exs. 10, 13, 14.

**Response: Disputed. Without any factual support, Defendant alleges Plaintiff was not at her desk performing her duties." Mak Corp. Rep. Depo., Exh. 2, at pp. 7:24-8:13. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. There are no complaints by employees of disruptive or inappropriate behavior by Plaintiff, while using the telephone. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17. No customers or medical providers have ever complained that Plaintiff behaved in an unprofessional manner over the phone. Beverlin Depo., Exh. 2, at p. 97:12-18, 100:14-101:1.**

54.   On or about June 14, 2016, Ms. Harris received complaints from plaintiff's co-workers that plaintiff was using her cell phone, disappearing from her desk and not doing her job. Ms. Harris emailed Ms. Beverlin that "Monique has been taking frequent breaks throughout the day" and was "observed using her cell phone at her desk texting today." *See* Ex. 3-K, Harris Email (Def. 0542), attached to Beverlin Dec.; Ex. 7, Harris Dep., 82:13-83:1, 29:8-16, 49:6-18.

**Response: Disputed. Centene has a group message portal, known as the "Daily Team Chat," where it allegedly requires employees to indicate when they leave and return to their desk; e.g., for restroom or lunch breaks. Mak Corp. Rep. Depo., Exh. 2, at p. 101:22-102:11; O'Neal Depo., Exh. 1, at pp. 30:22-31:15. The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5. Indeed, Plaintiff always understood this "work process" to be more of a courtesy, rather than a requirement. Harris Depo., Exh. 4, at p. 30:19-25, 36:2-15. Plaintiff is the only individual that was being monitored, with respect to tracking their activities in the Daily Team Chat. Beverlin Exh. 2, at p. 105:3-12. No other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23, 231:10-233:2; Beverlin Depo, Exh. 2, at p. 28:23-29:5. Further, there is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. In fact, there were numerous instances of other employees failing to log their activity in the Daily Team Chat, taking extended lunch breaks, extended 15-minute breaks or extended periods away from their desk. *See* June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25.**

**Further, Plaintiff indicated that she has been experiencing excessive bathroom usage related to her medical issues. *See* Plaintiff's Email to Beverlin, Exh. 15. Consequently, Plaintiff complained that Ms. Beverlin made comments regarding her frequent use of the restroom. O'Neal Depo., Exh. 1, at p. 190:18-23.**

55.     On June 22, Ms. Beverlin spoke with plaintiff about "her being away from her desk and being seen on her cell phone and disappearing," and that "this is getting to be an issue again." Plaintiff responded, "I get it, I'll do better." *See* Ex. 2, Beverlin Dep., 79:1-15.

**Response: Disputed. Centene has a group message portal, known as the "Daily Team Chat," where it allegedly requires employees to indicate when they leave and return to their desk; e.g., for restroom or lunch breaks. Mak Corp. Rep. Depo., Exh. 2, at p. 101:22-102:11; O'Neal Depo., Exh. 1, at pp. 30:22-31:15. The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5. Indeed, Plaintiff always understood this "work process" to be more of a courtesy, rather than a requirement. Harris Depo., Exh. 4, at p. 30:19-25, 36:2-15. Plaintiff is the only individual that was being monitored, with respect to tracking their activities in the Daily Team Chat. Beverlin Exh. 2, at p. 105:3-12. No other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23, 231:10-233:2; Beverlin Depo., Exh. 2, at p. 28:23-29:5. Further, there is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. In fact, there were numerous instances of other employees failing to log their activity in the Daily Team Chat, taking extended lunch breaks, extended 15-minute breaks or extended periods away from their desk. *See* June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25.**

**Further, Plaintiff indicated that she has been experiencing excessive bathroom usage related to her medical issues. Plaintiff's Email to Beverlin, Exh. 15. Consequently, Plaintiff complained that Ms. Beverlin made comments regarding her frequent use of the restroom. O'Neal Depo., Exh. 1, at p. 190:18-23.**

56.     On June 23, plaintiff sent Ms. Beverlin an email stating she had a doctor's appointment on July 6 for her "FML paper work, at that time I will see if he will provide me with a Dr. Excuse [sic] for my excessive bathroom usage . . . I just want to cover myself." Ms. Beverlin did not understand plaintiff to be disclosing any major issue; rather, she understood plaintiff's email as "her trying to cover herself." *See* Ex. 16, Pl. Email (Def. 0747); Ex. 2, Bev. Dep., 79:1-21.

**Response: Disputed, to the extent that Ms. Beverlin alleges Plaintiff was simply trying to "cover herself." Further, Plaintiff indicated that she has been experiencing excessive bathroom usage related to her medical issues. *See* Plaintiff's Email to Beverlin, Exh. 15. Consequently, Plaintiff complained that Ms. Beverlin made comments regarding her frequent use of the restroom. O'Neal Depo., Exh. 1, at p. 190:18-23.**

57.     On June 23, Ms. Harris learned that plaintiff previously represented that she missed work for FMLA reasons.  However, plaintiff did not report her FMLA usage to the third-party FMLA administrator, as was required.  Ms. Harris believed that plaintiff was dishonest by representing to Centene she was on FMLA leave for time when she had not informed the FMLA administrator.  Ms. Harris reported her conduct to Ms. Beverlin.  Ex. 7, Harris Dep., 52:9-16; Ex. 3-L, Harris Email (Def. 0647) attached to Ex. 3, Beverlin Dec.; Ex. 2, Beverlin Dep., 104:11-105:12.

**Response: Disputed. Ms. Harris could not provide any specific instances where she believed Plaintiff was being dishonest, with respect to reporting her use of FMLA. Harris Depo., Exh. 4, at pp. 52:9-53:54:14.**

58.     On June 30, Ms. Beverlin received further complaints that plaintiff was "away from her desk" outside of her allotted break time, and that this "happens during the workday almost everyday."  Ms. Beverlin believed that plaintiff was disappearing from her desk to talk on her cell phone.  *See* Ex. 3, Beverlin Dec., ¶ 30; Ex. 3-M, Email (Def. 0543).

**Response: Disputed. Centene has a group message portal, known as the "Daily Team Chat," where it allegedly requires employees to indicate when they leave and return to their desk; e.g., for restroom or lunch breaks. Mak Corp. Rep. Depo., Exh. 2, at p. 101:22-102:11; O'Neal Depo., Exh. 1, at pp. 30:22-31:15. The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5. Indeed, Plaintiff always understood this "work process" to be more of a courtesy, rather than a requirement. Harris Depo., Exh. 4, at p. 30:19-25, 36:2-15. Plaintiff is the only individual that was being monitored, with respect to tracking their activities in the Daily Team Chat. Beverlin Exh. 2, at p. 105:3-12. No other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23, 231:10-233:2; Beverlin Depo., Exh. 2, at p. 28:23-29:5. Further, there is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. In fact, there were numerous instances of other employees failing to log their activity in the Daily Team Chat, taking extended lunch breaks, extended 15-minute breaks or extended periods away from their desk. *See* June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25.**

**Further, Plaintiff indicated that she has been experiencing excessive bathroom usage related to her medical issues. Plaintiff's Email to Beverlin, Exh. 15. Consequently,**

Plaintiff complained that Ms. Beverlin made comments regarding her frequent use of the restroom. O'Neal Depo., Exh. 1, at p. 190:18-23.

59.     Plaintiff adamantly testified that she <u>never</u> used her personal cell phone during work hours.  *See* Ex. 1, Pl. Dep., 164:15-17.

**Response: Disputed. Plaintiff admitted there were times when she may have used her personal cell phone to engage in text messaging. O'Neal Depo., Exh. 1, at p. 125:11-19.**

60.     Plaintiff's cell phone records, however, show that on June 30, between 8:00 a.m. and 5:00 p.m., plaintiff talked on her cell phone <u>20 times</u> during work hours.  *See* Ex. 17, Pl. Cell Phone Records (Def. 1366-67).

**Response: Undisputed, but immaterial. Defendant indicates that Plaintiff's primary basis for termination was allegedly stealing time, by not documenting when she was away, or returning, from her desk in the "Daily Team Chat." Mak Corp. Rep. Depo., Exh. 2, at p. 206:11-16, 237:6-13; Beverlin Depo., Exh. 2, at p. 26:9-25, 27:1-5. Further, the Termination Review Form does not indicate that making personal phone calls on her cell phone was a basis for her termination, nor does it indicate that any individual observed Plaintiff making phone calls on cell phone. Exh. 19, Termination Review Form.**

61.     On July 1, Ms. Thomas reported to management that she "observed Monique O'Neal sitting at her desk with one earbud in her ear along with a hat on her head."  Ms. Thomas further reported that plaintiff took excessive breaks and was using her cell phone.  *See* Ex. 3-N, G. Thomas Email (Def 0584, 0656, 0657).

**Response: Disputed. Plaintiff indicated that she used her work phone for personal phone calls and would not have used an earbud. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. Further, Plaintiff indicated that she has been experiencing excessive bathroom usage related to her medical issues. Plaintiff's Email to Beverlin, Exh. 15. Consequently, Plaintiff complained that Ms. Beverlin made comments regarding her frequent use of the restroom. O'Neal Depo., Exh. 1, at p. 190:18-23.**

62.     On July 1, at about 4:30 p.m., it was reported to Ms. Beverlin that plaintiff represented that she was going to the restroom, but was instead seen "going up [the] stairwell to the 4th floor."  Ms. Beverlin noted that plaintiff "has been caught on the fourth floor stairwell

before talking on her cell phone when she should be working . . . she goes there to hide." *See* Ex.

3, Beverlin Dec., ¶ 32.

**Response: Disputed. Without any factual support, Defendant alleges Plaintiff was not at her desk performing her duties." Mak Corp. Rep. Depo., Exh. 2, at pp. 7:24-8:13. There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24. There are no complaints by employees of disruptive or inappropriate behavior by Plaintiff, while using the telephone. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17. No customers or medical providers have ever complained that Plaintiff behaved in an unprofessional manner over the phone. Beverlin Depo., Exh. 2, at p. 97:12-18, 100:14-101:1.  Further, Plaintiff indicated that she has been experiencing excessive bathroom usage related to her medical issues. Plaintiff's Email to Beverlin, Exh. 15. Consequently, Plaintiff complained that Ms. Beverlin made comments regarding her frequent use of the restroom. O'Neal Depo., Exh. 1, at p. 190:18-23.**

63.    Though plaintiff denies ever using her cell phone records at work, her cell phone

records show that on July 1, between 8:00 and 5:00, plaintiff talked on her cell phone 30 times

during work hours.  Ms. Beverlin had "multiple discussions about [plaintiff] being on her cell

phone a lot." *See* Ex. 17, Pl. Cell Phone Records (1367-69); Ex. 2, Beverlin Dep., 95:12-14.

**Response: Undisputed, but immaterial. Defendant indicates that Plaintiff's primary basis for termination was allegedly stealing time, by not documenting when she was away, or returning, from her desk in the "Daily Team Chat." Mak Corp. Rep. Depo., Exh. 2, at p. 206:11-16, 237:6-13; Beverlin Depo., Exh. 2, at p. 26:9-25, 27:1-5. Further, the Termination Review Form does not indicate that making personal phone calls on her cell phone was a basis for her termination, nor does it indicate that any individual observed Plaintiff making phone calls on cell phone. Exh. 19, Termination Review Form.**

64.    In addition to the cell phone use, Plaintiff admits: "There is no telling what I was

doing if I wasn't at my desk." See Ex. 1, Pl. Dep., 244:24-25.

**Response: Disputed. Plaintiff indicated that she could be doing any number of "special projects" if she wasn't at her desk. O'Neal Depo., Exh. 1, at p. 244:24-245:6. Though Plaintiff's primary job was to process referrals for nurses and doctors, Plaintiff also corrected off-air authorizations, waiver authorizations and submitted denial letters. O'Neal Depo., Exh. 1, at p. 16:10-25, 37:6-39:12.**

<u>Decision to Terminate</u>

65.     On July 1, Ms. Beverlin made the decision to terminate plaintiff.  Ms. Beverlin sent

an email to human resources with an attached excel spreadsheet documenting plaintiff's conduct.

She also sent a "Termination Review Form" to human resources seeking approval to terminate

plaintiff.  Based on plaintiff's history, Ms. Beverlin believed that plaintiff was excessively using

work time to talk on her cell phone and was engaging in other unprofessional conduct.  *See* Ex. 3,

Beverlin Dec., ¶ 33; Ex. 3-O, Email and Excel Chart; Ex. 3-P, Termination Form; Ex. 2, Beverlin

Dep., 91:19-92:24, 138:16-141:21.

**Response: Disputed. Defendant indicates that Plaintiff's primary basis for
termination was allegedly stealing time, by not documenting when she was away, or
returning, from her desk in the "Daily Team Chat." Mak Corp. Rep. Depo., Exh. 2, at p.
206:11-16, 237:6-13; Beverlin Depo., Exh. 2, at p. 26:9-25, 27:1-5. Further, the Termination
Review Form does not indicate that making personal phone calls on her cell phone was a
basis for her termination, nor does it indicate that any individual observed Plaintiff making
phone calls on cell phone. Exh. 19, Termination Review Form.**

**On June 23, 2016, Plaintiff sent an email to Ms. Beverlin stating that she planned to
renew for FMLA paperwork following a July 6, 2016 meeting with her doctor. Plaintiff's
Email to Beverlin, Exh. 15. On July 5, 2016, Plaintiff indicated that she would need to
utilize FMLA to deal with her son's asthma. Geraldine Thomas Email, Exh. 16; July 5,
2016 Email, Exh. 17; O'Neal Depo., Exh. 1, at p. 170:11-18. Plaintiff followed the company
policy and advised her immediate supervisor, Bobbie Harris and department leader, Terie
Beverlin, of her FMLA need. July 5, 2016 Email, Exh. 17. Mak Corp. Rep. Depo., Exh. 2, at
p. 201:1-9. Nonetheless, Ms. Beverlin indicates Plaintiff did not follow proper procedure by
copying Mr. Mak or Geraldine Thomas, who has no supervisory authority, on the email
correspondence. July 5, 2016 Email, Exh. 17; Mak Corp. Rep. Depo., Exh. 2, at p. 196:1-17.
Despite advising Ms. Harris, Ms. Beverlin and Geraldine Thomas that she was taking
FMLA leave to deal with her son's medical issues, Ms. Beverlin still insist Plaintiff did not
follow the proper procedure. Beverlin Depo., Exh. 2, at p. 89:14-24. Consequently, Ms.
Beverlin requests to terminate Plaintiff's employment that day. July 5, 2016 Email, Exh.
17. Plaintiff was terminated the day after she took FMLA leave related to her son on July
5, 2016. *See* FMLA Log, Exh. 11.**

66.     On July 5, 2016, Ms. Beverlin hoped to meet with plaintiff in the morning to

terminate her.  However, before Ms. Beverlin arrived at work, plaintiff left work early,

representing that she was leaving for FMLA reasons.  *See* Ex. 3, Beverlin Dec., ¶ 34.  Ex. 1, Pl.

Dep., 169:22-24.

**Response: Disputed. On July 5, 2016, Plaintiff indicated that she would need to utilize FMLA to deal with her son's asthma. Geraldine Thomas Email, Exh. 16; July 5, 2016 Email, Exh. 17; O'Neal Depo., Exh. 1, at p. 170:11-18. Plaintiff followed the company policy and advised her immediate supervisor, Bobbie Harris and department leader, Terie Beverlin, of her FMLA need. July 5, 2016 Email, Exh. 17. Mak Corp. Rep. Depo., Exh. 2, at p. 201:1-9. Nonetheless, Ms. Beverlin indicates Plaintiff did not follow proper procedure by copying Mr. Mak or Geraldine Thomas, who has no supervisory authority, on the email correspondence. July 5, 2016 Email, Exh. 17; Mak Corp. Rep. Depo., Exh. 2, at p. 196:1-17. Despite advising Ms. Harris, Ms. Beverlin and Geraldine Thomas that she was taking FMLA leave to deal with her son's medical issues, Ms. Beverlin still insist Plaintiff did not follow the proper procedure. Beverlin Depo., Exh. 2, at p. 89:14-24. Consequently, Ms. Beverlin requests to terminate Plaintiff's employment that day. July 5, 2016 Email, Exh. 17. Plaintiff was terminated the day after she took FMLA leave related to her son on July 5, 2016. *See* FMLA Log, Exh. 11.**

67.    Plaintiff alleged to the Kansas Commission on Human Rights that she took FMLA

leave on July 5 "to take my son to the doctor" for asthma.  When asked to identify the "doctor" in

interrogatories however, plaintiff admitted that she did not take her son to the doctor on July 5.

*Compare* Ex. 18, Pl. KHRC Charge (O'Neal 000136-137) *with* Ex. 19, Pl. Int. Responses to No.

9.

**Response: Disputed. On July 5, 2016, Plaintiff indicated that she would need to utilize FMLA to deal with her son's asthma. Geraldine Thomas Email, Exh. 16; July 5, 2016 Email, Exh. 17; O'Neal Depo., Exh. 1, at p. 170:11-18. Plaintiff followed the company policy and advised her immediate supervisor, Bobbie Harris and department leader, Terie Beverlin, of her FMLA need. July 5, 2016 Email, Exh. 17. Mak Corp. Rep. Depo., Exh. 2, at p. 201:1-9. Nonetheless, Ms. Beverlin indicates Plaintiff did not follow proper procedure by copying Mr. Mak or Geraldine Thomas, who has no supervisory authority, on the email correspondence. July 5, 2016 Email, Exh. 17; Mak Corp. Rep. Depo., Exh. 2, at p. 196:1-17. Despite advising Ms. Harris, Ms. Beverlin and Geraldine Thomas that she was taking FMLA leave to deal with her son's medical issues, Ms. Beverlin still insist Plaintiff did not follow the proper procedure. Beverlin Depo., Exh. 2, at p. 89:14-24. Consequently, Ms. Beverlin requests to terminate Plaintiff's employment that day. July 5, 2016 Email, Exh. 17. Plaintiff was terminated the day after she took FMLA leave related to her son on July 5, 2016. *See* FMLA Log, Exh. 11.**

68.     Plaintiff has now testified that: "I don't remember that particular date or circumstances" for taking FMLA leave, nor could she remember what information she received to warrant her taking FMLA leave on July 5.  *See* Ex.  1, Pl. Dep., 169:16-170:5.

**Response: Disputed. On July 5, 2016, Plaintiff indicated that she would need to utilize FMLA to deal with her son's asthma. Geraldine Thomas Email, Exh. 16; July 5, 2016 Email, Exh. 17; O'Neal Depo., Exh. 1, at p. 170:11-18. Plaintiff followed the company policy and advised her immediate supervisor, Bobbie Harris and department leader, Terie Beverlin, of her FMLA need. July 5, 2016 Email, Exh. 17. Mak Corp. Rep. Depo., Exh. 2, at p. 201:1-9. Nonetheless, Ms. Beverlin indicates Plaintiff did not follow proper procedure by copying Mr. Mak or Geraldine Thomas, who has no supervisory authority, on the email correspondence. July 5, 2016 Email, Exh. 17; Mak Corp. Rep. Depo., Exh. 2, at p. 196:1-17. Despite advising Ms. Harris, Ms. Beverlin and Geraldine Thomas that she was taking FMLA leave to deal with her son's medical issues, Ms. Beverlin still insist Plaintiff did not follow the proper procedure. Beverlin Depo., Exh. 2, at p. 89:14-24. Consequently, Ms. Beverlin requests to terminate Plaintiff's employment that day. July 5, 2016 Email, Exh. 17. Plaintiff was terminated the day after she took FMLA leave related to her son on July 5, 2016. *See* FMLA Log, Exh. 11.**

69.     On July 6, Ms. Beverlin terminated plaintiff because she had a history of dishonesty and unprofessionalism and Ms. Beverlin believed that plaintiff continued to be dishonest and unprofessional.  *See* Ex. 3, Beverlin Dec., ¶ 36; Ex. 2, Beverlin Dep., 19:23-21:2; 90:17-19.  Ms. Beverlin affirmatively denies terminating plaintiff due to FMLA use.  *See* Ex. 3, Beverlin Dec., ¶ 36.

**Response: Disputed. Defendant indicates that Plaintiff's primary basis for termination was allegedly stealing time, by not documenting when she was away, or returning, from her desk in the "Daily Team Chat." Mak Corp. Rep. Depo., Exh. 2, at p. 206:11-16, 237:6-13; Beverlin Depo., Exh. 2, at p. 26:9-25, 27:1-5. Further, the Termination Review Form does not indicate that making personal phone calls on her cell phone was a basis for her termination, nor does it indicate that any individual observed Plaintiff making phone calls on cell phone. Exh. 19, Termination Review Form.**

**On June 23, 2016, Plaintiff sent an email to Ms. Beverlin stating that she planned to renew for FMLA paperwork following a July 6, 2016 meeting with her doctor. Plaintiff's Email to Beverlin, Exh. 15. On July 5, 2016, Plaintiff indicated that she would need to utilize FMLA to deal with her son's asthma. Geraldine Thomas Email, Exh. 16; July 5, 2016 Email, Exh. 17; O'Neal Depo., Exh. 1, at p. 170:11-18. Plaintiff followed the company policy and advised her immediate supervisor, Bobbie Harris and department leader, Terie Beverlin, of her FMLA need. July 5, 2016 Email, Exh. 17. Mak Corp. Rep. Depo., Exh. 2, at p. 201:1-9. Nonetheless, Ms. Beverlin indicates Plaintiff did not follow proper procedure by**

**copying Mr. Mak or Geraldine Thomas, who has no supervisory authority, on the email correspondence. July 5, 2016 Email, Exh. 17; Mak Corp. Rep. Depo., Exh. 2, at p. 196:1-17. Despite advising Ms. Harris, Ms. Beverlin and Geraldine Thomas that she was taking FMLA leave to deal with her son's medical issues, Ms. Beverlin still insist Plaintiff did not follow the proper procedure. Beverlin Depo., Exh. 2, at p. 89:14-24. Consequently, Ms. Beverlin requests to terminate Plaintiff's employment that day. July 5, 2016 Email, Exh. 17. Plaintiff was terminated the day after she took FMLA leave related to her son on July 5, 2016. *See* FMLA Log, Exh. 11.**

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### Defendant's Employment Policies

70.     Centene maintains a written policy to not discriminate against individuals on the basis of their "physical or mental disability . . . medical condition . . . family care, or medical leave." *See* EEO Policy, Exh. 5.

71.     Centene maintains a written policy that indicates "harassment is unwelcome conduct, whether verbal, physical, or visual, that is based upon a person's . . . disability . . . family care or medical leave." *See* Harassment Policy, Exh. 6, at p. 1.

72.     Centene alleges it treats all complaints of discrimination with importance, regardless of whether the complaint is made verbally, or in writing. Mak Corp. Rep. Depo., Exh. 2, at pp. 36:3-9; Harris Depo., Exh. 4, at p. 14:2-17.

73.     Centene's policy is to treat all employees equally, including with respect to discipline. Mak Corp. Rep. Depo., Exh. 2, at pp. 32:2-9, 64:18-65:7.

74.     If an employee believes she is being discriminated against or harassed, the employee should notify a supervisor or human resources.  *See* Harassment Policy, Exh. 6, at p. 2, Mak Corp. Rep. Depo., Exh. 2, at pp. 37:11-24.

75.     Retaliation against an employee, who in good faith reports discrimination, is prohibited even if the company determines that the underlying complaint is not valid. Mak Corp. Rep. Depo., Exh. 2, at pp. 40:4-16.

76.     Employees may contact a corporate ethics helpline regarding complaints they may have at Centene. Mak Corp. Rep. Depo., Exh. 2, at pp. 54:19-55:8.

**Investigations and Subsequent Discipline**

77.     With respect to investigations, the local Human Resources department handles most, if not all, of the investigations. Mak Corp. Rep. Depo., Exh. 2, at pp. 42:4-43:15, 62:10-13. Beverlin Depo., Exh. 3, at p. 18:1-9.

78.     The investigations should be thorough and should include speaking to all witnesses and reviewing relevant documents, among other things. Mak Corp. Rep. Depo., Exh. 2, at pp. 41:8-42:1.

79.     Following an investigation, if Centene believed that an employee was engaging in illegal conduct in the workplace, such as abusing alcohol or drugs, Centene could require an employee submit to a drug test. Mak Corp. Rep. Depo., Exh. 2, at pp. 58:22-59:2.

80.     Centene allegedly maintains a progressive disciplinary policy starting with a verbal warning, then a performance improvement plan, a last chance warning and finally termination. Mak Corp. Rep. Depo., Exh. 2, at pp. 62:20-63:25; Harris Depo., Exh. 4, at p. 17:3-18.

81.     Human Resources is involved is involved in the process of terminating employees, including making recommendations to terminate. Mak Corp. Rep. Depo., Exh. 2, at pp. 28:18-25, 29:22-25.

**Plaintiff's Work Performance**

82.     Plaintiff was employed as a referral specialist at Centene. O'Neal Depo., Exh. 1, at p. 15:12-18.

83.     Bobbie Harris is the supervisor of Referral Specialists, as well as Plaintiff's immediate supervisor. Harris Depo., Exh. 4, at p. 9:9-14.

84.     Terie Beverlin was Bobbie Harris' supervisor, as the Manager of Utilization Management. Beverlin Depo., Exh. 3, at p. 9:2-3.

85.     Though Plaintiff's primary job was to process referrals for nurses and doctors, Plaintiff also corrected off-air authorizations, waiver authorizations and submitted denial letters. O'Neal Depo., Exh. 1, at p. 16:10-25, 37:6-39:12.

86.     Plaintiff's compensation increased every year she worked at Centene. Plaintiff's Yearly Compensation Report, Ex. 9, at p. 2.

87.     Regarding Plaintiff's 2015 Performance Evaluation, the comments state: "Monique has done a good job of adjusting to the changes in the LAM Department in 2015. She is flexible to the changing demands of our work flow and a valuable asset to the Referral Specialist Team . . . Monique is always willing to help the team complete their work." Plaintiff's Yearly Compensation Report, Ex. 9, at pp. 2-3.

88.     At no point in Plaintiff's 2015 Performance review, did it indicate she displayed a history of untruthfulness or was disruptive in any manner. Plaintiff's Yearly Compensation Report, Ex. 9, at pp. 2-3; Mak Corp. Rep. Depo., Exh. 2, at pp. 121:12-122:13.

89.     Further, merit increases are determined by performance. Mak Corp. Rep. Depo., Exh. 2, at p. 115:18-21; *See* Centene Performance and Compensation Guidelines, Exh. 8.

90.     As a result of her Performance, Plaintiff was given a $2,200 bonus and $2,339 bonus in May 2015 and May 2016, respectively. Mak Corp. Rep. Depo., Exh. 2, at p. 119:25:120:4.

**FMLA Leave**

91.     Plaintiff was placed on intermittent FMLA leave related to Gastroesophageal Reflux Diseases ("GERD") and anxiety disorder, beginning in 2014. FMLA Certification, Exh. 10; Mak Corp. Rep. Depo., Exh. 2, at pp. 128:18-129:3; Harris Depo., Exh. 4, at pp. 22:23-23:1. O'Neal Depo., Exh. 1, at p. 191:17-24.

92.     GERD causes acid Reflux digestive issues in the stomach, causing severe pain and effecting Plaintiff's ability to eat and walk. O'Neal Depo., Exh. 1, at p. 192:3-13, 213:2-9.

93.     With respect to anxiety disorder, Plaintiff experienced breathing issues, which increased her heart rate and caused numbness in her limbs. O'Neal Depo., Exh. 1, at p. 211:6-212:2.

94.     Despite her disability, Plaintiff could still perform the essential functions of her job duties. O'Neal Depo., Exh. 1, at p. 192:8-16.

95.     The FMLA certification indicated that Plaintiff may need to utilize leave up to four times a month. FMLA Certification, Exh. 10; Mak Corp. Rep. Depo., Exh. 2, at pp. 129:21:24.

96.     Plaintiff also had approved FMLA leave for her son, related to his asthma medical issues. FMLA Log, Exh. 11; Mak Corp. Rep. Depo., Exh. 2, at pp. 134:6-16; Harris Depo., Exh. 4, at pp. 22:23-23:1.

97.     Scott Mak, the Human Resources Manager, is responsible for interpreting Centene's policies and ensuring employees comply with the policy. Mak Corp. Rep. Depo., Exh. 2, at p. 160:3-15.

98.     Liberty Mutual handled all decisions with respect to whether an employee was approved for FMLA. Mak Corp. Rep. Depo., Exh. 2, at p. 78:14-22.

99.     Mr. Mak admits that an unexpected health issue may lead to intermittent FMLA leave, which could cause an employee to take intermittent FMLA leave without prior notice. Mak Corp. Rep. Depo., Exh. 2, at p. 83:9-25, 85:1-16.

100.    Regarding an employee's notice of FMLA leave, the employee should advise their direct manager first and, if no management is on the floor, the employee should let "somebody" know they are taking FMLA leave, which could include individuals in the human resources department. Mak Corp. Rep. Depo., Exh. 2, at p. 80:7-14, 84:6-25; Harris Depo., Exh. 4, at p. 23:22-24:13; O'Neal Depo., Exh. 1, at p. 60:16-61:5.

101.    The best option to let a supervisor know of FMLA leave is "face to face," but if that is not possible e-mail would be appropriate notice. Mak Corp. Rep. Depo., Exh. 2, at pp. 82:13-83:4; Beverlin Depo. Exh. 2, at p. 46:1-16; Harris Depo., Exh. 4, at p. 24:14-18. O'Neal Depo., Exh. 1, at p. 187:5-188:3.

**2015 Interference with FMLA Leave and Complaints**

102.    Between March 2015 to June 2015, Plaintiff was given occurrences (attendance actions leading to discipline) while she was on approved FMLA leave. *See* Scott Mak June 8, 2015 Email, Exh. 30.  Plaintiff's June 15, 2015 FMLA Complaint, Exh. 13.

103.    Mr. Mak's reasoning was clear, indicating that "if [Plaintiff] is calling in after 7am, even if for FML, this still counts as an occurrence of a late notice. Same for if she leaves early." *See* Scott Mak June 8, 2015 Email, Exh. 30.

104.    Indeed, Liberty Mutual approved Plaintiff's FMLA leave, with respect to the dates Plaintiff was disciplined in 2015. Exh. 29, Leave Entitlement Report.

105.     Particularly, Plaintiff was given a written warning for attendance, related to her FMLA leave. Plaintiff's June 15, 2015 FMLA Complaint, Exh. 13; Plaintiff's FMLA June 23, FMLA Complaint, Exh. 14.

106.     For example, Plaintiff was given a one (1) point occurrence on June 16, 2015 and June 17, 2015, respectively, even though Plaintiff was on approved FMLA leave from Liberty Mutual. *See* Exh. 28, 2015 Attendance Disciplinary Log; *compare with* Exh. 29, 2015 Leave Entitlement Report.

107.     On June 12, 2015, Plaintiff and Mr. Mak met to discuss the occurrences and related disciplinary action. Mr. Mak made the following comments during their meeting:

      a.     Any unscheduled time off using FML or not will be counted against your Attendance

      b.     FML should be used for emergent reasons and you just use it too much

      c.     Just because you are approved . . . doesn't mean you should use it. If everyone in the company had FML and used it, when ever they wanted it would impact the business needs of the company

      d.     I have to follow the attendance policy just like every other employee, no matter if I have FML.

      *Id.*; O'Neal Depo., Exh. 1, at p. 199:8-23, 201:3-11.

108.     Plaintiff indicated that Mr. Mak was upset and combative during their meeting. *Id.*

109.     In or around June 15, 2015, Plaintiff complained to Rebecca Bryant regarding concerns that she was not being treated properly, with respect to exercising her FMLA rights. Plaintiff's June 15, 2015 FMLA Complaint, Exh. 13.

110.    Consequently, in a June 23, 2015 Email to Mr. Mak and his superiors, Plaintiff provided a summary of her June 12, 2015 meeting with Mr. Mak. Plaintiff further stated that he was treating her unfairly due to her FMLA leave and that Centene was violating her statutory rights. Plaintiff's FMLA June 23, FMLA Complaint, Exh. 14; Mak Corp. Rep. Depo., Exh. 2, at p. 160:19-23.

111.    Mr. Mak admits that Plaintiff's statement showed concern that Plaintiff believed she was being discriminated against and harassed because of FMLA use. Mak Corp. Rep. Depo., Exh. 2, at p. 169:6-10.

112.    Nonetheless, Mr. Mak, did not care in the slightest about her complaints. Mak Corp. Rep. Depo., Exh. 2, at p. 170:19-171:11.

113.    Mr. Mak was never investigated related to Plaintiff's complaints. Mak Corp. Rep. Depo., Exh. 2, at pp. 171:17-16.

114.    Following several meetings with Mr. Mak, and his superiors, several occurrences were removed, while others remained. O'Neal Depo., Exh. 1., at p.  204:17-205:5; Mak Corp. Rep. Depo., Exh. 2, at p. 159:12-19.

115.    Plaintiff was still given a one (1) point occurrence on June 16, 2015 and June 17, 2015, respectively, even though Plaintiff was on approved FMLA leave from Liberty Mutual. *See* Exh. 28, 2015 Attendance Disciplinary Log; Exh. 29, Leave Entitlement Report.

116.    Mr. Mak has no explanation regarding why Plaintiff was issued the occurrences in the first place, other than to say there was a "misinterpretation" of the policy. Mak Corp. Rep. Depo., Exh. 2, at p. 159:7-19.

117.    There was no further training with respect to how employees' FMLA leave should be handled by supervisors. Mak Corp. Rep. Depo., Exh. 2, at p. 164:13-23.

**May 2016 Complaints**

118.     In and around 2015 through Plaintiff's termination, Plaintiff informed Ms.
Beverlin of issues she was experiencing with her immediate supervisor Bobbie Harris, regarding
her use of FMLA.  O'Neal Depo. Exh, 1, at p. 192:22-193:18, 196:1-13.

119.     Particularly, Plaintiff complained about the manner in which Bobbie Harris
treated her when she took FMLA leave; e.g., discussing Plaintiff's disability in front of co-
workers, questioning whether FMLA is necessary or how long Plaintiff planned to take FMLA
leave. O'Neal Depo., Exh. 1, at pp. 194:1-14; *see* ECF Doc. 19, at ¶¶ 18-22.

120.     Plaintiff also complained to Scott Mak that her co-workers openly questioned her
use and need for FMLA. O'Neal Depo., Exh. 1, at p. 13&;19-138:9.

121.     This treatment made Plaintiff feel ashamed for taking FMLA leave. O'Neal
Depo., Exh. 1, at p. 194:7-14.

122.     Centene admits that Plaintiff complained to Terie Beverlin, regarding issues she
had at the Centene. Mak Corp. Rep. Depo., Exh. 2, at pp. 12:20-13:3.

123.     Further, Ms. Beverlin admits that Plaintiff complained to her about her treatment
by Ms. Harris. Beverlin Depo., Exh. 2, at p. 40:12-25.

124.     Ms. Beverlin never disciplined Ms. Harris in any manner. Beverlin Depo., Exh.
2., at p. 73:18-22.

**June 1, 2016 Last Chance Warning**

125.     Plaintiff was given a "Last Chance Warning," primarily related to use of
bereavement leave and inappropriate phone use. Beverlin Depo. Exh. 2, at p. 25:13-20; O'Neal
Depo., Exh. 1, at pp. 90:25-91:22; O'Neal Dec., Exh. 31, at ¶ 4.

126.    Regarding bereavement leave, Plaintiff scheduled to take PTO days for her birthday in late May 2016; specifically, Plaintiff scheduled Friday, May 27, 2016 and Monday, May 30, 2016 for a trip to Las Vegas. O'Neal Depo., Exh. 1, at p. 92:4-93:1; O'Neal Dec., Exh. 31, at ¶ 5.

127.    The trip was planned several months in advance. O'Neal Depo., Exh. 1, at p. 107:24-108:10; O'Neal Dec., Exh. 31, at ¶ 6.

128.    On May 17, 2016, several days before she left for vacation, Rhonda Miller—a woman Plaintiff had known all her life—passed away. O'Neal Depo., Exh. 1, at pp. 95:1-3; O'Neal Dec., Exh. 31, at ¶ 7.

129.    Though Centene recorded a phone conversation on Monday, May 17, 2016, wherein Plaintiff indicated that Rhonda Miller was not her aunt, that evening Plaintiff discovered that Rhonda Miller was her father's sister—a previously unknown fact. O'Neal Depo., Exh. 1, at p. 93:25-94:8, 96:18-25, 107:3-17. O'Neal Dec., Exh. 31, at ¶¶ 8-9; Beverlin Depo., Exh. 3, at p. 24:18-25:7.

130.    The following day, Wednesday, May 18, 2016, Plaintiff requested bereavement to grieve the loss of her aunt with family and friends. O'Neal Depo., Exh. 1, at p. 108:18-24; O'Neal Dec., Exh. 31, at ¶ 10.

131.    Plaintiff never indicated that she planned to attend her aunt's funeral. O'Neal Dec., Exh. 31, at ¶ 11; O'Neal Depo., Exh. 1, at pp. 107:24-108:17.

132.    No written documentation is required for bereavement leave; rather, the employee simply advises Centene that a family member passed away and time off is needed. Mak Corp. Rep. Depo., Exh. 2, at pp. 72:7-73:4.

133.    The bereavement policy does not require employees to attend the funeral; rather, bereavement leave may be used to simply plan funeral services and/or spend time with family. Mak Corp. Rep. Depo., Exh. 2, at pp. 71:18-6.

134.    Other than Plaintiff, no employee has ever been terminated, or even disciplined, with respect to bereavement leave. Mak Corp. Rep. Depo., Exh. 2, at pp. 74:13-75:10, 179:15-25.

135.    With respect to telephone usage, Centene's policy allows employees to use the telephone for personal phone calls. See Telephone Usage Policy, Exh. 7; Harris Depo., Exh. 4, at p. 28:3-9.

136.    There are no contemporaneous complaints by employees of disruptive or inappropriate behavior by Plaintiff, while using the telephone. Mak Corp. Rep. Depo., Exh. 2, at p. 215:2-10; Beverlin Depo., Exh. 2, at p. 95:9-16; Harris Depo., Exh. 4, at p. 51:11-17.

137.    No customers or medical providers have ever complained that Plaintiff behaved in an unprofessional manner over the phone. Beverlin Depo., Exh. 2, at p. 97:12-18, 100:14-101:1.

138.    Defendant admits there is no indication that Plaintiff performed any illegal activities at Centene. Mak Corp. Rep. Depo., Exh. 2, at p. 215:18-20.

139.    No employee has ever been terminated for violating the telephone usage policy. Mak Corp. Rep. Depo., Exh. 2, at p. 96:20-22.

140.    Rather, Nicholas Shepard was given a verbal warning for excessive cell phone usage. Mak Corp. Rep. Depo., Exh. 2, at p. 92:20-93:4.

141.    David Nguyen was given a verbal warning for excessive cell phone usage that was disrupting his performance. Mak Corp. Rep. Depo., Exh. 2, at p. 92:20-93:4.

**June 2016 Complaints**

142.    Plaintiff took FMLA leave on June 6, 2016 through June 7, 2016. Harris FMLA Log, Exh. 21; O'Neal Depo., Exh. 1, at p. 250:17-251:4.

143.    Several days later, Ms. Harris and Ms. Beverlin began excessively tracking Plaintiff's activity in the Daily Team Chat. Daily Team Chat Summary, Exh. 22; Beverlin Chat Tracker, Exh. 23; Beverlin Depo, Exh. 2, at p. 105:18-24.

144.    As a result of Ms. Beverlin failing to remedy Ms. Harris' harassment of Plaintiff, Plaintiff told Ms. Beverlin that she intended to make complaints to Ms. Beverlin's supervisor. O'Neal Depo., Exh. 1, at p. 197:14-23.

145.    Plaintiff made what she believed was an anonymous complaint to the corporate hotline in June 2016, regarding the harassment and discrimination issues she experienced with Bobbie Harris, as well as Geraldine Thomas. O'Neal Depo., Exh. 1, at p. 198:1-7, 222:21-24.

146.    On June 23, 2016, Plaintiff sent an email to Ms. Beverlin stating that she planned to renew her FMLA paperwork following a July 6, 2016 meeting with her doctor. Plaintiff's Email to Beverlin, Exh. 15.

147.    Consequently, Plaintiff further advised Ms. Harris of her need to take FMLA on July 6, 2016. Plaintiff's Email to Beverlin, Exh. 15; O'Neal Depo., Exh. 1., at p. 226:6-25.

148.    On June 29, 2016, Bobbie Harris emailed Human Resources regarding Plaintiff's FMLA usage, wrongfully asserting that Plaintiff needed to provide a Doctor's excuse for approved FMLA. Bobbie Harris Email, Exh. 20. Mak Corp. Rep. Depo., Exh. 2, at p. 240:24-241:12.

149.    Pursuant to the policy, Defendant admits that Plaintiff was not required to provide a doctor's note to justify her FMLA use. Mak Corp. Rep. Depo., Exh. 2, at p. 240:21:241:12.

**Failure to Investigate Complaints**

150.    In June 2016, an anonymous complaint was made against Bobbie Harris, regarding her treatment of employees. Bobbie Harris Investigations, Exh. 12, at p. 4.

151.    Scott Mak claims that when the company received an anonymous complaint, such as the one regarding Ms. Harris, he would perform an investigation; particularly, speaking to relevant employees and reviewing relevant documents. Mak Corp. Rep. Depo., Exh. 2, at pp. 142:22-144:17.

152.    Terie Beverlin, Plaintiff's Department Manager, has never participated in any investigation by Mr. Mak regarding the anonymous complaints made against Bobbie Harris, despite the fact that Ms. Beverlin was Ms. Harris' direct supervisor. Beverlin Depo., Exh. 2, at p. 38:9-38:2; 40:4-11; 70:14-18.

153.    Terie Beverlin, Plaintiff's Department Manager, has never participated in any investigation whatsoever related to complaints of discrimination, harassment or retaliation, while employed at Centene. Beverlin Depo., Exh. 2, at p. 38:9-18.

154.    Plaintiff was never interviewed by Mr. Mak because Plaintiff was on FMLA leave the day Mr. Mak allegedly conducted his investigation. Bobbie Harris Investigation, Exh. 12, at p. 4; Mak Corp. Rep. Depo., Exh. 2, at pp. 149:17-23.

155.    Though Mr. Mak claims he wanted to handle the complaint in a timely manner, the complaint was received, processed, "investigated" and closed on the same day, without Plaintiff's input. Bobbie Harris Investigation, Exh. 12, at pp. 4-5; Mak Corp. Rep. Depo., Exh. 2, at pp. 149:19-151:8.

156.    Another complaint was made against Bobbie Harris in September 2016, alleging she constantly displays loud and unprofessional behavior toward employees. Bobbie Harris Investigation, Exh. 12, at p. 1.

157.    Mr. Mak claims that he spoke to individuals, such as Terie Beverlin, regarding the complaints of discrimination against Bobbie Harris. However, Ms. Beverlin admits that Mr. Mak never spoke to her regarding any allegations. Investigations, Exh. 12, at p. 4; Beverlin Depo., Exh. 2, at p. 38:9-38:2; 40:4-11.

158.    Bobbie Harris was never disciplined with respect to either anonymous complaint. Mak Corp. Rep. Depo., Exh. 2, at pp. 153:16-18, 157:4-7; Beverlin Depo., Exh. 2, at p. 73:18-22.

159.    Bobbie Harris claims she was never even aware that anonymous complaints of discrimination had been made against her. Harris Depo., Exh. 4, at p. 38:16-24.

160.    Scott Mak never spoke to Bobbie Harris regarding complaints of discrimination against her. Harris Depo., Exh. 4, at p. 38:25-39:3.

**Termination**

161.    On July 5, 2016, Plaintiff indicated that she would need to utilize FMLA to deal with her son's asthma. Geraldine Thomas Email, Exh. 16; July 5, 2016 Email, Exh. 17; O'Neal Depo., Exh. 1, at p. 170:11-18.

162.    Plaintiff followed the company policy and advised her immediate supervisor, Bobbie Harris, Department Manager, Terie Beverlin, as well as her Team Leader, Geraldine Thomas, of her FMLA need. July 5, 2016 Email, Exh. 17; Mak Corp. Rep. Depo., Exh. 2, at p. 80:7-14, 84:6-25, 201:1-9; Harris Depo., Exh. 4, at p. 23:22-24:13; O'Neal Depo., Exh. 1, at p. 60:16-61:5.

163. Nonetheless, Ms. Beverlin indicates Plaintiff did not follow proper procedure by copying Mr. Mak or Geraldine Thomas, who has no supervisory authority, on the email correspondence. July 5, 2016 Email, Exh. 17; Mak Corp. Rep. Depo., Exh. 2, at p. 196:1-17.

164. Despite advising Ms. Harris, Ms. Beverlin and Geraldine Thomas that she was taking FMLA leave to deal with her son's medical issues, Ms. Beverlin still insist Plaintiff did not follow the proper procedure. Beverlin Depo., Exh. 2, at p. 89:14-24.

165. Consequently, Ms. Beverlin requested to terminate Plaintiff's employment that day. July 5, 2016 Email, Exh. 17.

166. Plaintiff was terminated the day after she took FMLA leave related to her son on July 5, 2016. *See* FMLA Log, Exh. 11.

167. Plaintiff was terminated from Centene on July 6, 2016. Mak Corp. Rep. Depo., Exh. 2, at p. 186:13-16; Plaintiff's Termination Letter, Exh. 18; Exh. 19, Termination Review Form.

168. Mr. Mak, in connection with Ms. Beverlin, was involved in the decision to terminate Plaintiff. Mak. Corp. Rep. Depo., Exh. 2, at p. 223:13-22; Beverlin Depo, Exh. 2, at p. 90:17-91:2.

**Daily Team Chat and Alleged Performance Issues**

169. Defendant indicates that Plaintiff's primary basis for termination was allegedly stealing time, by not documenting when she was away, or returning, from her desk in the "Daily Team Chat." Mak Corp. Rep. Depo., Exh. 2, at p. 206:11-16, 237:6-13; Beverlin Depo., Exh. 2, at p. 26:9-25, 27:1-5.

170. Scott Mak, Manager of Human Resources, alleges that Plaintiff's termination was solely based upon a "history of integrity issues and ultimately there was stealing time from the

organization." Mak Corp. Rep. Depo., Exh. 2, at p. 7:14-20; Beverlin Depo., Exh. 2, at p. 25:25-26:4.

171.    Defendant admits it has no factual basis to allege that Plaintiff was not performing her duties when she was not at her desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 7:24-8:13.

172.    Centene has a group message portal, known as the "Daily Team Chat," where it allegedly requires employees to indicate when they leave and return to their desk; e.g., for restroom or lunch breaks. Mak Corp. Rep. Depo., Exh. 2, at p. 101:22-102:11; O'Neal Depo., Exh. 1, at pp. 30:22-31:15.

173.    The Daily Team Chat is not an official policy; rather, a "work process" that advise employees how to do their job. Mak Corp. Rep. Depo., Exh. 2, at p. 102:22-24; 231:1-5.

174.    Indeed, Plaintiff always understood this "work process" to be more of a courtesy, rather than a requirement. Harris Depo., Exh. 4, at p. 30:19-25, 36:2-15.

175.    Further, because Plaintiff often had additional job duties than other referral specialist, such as waiver authorizations, Plaintiff was not always monitoring the Daily Team Chat. O'Neal Depo., Exh. 1, at p. 36:2-37:19.

176.    Plaintiff's supervisor, Bobbie Harris, and department leader, Terie Beverlin, are the individuals, that perform a review of the Daily Team Chat. Mak Corp. Rep. Depo., Exh. 2, at p. 234:12-18; Beverlin Depo., Exh. 2, at p. 105:13-17. 106:13-23.

177.    Terie Beverlin relies heavily on input from Bobbie Harris, with respect to whether employees are performing the duties and responsibilities, as well as adhering to company policies and procedures. Beverlin Depo., Exh. 2, at p. 129:9-24; Harris Depo., Exh. 4, at p. 19:21-25.

178.   In fact, Bobbie Harris was the individual in the referral specialist department that communicated most with employees in assessing whether or not they are performing their duties. Harris Depo., Exh. 4, at p. 19:7-20.

179.   Plaintiff is the only individual that was being monitored, with respect to tracking their activities in the Daily Team Chat. Beverlin Exh. 2, at p. 105:3-12.

180.   No other employee has ever been terminated, or even disciplined, for failing to log in and out of the Daily Team Chat, when away from their desk. Mak Corp. Rep. Depo., Exh. 2, at pp. 103:4-23, 231:10-233:2; Beverlin Depo, Exh. 2, at p. 28:23-29:5.

181.   There is no indication that Plaintiff was not performing her work duties as a referral specialist. Beverlin Depo., Exh. 2, at p. 31:12-21; 98:21-24.

182.   Ms. Beverlin testified that she did not believe that any other employees were failing to properly log their activities in their Daily Team Chat. Beverlin Depo., Exh. 2, at p. 98:14-20.

183.   Employees are entitled to two fifteen-minute breaks and a one (1) hour lunch break. O'Neal Depo., Exh. 1, at p. 44:6-19, 79:16-80:1.

184.   On June 14, 2016, there were numerous instances of other employees failing to log their activity in the Daily Team Chat, taking extended lunch breaks, extended 15-minute breaks or extended periods away from their desk:

| Name | Activity | Failed to: Log out/Log in |
|------|----------|---------------------------|
| Mary Hadi | Leaves at 9:05am | Fails to Log In |
| Nicole Richardson | Leaves on "break" at 9:45am | Doesn't return until 10:03am |

| Mary Hadi | Leaves on "break" at 10:01am | Doesn't return until 10:21am |
|---|---|---|
| Elizabeth Sampson | Say "back" at noon | Never indicated she was leaving her desk |
| Nicole Richardson | Leaves for lunch at 12:02pm | Never indicated when she returned from lunch |
| Paula Anna | Leaves for "rr" at 12:50pm | Never indicated when she returned for "rr" |
| Mary Hadi | Leaves for lunch at 1:06pm | Never indicated when she returned from lunch. |

*See* June 14, 2016 Daily Team Chat Screenshot, Exh. 24; Beverlin Depo., Exh. 2, at p. 109:24-119:25.

185.     Bobbie Harris admits that individuals either violated the Daily Team Chat work process, or exceeded their lunch and break times, on June 14, 2016. Harris Depo., Exh. 4, at pp. 63:22-70:23.

186.     Though she had violations of either failing to track her activity in the Daily Team Chat, or took an extended break, Mary Hadi was never disciplined. Beverlin Depo., Exh. 2, at p. 120:16-24.

187.     In fact, neither Mari Hadi, or any other employee was ever monitored by Bobbie Harris, despite the fact that Ms. Harris stated she begins to "monitor" employees in the Daily Team Chat after three (3) instances of not following the procedure. Harris Depo., Exh. 4, at p. 50:7-21, 71:7-72:7.

188.    Bobby Harris emailed Terie Beverlin on June 14, 2016, regarding Plaintiff's failure to log her activity in the Daily Team Chat. June 14, 2016 Email from Harris to Beverlin, Exh. 25.

189.    Terie Beverlin never received notifications from Bobbie Harris related to any other employees whom were failing to log their activity in the Daily Team Chat, or take extended leaves from their desks. Beverlin Depo., Exh. 2, at p. 125:9-15.

190.    Bobbie Harris never sent an email to Ms. Beverlin regarding any other employee, other than Plaintiff, related their failure to log their activity in the Daily Team Chat. Harris Depo., Exh. 4, at pp. 32:1-10, 73:22-74:3.

191.    In October 2016, Mary Hadi was noted to have attendance issues, arriving late, calling in late, not taking breaks and lunch at scheduled times, taking extra breaks, spending "most of the day talking to co-worker," making personal calls on the company phone and having low audit scores, but she was never terminated. October 20, 2016 Harris Email, Exh. 26; Beverlin Depo., Exh. 2, at p. 131:10-12.

192.    On October 21, 2016, Mary Hadi was not terminated, but simply given a Last Chance Agreement, with respect to the following issues:

- Up to 25 personal phone conversations in one month, during working hours;

- Discussing personal life events, excessively during working hours;

- Using company time and resources for personal benefit; e.g., not following lunch and break schedules, not following the company's usage policy for equipment, not following all processes outlined by your supervisor to conduct daily work, and not putting the needs of the business and members first during working hours.

    Mary Hadi Last Chance Agreement, Exh. 29.

193.    In October 2016, Paula Anna was noted to have attendance issues, a pattern of late arrivals, not taking breaks and lunch at scheduled times, spending he day talking to co-worker and have low productivity numbers, but she was not terminated at that time. October 20, 2016 Harris Email, Exh. 26.

194.    No other employee has ever been disciplined with respect to having low productivity numbers. Harris Depo., Exh. 4, at p. 21:25-26:7.

## ARGUMENT AND AUTHORITIES

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (internal quotation marks omitted).

In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id*. (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve

the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). In the Arguments

below, Plaintiff has set forth specific facts from which a rational trier of fact could find for Plaintiff.

## II.   SUBSTANTIAL EVIDENCE SUPPORTS PLAINTIFF'S CLAIMS OF INTERFERENCE WITH HER FMLA RIGHTS.

The Family Medical Leave Act ("FMLA") was enacted in 1993 to provide eligible

employees unpaid time off from work for serious health conditions or . . . to care for a parent,

child, or spouse with a serious health condition. 29 U.S.C. § 2612(a). The leave can be either

continuous, or, where warranted as a matter of medical necessity, intermittent, up to the twelve-

workweek maximum. 29 C.F.R. §§ 825.200 and 202.

Under the FMLA, it is unlawful for a covered employer to "interfere with, restrain, or deny

the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. §

2615(a)(1). A *prima facie* case of FMLA interference is established where Plaintiff can

demonstrate that: (1) she was entitled to FMLA leave; (2) some adverse action by the employer

interfered with her right to take FMLA leave; and (3) this adverse action was related to the exercise

or attempted exercise of her FMLA rights. *Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d

1164, 1180 (10th Cir. 2006).

Here, Liberty Mutual handled all decisions with respect to whether an employee is

approved, and thereby entitled to FMLA leave.[2] (F. 98). Regarding an employee's notice of FMLA

leave, Centene's policy requires that the employee advise their direct manager first and, if no

management is on the floor, the employee should let "somebody" know they are taking FMLA

leave. (F. 100). The best option to let a supervisor know of FMLA leave is "face to face," but if

that is not possible, an Email would be sufficient. (F. 101).

---

[2] Hereinafter, references to the Plaintiff's Statement of Additional Material Facts will be "F. __".

Beginning in 2014, Plaintiff was placed on intermittent FMLA leave related to Gastroesophageal Reflux Diseases ("GERD") and anxiety disorder. (F. 91, 95). The FMLA certification indicated that Plaintiff may need to utilize leave up to four times a month. (F. 91). Further, Plaintiff had approved FMLA leave for her son, related to his asthma. (F. 96). Defendant does not dispute that Plaintiff was granted intermittent FMLA leave by Liberty Mutual. *See* ECF Doc. 41, at p. 22.

### A. Defendant Interfered with Plaintiff's Right to take FMLA leave.

Throughout 2015, Plaintiff took intermittent FMLA leave. (F. 91, 102). Though the leave was approved by Liberty Mutual, Plaintiff was given multiple occurrences (attendance actions leading to discipline) for taking leave.  (F. 98, 102, 104). Consequently, Plaintiff was also given a written warning. (F. 105, 106). In or around June 2015, Plaintiff complained to Rebecca Bryant regarding concerns that she was not being treated properly, with respect to exercising her FMLA rights. (F. 109). Following several discussions with Scott Mak (the Human Resources Manager) and his superiors, several occurrences were removed, while others remained. (F. 97, 107, 110, 114-115). Specifically, Plaintiff was still given a one (1) point occurrence on June 16, 2015 and June 17, 2015, respectively, for calling in sick within one (1) hour of her scheduled start time, even though Plaintiff was on approved intermittent FMLA leave from Liberty Mutual. (F. 115).

Considering that Mr. Mak had dismissive views on FMLA leave, it is not difficult to understand why Plaintiff was singled out and disciplined. Mr. Mak believes that "if [Plaintiff] is calling in after 7am, even if for FML, this still counts as an occurrence of a late notice. Same for if she leaves early." (F. 103). Ironically, Mr. Mak admits that intermittent leave, by its very nature, may be unforeseen causing an employee to take leave without prior notice. (F. 99).

Defendant provides no plausible explanation for its actions. Indeed, Mr. Mak, as the individual primarily tasked with interpreting Centene's policies and ensuring employees' compliance, now states that Centene's actions were simply a misunderstanding, despite incontrovertible evidence otherwise. (F. 97, 116). Not that it matters. With respect to FMLA interference claims, the *McDonnell Douglas* burden shifting framework, applicable in other employment discrimination and retaliation claims, does not apply. *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). In other words, an employer's intent (or lack thereof) to interfere with the employee's FMLA rights is irrelevant. *Id.*

Consequently, even though Plaintiff was entitled to FMLA leave, issuing Plaintiff occurrences, and subsequent disciplinary action, for exercising her FMLA rights is a direct violation of the statute. Plaintiff is entitled to relief.

### B. Defendant attempted to restrain, and ultimately denied, Plaintiff's right to take FMLA leave.

Plaintiff continued to take FMLA leave throughout 2015 and 2016. (F. 102, 142). On June 23, 2016, Plaintiff sent an Email to Terie Beverlin (Plaintiff's Department Manager) advising Ms. Beverlin of her need to take FMLA leave on July 6, 2016. (F. 147). Plaintiff further indicated that on July 6, 2016 she planned to speak with her physician regarding renewal of her FMLA leave for the following year. (F. 84, 146).

On June 29, 2016, Bobbie Harris (Plaintiff's Immediate Supervisor) Emailed Human Resources regarding Plaintiff's FMLA usage. (F. 83, 148). After noting that Plaintiff called in sick that morning and wasn't sure if she would be in later that day, Ms. Harris unlawfully asserted that Plaintiff was required to bring a Doctor's "excuse" to justify leave—despite being on approved

intermittent FMLA leave. *Id.* Pursuant to the policy, Defendant admits that Plaintiff was not required to provide a doctor's note to justify her FMLA use. (F. 149).

Several days later, on July 5, 2016, Plaintiff indicated that she would need to utilize FMLA to deal with her son's asthma. (F. 161). Plaintiff followed the company policy and advised her immediate supervisor, Bobbie Harris and department leader, Terie Beverlin, by Email, of her FMLA need. (F. 162). Plaintiff also notified her Team Leader, Geraldine Thomas, in person. *Id.* Despite advising Ms. Harris, Ms. Beverlin and Ms. Thomas that she was taking FMLA leave, Ms. Beverlin still insist Plaintiff did not follow the proper procedure by *further* copying Mr. Mak on the email correspondence. (F. 163-164). Consequently, Ms. Beverlin requested to terminate Plaintiff's employment that day. (F. 165). In consultation with Mr. Mak, Plaintiff was officially terminated on July 6, 2016, the day after she took FMLA leave related to her son, and the same day Plaintiff indicated she planned to seek renewal of her FMLA leave for the following year. (F. 81, 146-147, 166-168).

Based upon the record above, it is clear Centene attempted to restrain or deny Plaintiff's FMLA rights by: (1) unlawfully asserting she required a doctor's excuse to take leave on June 29, 2016, (2) asserting she did not follow company policy on July 5, 2016, despite giving notice to three (3) individuals of her FMLA leave, (3) denying Plaintiff leave on July 6, 2016 and (4) denying Plaintiff the opportunity to renew her 12-week FMLA leave for the upcoming year. (F. 149, 163-164, 167-168). *See Campbell*, 478 F.3d at 1287 (internal citation omitted) (An employer may expose itself to a potential FMLA interference/entitlement claim by preventing its employee from taking the full twelve weeks of leave.). Indeed, the temporary proximity of Plaintiff's denial of FMLA leave, following several instances of requested leave, further establish unlawful interference by Centene. *See Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1227 (10th Cir. 2012)

(recognizing that the exceedingly close timing between the employee's request for leave and employee's termination could be sufficient, without more, to establish unlawful FMLA interference).

Nonetheless, Defendant argues that that it would have terminated Plaintiff regardless of her taking FMLA leave. *See Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d 1164, 1180 (10th Cir. 2006) (Where the employee successfully establishes her entitlement to an FMLA right and some sort of employer interference with it, the burden of proof automatically shifts to the employer on the third element). Notably, as fully articulated below in Section IV.B, Defendant's suggested basis for Plaintiff's termination is without merit.

It is unmistakable that Defendant interfered with Plaintiff's rights under the FMLA. Since Defendant purports that Plaintiff would have been terminated regardless of her leave, a fact issue exists as to whether Defendant's actions have merit. Thus, summary judgment should be denied on Plaintiff's FMLA interference claims.

## III.   SUBSTANTIAL EVIDENCE SUPPORTS PLAINTIFF'S CLAIMS OF DISCRIMINATORY TREATMENT.

The Americans with Disabilities Act ("ADA") prohibits employers from discriminating against a "qualified individual with a disability" with respect to terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a); *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1253 (10th Cir. 2001). To establish a prima facie case of discrimination under the ADA, plaintiff must show that she is disabled within the meaning of the ADA; that she is qualified (i.e., able to perform the essential functions of the job with or without accommodation); and that she was discriminated against because of his disability. *See McKenzie v. Dovala*, 242 F.3d 967, 969 (10th Cir. 2001).

A.      **Under the ADA, Plaintiff was disabled.**

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1).

1.   Actual Disability.

To show an actual disability, Plaintiff "must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014) (quoting *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011)). The third factor requires Plaintiff to show that she is limited in her major life activity "as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(4)(i).

Here, Plaintiff was diagnosed with Gastroesophageal Reflux Diseases ("GERD") and anxiety disorder. (F. 91). GERD causes Acid Reflux digestive issues in the stomach, leading to severe pain and affecting Plaintiff's ability to eat, walk and work. (F. 92). *See Rakity v. Dillon Cos., Inc.,* 302 F.3d 1152, 1158 (10th Cir. 2002) (Working is considered a major life activity). With respect to anxiety disorder, Plaintiff experienced breathing issues, which increased her heart rate and caused numbness in her limbs. (F. 93). This medical condition caused her to take intermittent leave from work on a regular basis. (F. 91). The Court can reasonably infer that Plaintiff has a recognized impairment that substantially limited her ability to eat, walk and work.

2.   Perceived Disability

Under the ADA Amendments Act ("ADAAA"), a "regarded as" impairment "need not limit or even be perceived as limiting a major life activity—the employer need only regard the

51

employee as being impaired." 42 U.S.C. § 12102(3)(A); *Adair v. City of Muskogee*, 823 F.3d 1297, 1305 (10th Cir. 2016). A plaintiff thus needs to plead and prove only that she was regarded as having a physical or mental impairment. *Id*. (citing *Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016)). In this case, Plaintiff would need to show that (1) her stomach issues are actual or perceived impairments, (2) those impairments were not transitory or minor, and (3) Centene was aware of and therefore perceived the impairments at the time she was disciplined and terminated. *Adair*, 823 F.3d at 1306.

Here, as indicated above, Plaintiff has presented sufficient evidence from which an inference could be drawn that she was regarded as having such impairments. Beginning in 2014 through her termination in 2016, Plaintiff took FMLA leave, as a result of stomach issues that affected her ability to walk, eat and work. (F. 91, 92-93, 102). These issues were not minor or transitory, defined as "an impairment with an actual or expected duration of six (6) months or less." 42 U.S.C. § 12102(3)(B). Indeed, Scott Mak, Centene's Human Resources Manager, indicated that he believed Plaintiff was taking excessive leave to deal with her medical issues and that Plaintiff's leave should only be used for emergency situations. (F. 103, 107). Further, when Plaintiff took leave for stomach issues and anxiety, Plaintiff's supervisor, Bobbie Harris, sought to use her leave as a basis for discipline. (F. 148). While Defendant now asserts that there were other reasons for terminating her employment, the Court could reasonably infer Plaintiff was terminated because she was regarded as having an impairment.

### B.   Plaintiff was qualified to perform the essential functions of her job.

Plaintiff must show that she is able to perform the essential functions of her job. *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015). The 10th Circuit has stated that a "plaintiff is a qualified individual as long as she can perform a job offered by the employer that

she desires." (alterations and quotation marks omitted)). *Id.* at 884. The ADA's implementing regulations, promulgated by the EEOC, provide that "[t]he term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1) (2015).

Here, Plaintiff is qualified for the position as a referral specialist, whose primary job duties were to process referrals for nurses and doctors. (F. 82). Plaintiff also corrected off-air authorizations, waiver authorizations and submitted denial letters. (F. 85). Though Plaintiff was placed on intermittent FMLA leave two years prior to her termination, Plaintiff consistently performed her duties, even though she took intermittent leave. (F. 91). Indeed, Plaintiff's compensation increased every year she worked at Centene and also received merit bonuses. (F. 86-90). Put another way, as long as Plaintiff was able to take intermittent leave to deal with medical issues, which is a reasonable accommodation, Plaintiff could perform the essential functions of the job. (F. 94). There is enough evidence for a reasonable jury to conclude that at the time of her firing, Plaintiff could still perform the essential functions of her job with reasonable accommodation.

### C.    Plaintiff was discriminated against because of her disability.

Lastly, the Court could reasonably infer that Centene discriminated against Plaintiff because of her disability. "Under the ADA, prohibited discrimination includes failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *See Rascon v. U.S. West Communications, Inc.* 143 F.3d 1324, 1333–34 (10th Cir. 1998). Plaintiff's FMLA leave for her medical issues amounts to a request for a reasonable accommodation for her disability. *See Rascon,* 143 F.3d at 1333–34 (citing *Hudson v. MCI Telecomms. Corp.,* 87 F.3d 1167, 1169 (10th Cir. 1996)) (Leave for medical treatment may

qualify as reasonable accommodation under the ADA.). The 10th Circuit has stated that where a Plaintiff request and takes no more leave than the FMLA already required that she be given, the Court cannot conclude that the length of time was unreasonable or that the leave unduly burdened the employer. *See Smith v. Diffee Ford-Lincoln-Mercury, Inc.,* 298 F.3d 955, 967 (10th Cir. 2002).

As fully stated above in Section II.A-B, Scott Mak, Centene's Human Resources Manager, believes Plaintiff was taking excessive leave to deal with her medical issues and that Plaintiff's leave should only be used for emergency situations. (F. 103, 107). Plaintiff's supervisor, Bobbie Harris, similarly made comments regarding Plaintiff's medical issues and whether medical leave was necessary. (F. 119, 148). These statements could lead a jury to reasonably conclude that Plaintiff was terminated because she needed more time off than her co-workers to deal with her medical issues—that is, because she had a disability that Defendant no longer wanted to accommodate. *See E.E.O.C. v. Heartway Corp.,* 466 F.3d 1156, 1167 (10th Cir. 2006) ("[The supervisor's] expression of concern ... that there would be 'mass exodus' if the clients found out that the cook had <u>hepatitis</u> supports a finding that [the plaintiff] was therefore fired because she had that disease.").

It is undisputed that Centene fired Plaintiff the day she indicated she was going to seek a renewal of her medical leave. (F. 146, 167-168). Whether Plaintiff would have kept her job had she not taken medical leave, or whether she would have been fired anyway, is a question for the jury. Indeed, the timing of Plaintiff's dismissal, together with testimony suggesting Plaintiff's disciplinary actions were attributable to her taking medical leave, provide adequate prima facie evidence of discrimination under the ADA. (F. 167-168).

Though Defendant alleges that Plaintiff was terminated for alleged dishonesty and integrity issues, Plaintiff has shown that genuine issues of material facts exist with respect to whether

Defendant's arguments are legitimate and non-discriminatory. *See* Section IV.B. Consequently, Summary Judgment should not be granted with respect to Plaintiff's ADA claim.

## IV.  SUBSTANTIAL EVIDENCE SUPPORTS PLAINTIFF'S CLAIMS OF RETALIATION UNDER THE FMLA AND ADA.

In addition to interfering with Plaintiff's substantive rights, Defendant sought to retaliate against Plaintiff for exercising her FMLA rights, as well as the protections provided to her under the ADA. 29 U.S.C. § 2615(a)(2); *see also* 29 C.F.R. § 825.220(c). Since the FMLA and ADA are both subject to the *McDonnell Douglas* burden-shifting framework, both claims may be analyzed simultaneously. *See Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1207–08 (10th Cir. 2007); *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1167 (10th Cir. 2006). To establish a prima facie case of retaliation, Plaintiff must demonstrate: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between her exercise of rights and the adverse employment action. *Id.* at 1171. If the employee successfully states a *prima facie* case of retaliation, the burden then shifts to the employer to offer a legitimate, non-retaliatory reason for the adverse employment action. *Id.* The employee then bears the ultimate burden of demonstrating that the employer's proffered reason is pretextual. *Id.* Notably, Plaintiff's burden at the prima facie stage requires only a "small amount of proof necessary to create an inference" of discrimination or retaliation, by a preponderance of the evidence, and the burden is "not onerous." *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005))

### A. Due to Plaintiff exercising her rights under the law, Defendant engaged in retaliatory and hostile behavior.

Below, Plaintiff has articulated numerous acts of protected activity. As a result of those acts, and contrary to company policy, Defendant engaged in retaliatory actions. (F. 75). It appears

that the only element disputed by Defendant is that Plaintiff cannot establish a causal connection between Plaintiff exercising her rights and the adverse employment actions. Instead, Defendant argues it had legitimate and nondiscriminatory reasons for the decisions it made with respect to Plaintiff. Critically, as indicated in Section IV.B below, the reasons provided by Defendant are inconsistent, unfounded in facts and serve to underscore Defendant's pretext for discrimination.

1. After taking approved FMLA leave, Plaintiff was disciplined by Centene in 2015.

Liability for unlawful retaliation can arise in situations where an employee engages in protected activity, such as by taking FMLA leave. *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287-88 (10th Cir. 2007). Where FMLA leave also amounts to a request for reasonable accommodation of an employee's disability, liability may arise due to adverse actions related to an employee's reasonable accommodation. *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002). Here, between March 2015 to June 2015, Plaintiff was given occurrences (attendance actions leading to discipline) while she was on approved FMLA leave for her medical issues. (F. 102, 105-106). Plaintiff was also given a written warning. (F. 105). Following several meetings with Mr. Mak, and his superiors, several occurrences were removed, while others remained. (F. 107, 109, 114). Plaintiff was still given a one (1) point occurrence on June 16, 2015 and June 17, 2015, respectively, even though Plaintiff was on approved FMLA leave from Liberty Mutual. (F. 115). Indisputably, Mr. Mak, the Manager of Human Resources, indicated that "if [Plaintiff] is calling in after 7am, even if for FML, this still counts as an occurrence of a late notice. Same for if she leaves early." (F. 97, 103). As indicated in Section II.A above, Defendant had no legitimate, non-discriminatory basis for the actions it took toward Plaintiff.

2.  <u>Plaintiff complained of discrimination on multiple occasions in June 2015.</u>

On June 12, 2015, Plaintiff and Mr. Mak met to discuss the occurrences, and related disciplinary action, Plaintiff received. Mr. Mak made the following comments during their meeting:

  a. Any unscheduled time off using FML or not will be counted against your Attendance
  b. FML should be used for emergent reasons and you just use it too much
  c. Just because you are approved . . . doesn't mean you should use it. If everyone in the company had FML and used it, whenever they wanted it would impact the business needs of the company
  d. I have to follow the attendance policy just like every other employee, no matter if I have FML. (F. 107).

Plaintiff indicated that Mr. Mak was upset and combative during their meeting. (F. 108). Several days later, Plaintiff complained to Rebecca Bryant regarding concerns that she was not being treated properly, with respect to exercising her FMLA rights. (F. 109). Further, in a June 23, 2015 Email to Mr. Mak and his superiors, Plaintiff provided a summary of the June 12, 2015 meeting and further stated that she was being treated unfairly due to her FMLA leave and that Centene was violating her statutory rights. (F. 110). Though Mr. Mak concedes Plaintiff believed she was being discriminated against because of her FMLA use, Mr. Mak was unconcerned about her complaints. (F. 111-112). And though its polices indicate that complaints of discrimination and harassment are taken serious by the company, and should be investigated thoroughly, Mr. Mak was never investigated nor did any further investigation of Plaintiff's complaints occur. (F. 70-75, 113). Further, Centene never provided any further training to employees regarding FMLA leave. (F. 117).

### 3.   Plaintiff complained of discriminatory acts by her supervisor Bobbie Harris.

In and around 2015 through Plaintiff's termination, Plaintiff informed Terie Beverlin (Plaintiff's Department Manager) of issues she was experiencing with her immediate supervisor Bobbie Harris—regarding her medical issues and use of FMLA. (F. 118). Particularly, Plaintiff complained about the manner in which Bobbie Harris treated her when she took FMLA leave; e.g., discussing Plaintiff's medical issues in front of co-workers, questioning whether FMLA is necessary or how long Plaintiff planned to take FMLA leave. (F. 119). Pursuant to the policy, Plaintiff also made Mr. Mak aware of the issues she was experiencing and that this treatment made Plaintiff feel ashamed for taking FMLA leave. (F. 74, 120-121).  Though Centene and Ms. Beverlin admit that Plaintiff complained about her issues with Ms. Harris, Ms. Harris was never disciplined in any manner. (F. 122-124).

As a result of Ms. Beverlin failing to remedy Ms. Harris' harassment of Plaintiff, Plaintiff told Ms. Beverlin that she intended to make complaints to Ms. Beverlin's superiors. (F. 144). Plaintiff then made what she believed was an anonymous complaint to the corporate hotline in June 2016, regarding the harassment and discrimination issues she experienced with Bobbie Harris and the failure of her management to remedy the situation. (F. 76, 145, 150).

Pursuant to company policy, Mr. Mak claims that when receiving a complaint, he would perform an investigation; particularly, speaking to relevant employees and reviewing relevant documents. (F. 77-78, 151). In reality, Mr. Mak's actions do not match his words. Though Ms. Beverlin was the Department Manager, she admits that she never participated in any investigation whatsoever related to complaints of discrimination, harassment or retaliation, much less any investigation related to complaints made against Bobbie Harris. (F. 152-153, 157). Further, though Mr. Mak claims he wanted to be thorough in investigating allegations against Ms. Harris, the

complaint was received, processed, "investigated" and closed on the same day. (F. 155). Plaintiff was never interviewed and provided no input, with respect to the complaint. (F. 154).

Unsurprisingly, another complaint was made against Bobbie Harris in September 2016, alleging she constantly displays loud and unprofessional behavior toward employees. (F. 156). Again, Ms. Harris was never disciplined. (F. 158). Indeed, Ms. Harris admits that Mr. Mak never spoke to her regarding discrimination complaints made against her. (F. 159-160).

<ol start="4">
<li>Following Plaintiff's request for accommodations, and subsequent use of approved medical leave, Plaintiff was disciplined by Centene in 2016.</li>
</ol>

As indicated more thoroughly in Section II.B, Plaintiff requested reasonable accommodations to deal with her medical issues; particularly, medical leave under the FMLA. (F. 91-96). The accommodation request was granted and Plaintiff exercised her rights by taking FMLA leave on June 6, 2016 through June 7, 2016. (F. 91, 142). Though Plaintiff was entitled to take FMLA on June 29, 2016, Centene sought to use Plaintiff's absence as a basis for further disciplinary action. (F. 148). Finally, on July 6, 2016, the date Plaintiff indicated she planned to renew her accommodation request for medical leave, Plaintiff was terminated. (F. 167-168). *See, e.g., Williams v. W.D. Sports, N.M., Inc.* 497 F. 3d 1079, 1091 (10th Cir. 2007) (Protected conduct closely followed by an adverse action is sufficient evidence to justify an inference of retaliatory motive).

Taking all inferences from these facts in the light most favorable to Plaintiff, Plaintiff has produced sufficient evidence demonstrating she engaged in protected activity, which lead to material adverse employment actions; e.g., attendance violations, a written-warning and ultimately termination. *Kendrick v. Penske Transp. Servs.,* 220 F.3d 1220, 1227 (10th Cir. 2000); *See also Chertkova v. Connecticut Gen. Life Ins.,* 92 F.3d 81, 91 (2d Cir.1996) ("there is no unbending or

rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision").

**B.** **Defendant's Stated Reasons for its disciplinary actions against Plaintiff are really pretext for discrimination.**

Once Plaintiff's prima facie case is established, Defendant must offer a "legitimate nondiscriminatory reason for the adverse employment action." *Monroe v. City of Lawrence,* 2014 WL 289463 (D.Kan. 2014) (quoting *Carney v. City & Cnty. of Denver,* 534 F.3d 1269, 1273 (10th Cir. 2008)).  The burden then shifts back to the plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual." *Id.*

Plaintiffs can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. General Elec. Astrospace,* 101 F.3d 947, 951–52 (3rd Cir .1996)); *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038-1039 (10th Cir. 2011).  Although there is no strict form that plaintiffs must follow, a plaintiff usually makes a showing of pretext in one of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.
> *Kendrick,* 220 F.3d at 1230 (internal citations omitted).

The relevant issue is not whether the stated reasons were wise, fair, or correct but whether the defendant honestly believed in those reasons and acted in good faith. *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004). Here, Defendant alleges that Plaintiff's termination was solely

based upon a "history of integrity issues and . . .  stealing time from the organization." (F. 169-170). Critically though, the factual record suggest that Defendant exclusively held Plaintiff to a different standard than her co-workers regarding work policies and procedures. (F. 184). *See Tyler v. RE/MAX Mountain States, Inc.,* 232 F.3d 808, 814 (10th Cir. 2000) (holding that when the plaintiff casts doubt on employer's stated reasons for adverse employment action(s), the jury could reasonably find the employer lacks credibility)).

1.   **The disciplinary actions that form the basis for Plaintiff's Last Chance Agreement are without merit.**

Plaintiff was given a "Last Chance Warning," primarily related to use of bereavement leave and inappropriate phone use. (F. 125). Regarding bereavement leave, Defendant argues Plaintiff was dishonest by requesting leave for her aunt's funeral. (F. 126). However, upon being questioned, Plaintiff was clear and consistent in explaining the situation. Defendant simply chose to ignore her explanation.

Undeniably, Plaintiff scheduled to take PTO days for her birthday in late May 2016; specifically, Plaintiff scheduled Friday, May 27, 2016 and Monday, May 30, 2016 for a trip to Las Vegas. (F. 126). The trip was planned several months in advance. (F. 127). On May 17, 2016, several days before she left for vacation, Rhonda Miller—a woman Plaintiff had known all her life—passed away. (F. 128). Though Centene recorded a phone conversation on Monday, May 17, 2016, wherein Plaintiff indicated that Rhonda Miller was not her aunt, that evening Plaintiff discovered that Rhonda Miller was her father's sister—a previously unknown fact. (F. 129). The following day, Wednesday, May 18, 2016, Plaintiff requested bereavement to grieve the loss of her aunt with family and friends. (F. 130).

To be certain, Plaintiff never indicated that she planned to attend her aunt's funeral. (F. 131). Indeed, the bereavement policy does not require employees to attend the funeral; rather, bereavement leave may be used to simply plan funeral services and/or spend time with family. (F. 133). The bereavement policy also does not require any type of written documentation related to a family member's death. (F. 132). Considering the fact that no employee, other than Plaintiff, has ever been disciplined or terminated regarding bereavement leave, Defendant's attempts to paint Plaintiff as a liar are meritless. (F. 134).

Further, with respect to the telephone policy, Centene's policy allows employees to make personal phone calls. (F. 135). Though Defendant argues that Plaintiff engaged in unprofessional conversations over the phone, this "violation" amounts to little more than trolling for an issue, *any* issue at that. Despite Defendant's "fresh off the keyboard" declarations from several employees, there are no contemporary complaints by employees of disruptive or inappropriate behavior by Plaintiff. (F. 136). Further, no customers or medical providers have ever complained that Plaintiff behaved in an unprofessional manner over the phone. (F. 137). It is also apparent that Plaintiff never engaged in making any unprofessional statements or engaging in illegal activities.  (F. 34, 138). Quite the opposite, Plaintiff's compensation increased every year she worked at Centene and she also received merit bonuses. (F. 86-90). Notably, other similarly-situated employees who engaged in the similar conduct to Plaintiff were simply given verbal warnings for excessive phone usage, and no employee has ever been terminated for violating the policy. (F. 139-141).

2. **Defendant's ultimate reasoning for Plaintiff's termination does not hold water when considering the inconsistent nature that it applies discipline.**

Defendant indicates that the primary basis for Plaintiff's termination was allegedly stealing time, by not documenting when she was away, or returning, from her desk in the "Daily Team Chat." (F. 169-170). The Daily Team Chat is a group message portal, where Centene alleges

employees should indicate when they leave and return to their desk; e.g., for restroom or lunch breaks.[3] (F. 172). It is not an official policy, rather a "work process." (F. 173-174). Bobbie Harris and Terie Beverlin monitored the Daily Team Chat—though Ms. Beverlin relies heavily on input from Ms. Harris—with respect to whether employees are performing their duties and adhering to Centene's policies. (F. 176-177-178).

Here, Plaintiff took FMLA leave on June 6, 2016 through June 7, 2016. (F. 142). Several days later, Ms. Harris and Ms. Beverlin began excessively tracking Plaintiff's activity in the Daily Team Chat. (F. 143). Because Plaintiff often had additional job duties than other referral specialists, such as waiver authorizations, Plaintiff did not always indicate when she was left or returned to her desk. (F. 85, 175). By Defendant's logic, Plaintiff was not performing her duties. However, Defendant admits it has no factual basis for this assertion. (F. 171, 181). What is certain is that while other employees engaged in the same conduct, or lack thereof, those individuals did not incur the same scrutiny as Plaintiff. (F. 179). *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (Pretext can be shown by showing the employer enforced company policies more strictly against the plaintiff than against other similarly situated employees.); *Mohammed v. Callaway,* 698 F.2d 395, 401 (10th Cir. 1983) (pretext can be shown by serious procedural irregularities).

Indeed, Plaintiff is the only individual that was monitored in the Daily Team Chat. (F. 179). For instance, Ms. Harris emailed Ms. Beverlin on June 14, 2016, regarding Plaintiff's failure to log her activity. (F. 188). Yet, Ms. Beverlin never received, nor did Ms. Harris ever send,

---

[3] Employees are entitled to two fifteen-minute breaks and a one (1) hour lunch break. (F. 183).

notifications related to *any* other employees whom were failing to log their activity in the Daily Team Chat, or whom took extended leaves from their desks. (F. 189-190).

Laughably, Ms. Beverlin testified that she did not believe that any other employees were failing to properly log their activities. (F. 182). However, after reviewing <u>one-day</u> of the Daily Team Chat—June 14, 2016, the same day Ms. Harris Emailed Ms. Beverlin regarding Plaintiff—there were numerous instances of other employees failing to log their activity, taking extended lunch breaks and/or extended 15-minute breaks:

| Name | Activity | Failed to: Log out/Log in |
|------|----------|---------------------------|
| Mary Hadi | Leaves at 9:05am | Never indicated when she returned |
| Nicole Richardson | Leaves on "break" at 9:45am | Doesn't return until 10:03am |
| Mary Hadi | Leaves on "break" at 10:01am | Doesn't return until 10:21am |
| Elizabeth Sampson | Says "back" at noon | Never indicated she was leaving her desk |
| Nicole Richardson | Leaves for lunch at 12:02pm | Never indicated when she returned from lunch |
| Paula Anna | Leaves for "rr" at 12:50pm | Never indicated when she returned from "rr" |

| Mary Hadi | Leaves for lunch at 1:06pm | Never indicated when she returned from lunch. |

(F. 184).

While Ms. Harris admits the individuals above either violated the Daily Team Chat, or exceeded their lunch and break times, no employee was disciplined or counseled. (F. 180, 185-187) In fact, no employee has ever been terminated, or even disciplined, for failing to log their activity in the Daily Team Chat. (F. 180).

Quite the opposite. A number of employees; e.g., such as Mary Hadi, engaged in the same activity, or worse, that Defendant deemed unprofessional and dishonest by Plaintiff. (F. 191-194). In October 2016, Mary Hadi—already on a Last Chance Agreement—was noted to have attendance issues, arriving late, calling in late, not taking breaks and lunch at scheduled times, taking extra breaks, spending "most of the day talking to co-worker," making personal calls on the company phone (up to 25 conversations in one instance), excessively discussing personal life events with individuals inside and outside Centene and having low audit scores. (F. 191). Unsurprisingly, Ms. Hadi was never terminated, but simply placed on another Last Chance Agreement. (F. 192).

Finally, Defendant provides facts in its MSJ that were never cited as a basis for Plaintiff's termination; particularly, Plaintiff's cell phone records. *See Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) (A factfinder can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision.). Putting aside the fact that Defendant grossly overstates Plaintiff's use of her cell phone during working hours, nor does it indicate whether Plaintiff was on lunch or break times, Defendant does not cite personal cell phone calls as a basis for Plaintiff's termination. (F. 169-170, 167). Defendant

should not now, nearly two years after Plaintiff's termination, be allowed to justify Plaintiff's termination based upon facts that were never cited, or known to it, at the time she was terminated. Further, other employees, such as Nicholas Shepard, David Nguyen and Mari Hadi, were certainly not terminated, or barely disciplined, despite similar behavior. (F. 140-141, 191-192).

Viewed in the light most favorable to the non-movant, Plaintiff has provided sufficient facts for a reasonable jury to conclude that Defendant's proffered reasons for its discriminatory actions toward Plaintiff were really pretext for discrimination. Therefore, since genuine issues of material facts exists, summary judgment should be denied.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests the Court deny Defendant's Motion for Summary Judgment of Plaintiff's Complaint.

HOLMAN SCHIAVONE, LLC

By: _/s/ M. Shaun Stallworth_
  M. Shaun Stallworth, KS Fed. Bar# 78332
  sstallworth@hslawllc.com
  4600 Madison, Suite 810
  Kansas City, Missouri 64112
  Telephone: 816.283.8738
  Facsimile: 816.283.8739

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

Plaintiff hereby certifies that a true and accurate copy of the foregoing was served on May 30, 2018 via e-mail and through the Court's CM/ECF system to:

Robert A. Kaiser, MO #31410
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105
(314) 621-5070
(314) 621-5065 (facsimile)
rkaiser@armstrongteasdale.com

Dione C. Greene, KS #23010
ARMSTRONG TEASDALE LLP
2345 Grand Boulevard, Suite 1500
Kansas City, Missouri 64108-2617
(816) 221-3420
(816) 221-0786 (facsimile)
dgreene@armstrongteasdale.com

**ATTORNEYS FOR DEFENDANT**

 */s/ M. Shaun Stallworth*
**ATTORNEYS FOR PLAINTIFF**