# Exhibit 4

Wilson, I can't remember what her hyphenated name was.
Q. Who was the manager of Utilization Management at that time?
A. It was Charlsie, when I first started back in two thousand -- I actually started as a temp in January of 2013 and then I became permanent April 1st.
Q. Okay.
A. Of 2013.
Q. At some point Ms. Beverlin became the manager of Utilization Management, correct?
A. Yes.
Q. Okay. And then you became the supervisor over referral specialists, correct?
A. Yes.
Q. When did that occur?
A. I believe October of 2014.
Q. Okay. And who was your manager at that time?
A. Mariza Greenwald.
Q. And at some point that changed?
A. Yes, Mariza went to a different department so then the manager was Patty Counter.
Q. Okay. And then at some point Ms. Beverlin was the manager after Ms. Counter?
A. After Patty Counter left, then Terie became manager.



Q. Okay.
A. And now I believe Terie is the director.
Q. So then you went back to being a prior authorization nurse; is that right?
A. Correct.
Q. When did this occur?
A. December of I want to say 2016.
Q. Why did you go back to being a prior authorization nurse?
A. The department decided they were going to reorganize and they weren't going to have supervisors anymore, they had team leads, so I went back to doing prior authorization.
Q. Did you apply for the team lead position?
A. No, that was already filled. There wasn't one open.
Q. Okay. And who currently is the team lead?
A. At that time it was Susan Ray.
Q. Who's the current team lead?
A. I don't know that they have one because they have reorged again up there.
Q. So basically they are getting rid of supervisors for referral specialists and simply having team leads?
A. Correct.
Q. And the team leads would then report directly to



the manager --
A. Managers.
Q. -- of Utilization Management?
A. Correct.
Q. Okay. So you were a prior authorization nurse beginning in December 2016 and then at some point you became the clinical appeals coordinator; is that right?
A. Yes.
Q. Is that in the same department?
A. No, it's in the Quality Department.
Q. Who's your supervisor now?
A. Michelle Collins.
Q. How long have you been in that position?
A. Since November of 2017.
Q. I'm handing you Plaintiff's Exhibit No. 2. Have you ever seen this document before?
A. Yes, I have.
Q. This appears to be the company's anti-harassment policy; do you see that?
A. This isn't the harassment policy.
Q. I apologize. That appears to be the company's equal employment opportunity policy, correct?
A. Correct.
Q. All right. The second sentence in the policy says, "The company does not unlawfully discriminate on



the basis of race, color, religious creed, citizenship status, sex, national origin, ancestry, marital status, sexual orientation, gender, gender expression and gender identity, genetic information, physical or mental disability, medical condition" and a number of other character traits that the company does not discriminate against; do you see that?
A. Yes.
Q. Have you always understood that to be a true and accurate statement?
A. Yes, I have.
Q. You would agree with me that employers must not discriminate against employees, correct?
A. Correct.
Q. You'd agree with me that employers should treat all employees equally, correct?
A. It just depends on their history. But as far as harassment, yes, all employees should be treated equally.
Q. Okay. With respect to discrimination, harassment or retaliation, you would agree that employees should treat -- make an attempt to treat the employee equally with respect to investigating claims of harassment, discrimination or retaliation, correct?
A. Correct.
Q. I'm handing you Plaintiff's Exhibit No. 3. This

is the company's anti-harassment policy. Have you seen this document before?
A. Yes, I have.
Q. Underneath the Policy section it says, "The company is committed to maintaining a work environment that is free of unlawful harassment, including sexual harassment. We will not tolerate harassment of company employees by anyone, including any supervisor, coworker or third parties, nor will we tolerate harassment of customers, vendors or others by a company employee while on the job." Have you always understood that to be a true and accurate statement?
A. Yes, I have.
Q. On the second page of this exhibit, the second paragraph says, "The company forbids retaliation against anyone for reporting harassment, assisting in making a harassment complaint, or participating in a harassment investigation." Do you see that?
A. I do.
Q. Have you always understood that to be a true and accurate statement?
A. Yes, I have.
Q. You would agree with me that the employer, in this instance Sunflower, should treat all complaints of retaliation with importance, correct?



A. Yes. Sorry, yes.
Q. That's okay. I hand you Plaintiff's Exhibit No. 4. Underneath the heading for Reporting Discrimination it says, "An employee who believes that he or she has experienced or witnessed discrimination, or who becomes aware of possible discrimination, should notify a supervisor of the company or a Human Resources representative assigned to the employee's work site or the employee's business unit." Do you see that?
A. I do.
Q. "The notification can be orally or in writing. An employee need not report such behavior to his or her direct supervisor." Do you see that?
A. I do.
Q. Have you always understood that to be a true and accurate statement?
A. Yes.
Q. So you would agree with me that this means that a report of discrimination could be made verbally or in writing, correct?
A. Correct.
Q. And it does not have to be reported to the direct supervisor, correct?
A. Correct. If they have a complaint about a supervisor, I'm sure that they're not going to report it



to the supervisor, they're going to go to the manager in charge or HR.
Q. Fair enough. Have you ever been involved in investigating complaints of harassment, retaliation or discrimination?
A. I have been called to the office once for a complaint.
Q. And what was that related to?
A. I really can't remember.
Q. Was it a complaint about you?
A. I believe so, an anonymous complaint I think.
Q. When did that occur?
A. I couldn't tell you, I don't know the date.
Q. Who called you to the office?
A. Scott Mak.
Q. Okay. Are you aware of any other complaints against you?
A. I'm aware of one other complaint that after the Plaintiff was terminated, her sister, Gregshima O'Neal, called corporate and filed a complaint against me there.
Q. Was this an anonymous complaint that she filed?
A. No.
Q. Okay. How did you find out about that complaint?
A. Corporate HR called me and investigated. I did



an interview over the phone.
Q. Okay. What did they say the basis of that complaint was?
A. Basically, if I remember correctly, that I harassed her.
Q. Okay.
A. I don't remember all the specifics of that case.
Q. What do you remember about the specifics of your conversations with Mr. Mak regarding the complaints against you?
A. I don't remember specifics and I don't believe that -- if I remember right, he didn't tell me what the complaint was, he just asked certain questions and I answered them.
Q. Do you recall what questions he asked?
A. No, not right offhand I don't.
Q. Okay. Did he indicate who may have made the complaint against you?
A. No, he did not.
Q. Okay.
A. Not that I can recall.
Q. Fair enough. Just to be clear, have you ever personally led an investigation into complaints of harassment, discrimination or retaliation?
A. Have I?

Q. Yes, ma'am.
A. No, I have not.
Q. Okay. Does Sunflower have a progressive disciplinary procedure?
A. Sunflower, yes. As far as I remember they do.
Q. What's your understanding of that procedure?
A. The procedure is first you get a verbal discussion. If that doesn't solve the issue, then it's a written. If that doesn't solve the issue, then it's a Performance Improvement Plan. And if that doesn't solve the issue, then it's Last Chance Agreement.
Q. So you stated a verbal warning, then a written warning?
A. Uh-huh. Performance Improvement Plan.
Q. A Performance Improvement Plan.
A. And then Last Chance --
Q. Then last chance.
A. -- Agreement.
Q. Can an employee's issues ever be escalated directly to a last chance?
A. That would be determined by the manager and HR.
Q. The manager and HR?
A. (Witness nodded.)
Q. Okay. Are you involved with disciplining employees?



A. No. The only discipline I would do would be a verbal. Anything else, I would have to get with my manager and HR to see what they wanted to do.
Q. So what is your role in the department as a supervisor of referral specialists?
A. It was the day-to-day operations of referral specialists, make sure we're being compliant with our turn-around times, that work processes and policies and procedures are being followed.
Q. What if policies and procedures are not being followed?
A. Then I would try to educate them on the policy and procedure and the correct way to do things.
Q. Anything else?
A. If that didn't solve the issue, then I would have -- I would just submit information to Terie, my manager.
Q. Okay. Are you the primary individual that is responsible for determining whether or not referral specialists were performing their job when you were the referral specialists' supervisor?
A. What do you mean by --
Q. Well, first, let me back up and say in this context I'm talking about your role as the supervisor of referral specialists. So my question is, the manager of



Utilization Management is over the entire department, correct?
A. Correct.
Q. As I understand it, there are four sub groups in the Utilization Management Department, correct?
A. Correct.
Q. Okay. So as the supervisor of the Referral Specialists Department, you are the individual that is tasked with ensuring that referral specialists are performing their job, correct?
A. Correct.
Q. So you would be the individual that is most involved in communicating with employees in assessing whether or not they are performing their duties, correct?
A. Correct.
Q. You then provide your assessment of the employee's performance to the manager of Utilization Management if an individual employee is not performing their job, correct?
A. Correct.
Q. Okay. The manager of Utilization Management would rely upon your assessment in part to determine whether or not employees are performing their jobs, correct?
A. Correct.



Q. Okay.
A. Can I add something there?
Q. Sure.
A. It wouldn't just be my assessment. It would be like documentation, it would be any productivity reports, anything like that, that would get sent to the manager as well.
Q. Okay. So you mentioned documents and productivity reports. In connection with that, would you agree that it's important to keep detailed records of whether or not employees are performing their duties?
A. I would agree that you need to keep a record of the employees performing their duties, yes.
Q. Consequently, if the employee is not performing their duties, you would want to make sure that you're keeping accurate records, correct?
A. Yes.
Q. What's a productivity report by the way?
A. It's a report ran out of the system that shows how many authorizations a staff member has built or how many notes they put in the system, and it just shows how many authorizations they built or touched for a period of time.
Q. Is it basically related to a referral specialist's efficiency?

A. Excuse me?
Q. Is it somewhat related to whether or not the referral specialist is being efficient with respect to answering phones calls?
A. That has nothing to do with phone calls.
Q. Okay, okay. I'm trying to understand.
A. It's just a system out of our True Care system, out of the documentation system a report can be ran out of there, and it shows how many authorizations they built in a month, in a day or seven days I think is the three times. I don't know, they might have changed that report by now.
Q. Okay. And what would you say is an average amount of authorizations that should be handled in a month by a referral specialist?
A. I don't know that amount.
Q. Well, to put it another way, how few authorizations would need to be handled in order for that referral specialist to be disciplined or at least have a verbal discussion regarding how many authorizations they are handling?
A. I don't remember the amount, and I don't know that they even had a set amount at that time when I took over.
Q. Have you ever counseled or disciplined any



referral specialist for having a low productivity report?
A. Have I counseled them? I've probably spoken to them, yes.
Q. Has there ever been any type of formal discipline with respect to an employee having a low productivity report?
A. No.
Q. I'm handing you Plaintiff's Exhibit 7. It's the family and medical leave policy. Have you seen this document before?
A. Yes, I have.
Q. Underneath the policy there is a subheading for Section B called Qualifying Reasons; do you see that?
A. Yes, I do.
Q. Paragraphs 3 and 4 indicate that an employee may take FML for an immediate family member with a serious health condition or the serious health condition of the employee respectively; do you see that?
A. I do.
Q. Have you always understood that to be a true and accurate statement?
A. Yes, I have.
Q. Are you aware that Ms. O'Neal was taking FML with respect to her own medical condition as well as her son's medical condition?



A. Yes, I was.
Q. When did you first become aware that Ms. O'Neal was taking FML with respect to her own medical condition?
A. When I became supervisor.
Q. And you became supervisor in or around October 2014?
A. Right. But then I was out sick so I didn't really come back to work until like November 16th because I was out on short-term disability.
Q. 2014?
A. Did I say '16?
Q. No, ma'am, I'm just making sure. Around November 2014 is when you basically took over duties as supervisor of referral specialists?
A. Right. When I came back but my manager was Mariza Greenwald and she wanted to ease me into that position, so she took care of a lot of the stuff.
Q. I understand. Now, what is your understanding of how an employee should let Sunflower know that they need to take FML?
A. To let Sunflower know? I mean --
Q. Or -- yes, to let Sunflower know, the company, that they're taking FML for a particular day.
A. That they already have FML and they need to take a day off; is that what you're saying?



Q. Sure.
A. They would just either let the supervisor know that they needed the day off for a doctor's appointment or whatever they needed for their FML.
Q. And let's be clear. We're assuming that they've already been approved by the third-party provider?
A. Right.
Q. So we're assuming they have already been approved by the third-party provider, and my question to you was, how would you let the company know that they need to take leave, and as I understand your testimony they would simply need to let a supervisor know?
A. Yes.
Q. How do you let a supervisor know?
A. They would either e-mail me or they would tell me in person that they needed to take off.
Q. If you are not around, who should they let know?
A. Terie, the manager.
Q. Okay. By the way, it's my understanding that Ms. O'Neal was on intermittent FML leave; are you aware of that?
A. Yes, I was.
Q. So similarly, if she simply needed to take four hours off on a particular day or even had to take leave on the same day, she would need to let you or Ms.

Beverlin know, correct?
A. As early as she could possibly let us know.
Q. Okay. Are you aware of whether or not Ms. O'Neal had issues with using the restroom excessively?
A. She never told me that she had issues.
Q. Okay. So you were unaware that Ms. O'Neal had issues related to acid reflux?
A. I did not know that. I thought she had lupus.
Q. Okay. What is that representation made on?
A. A conversation that I had with her because when I took over supervisor, coming back from short-term disability, I also had an autoimmune disease and she said she did as well, she had lupus. She might have said she had GERD, but I can't really remember. She had some stomach issues.
Q. Okay. So you recall that Ms. O'Neal may have mentioned that she had GERD?
A. Possibly, yes.
Q. Are you aware of whether or not the GERD was contributing to Ms. O'Neal to use the restroom excessively?
A. I do not know that.
Q. If an employee needed a reasonable accommodation, for instance related to stomach issues, what's the process that the employee would need to go



through to be approved for that request?
A. I would imagine they'd have to go through HR.
Q. Okay. So similarly, it may need to go through HR, the third-party processor?
A. I don't know about Liberty Mutual, but if they needed extra accommodations, I'm sure HR would be aware and let the supervisors know that they needed to have extra accommodations due to their illness.
Q. Okay. I'm handing you Plaintiff's Exhibit No. 8. Have you seen this document before?
A. Possibly, it's been a long time ago.
Q. All right. It's my understanding that this is a document out of the employee handbook. Do you have any reason to dispute that?
A. No, I don't.
Q. Okay. If you look at the previous exhibit, the previous exhibit appears to state Policy and Procedure whereas this document appears to be from the handbook. Are you aware of whether or not there is any other written policy related to telephone usage?
A. Can you clarify what you mean?
Q. Well, I understand that this is a policy and procedure --
A. Uh-huh.
Q. -- of the company. I understand that this is a



policy, or at least something that would have been provided to employees in the employee handbook. I further understand that when employees are provided an employee handbook, that they have to acknowledge that they have received the handbook with a signature.
A. Right.
Q. So I guess what I'm just trying to understand is, is there any other type of policy that would have been provided to employees related to telephone usage?
A. Not that I'm aware of.
Q. The first sentence underneath Telephone Usage says, "Personal phone calls in pursuit for necessary personal business are allowed but should be infrequent and not disruptive." Do you see that?
A. I do.
Q. What would be considered infrequent use of a phone call or personal phone calls?
A. I don't know what would be considered. I mean if it's disruptive. I don't know the exact number about frequent. But when you're getting daily phone calls or you're on your personal phone daily, it becomes disruptive to the team.
Q. How does it become disruptive to the team?
A. Because the other team complains about the person being on their cell phone all day.



Q. Okay. Anything else?
A. Not that I can recall at this time.
Q. At least from this policy, it appears to indicate that phone calls, personal phone calls could be made on the business phone, correct?
A. Correct.
Q. Is that your understanding of the policy?
A. Hold on one second. Yes, during their break and lunch times.
Q. Okay. And what about the use of cell phones, what's the policy on cell phones?
A. I don't recall. Is it in here?
Q. Well, you tell me.
A. I don't remember the policy on cell phones. I think they could use the cell phones if they were infrequent and just not disruptive, when I started.
Q. Okay. Did that change at some point?
A. Yes.
Q. When did that change?
A. I believe March 22nd of 2015 we had a team meeting.
Q. Okay. And do you recall what was the general basis of that team meeting regarding cell phone use?
A. There was no longer going to be any cell phone usage.

Q. Whatsoever?
A. Whatsoever.
Q. Okay. Was that policy adhered to by all employees?
A. Occasionally one or two might forget and they would have a -- just go talk to them.
Q. Uh-huh.
A. But the Plaintiff was on hers all the time.
Q. Was anyone else on their cell phones all the time?
A. Not all the time. Not as frequent as Monique O'Neal was.
Q. What's considered frequent?
A. Daily.
Q. So no one else was on their cell phone daily?
A. No, sir.
Q. Okay. Who else may have been on their cell phone at times but perhaps not as frequent as you were indicating?
A. I believe Jennifer Moppin was one. I really can't remember.
Q. Anyone else?
A. I can't remember anyone. That's the only name that comes up on the top of my head. I'm sure there might have been others.



Q. Okay. And related to Ms. O'Neal's cell phone use, what was your response to her use of her cell phone?
A. Excuse me?
Q. What did you do?
A. I just verbally asked her to put her cell phone away.
Q. When did you do that?
A. I don't know the exact date. There was probably a couple occasions that I asked her to put her cell phone away.
Q. Between March 22nd, 2016, and the time when Ms. O'Neal was terminated, you believe you told her on multiple occasions to put her cell phone away?
A. Yes.
Q. Okay. I understand that there's also a policy related to the daily team chat; is that right?
A. Yes. I don't know if it's a policy but it's like a work process.
Q. What's the difference?
A. Policy is, to me, it's Sunflower's policy and then you have work processes that tell you the daily things that go on on the team and how to do the job.
Q. Would you agree with me that a policy may have more weight and authority than a work process?
A. Possibly.



Q. When would it not?
A. I don't know. Probably a policy is the policy. If there's a policy written for that, yes.
Q. Are you aware of whether or not there is a policy written for the daily team chat?
A. I do not believe there's a policy.
Q. And what was the work process with respect to the daily team chat?
A. It was that all the team members needed to be signed into the chat and when they went up to -- went to leave their desk to go to the restroom or break or wherever, they were supposed to enter it into the chat that they were leaving, and then enter when they were back.
Q. Did that always occur?
A. Not always.
Q. How often did it not occur?
A. With Ms. O'Neal a lot. With other ones, occasionally.
Q. Okay. And what happened if an employee such as Ms. O'Neal was not logging into and out of the chat when they are away from their desk?
A. I would either verbally give her a reminder or send her an e-mail. Most of the time it would be verbally.



Q. When did you ever send an e-mail to an employee other than Ms. O'Neal related to logging in and out of the chat?
A. Probably didn't. Probably went and told them verbally.
Q. Okay. So as you sit here today, you're unaware of any instance where you may have e-mailed another employee related to instances of them not logging in or out of the chat; is that right?
A. That's correct at this time.
Q. Okay.
A. I can't remember any more.
Q. How many times did you monitor employees with respect to whether or not they were logging in and out of the chat?
A. It was daily.
Q. Okay. So you daily monitored your employees in the Referral Specialists Department to determine whether or not they were logging in and out of the chat, correct?
A. I wasn't sitting there looking at the chat the whole time, but if I saw somebody get up, or whatever, and I knew it wasn't break time, then I would look at the chat to see where they were going and then when they came back.
Q. Okay. What is the basis for which an employee

may receive a merit increase?

A. They receive one yearly.

Q. Is it automatic?

A. It's based off of their performance review.

Q. Okay. And in the performance review, it would indicate whether or not an employee was performing their job duties, correct?

A. It really wasn't a disciplinary tool for that, it was only for a merit increase, and I believe everybody deserved a merit increase.

Q. Are you saying that that's what you personally believe or you believe that everyone got it necessarily?

A. I personally believe that everybody should receive a merit increase.

Q. Okay. And you said it wasn't the tool for evaluating performance. Were there other performance evaluations of employees?

A. If they had -- there was other forms if they had disciplinary problems. The performance review for a merit increase was not the place to put that information.

Q. Okay. And so if there were no disciplinary problems that would have been indicated on their respective documents and if it wasn't indicated on the performance evaluation related to merit increases, is it fair to say that the employee was performing to



expectations?

A. It's not fair to say that because if they were not performing -- if they were performing to a point where they should get a merit increase, then that would have been documented on that form. If they had disciplinary actions pending or present with them, they would be documented on other forms.

Q. Okay. But if an employee did not have any disciplinary actions pending, one, and, two, if there were no indications on the employee's yearly performance evaluation, how would you necessarily know that the employee was not performing their duties?

A. Okay. Say that one more time, sorry.

Q. That's fair. All I'm trying to understand is, I understand that, from your testimony today, that if an employee was not performing their duties, it would be noted on some type of disciplinary form, correct?

A. Correct.

Q. All right. And further, you have stated that the performance evaluation is not necessarily the tool to indicate whether or not an employee is performing their functions, correct?

A. It's not the tool to put discipline in --

Q. Okay. Well --

A. - if they have issues.



Q. That's fair. If you were having an issue with an employee, would you not note that on their performance evaluation?

A. No, it would be noted on a different document.

Q. Okay. Well, let me hand you Plaintiff's Exhibit 9. If you look on the second page toward the bottom, there appears to be some writing on that. By the way, this appears to be the evaluation for Monique O'Neal for the year ending in 2016; do you see that?

A. Yes, I do.

Q. Okay. On the bottom of the second page there appear to be some comments underneath the section for 2015; do you see that?

A. Yes.

Q. Okay. And those comments, could you read that, those comments for me, please?

A. Under where it says meets expectations?

Q. Yes, ma'am.

A. It says, "Monique has done a good job of adjusting to the changes in the UM Department in 2015. She is flexible to changing demands of our work flow and a valuable asset to referral specialist team. Monique has improved her attendance issues and her communication skills in 2015. Monique is always willing to help the team complete their work."



Q. At least with respect to this particular document, there are no indications that Ms. O'Neal was not performing her duties, correct?

A. Monique had improved during this evaluation.

Q. No, ma'am, that's not what I asked. I asked at least with respect to this particular document, is there any indication that she was not performing her duties, in that section that you just read?

A. At this time she had improved. She was not not performing her duties and she had improved her attendance at this time.

Q. Well, it doesn't say that she had low productivity numbers, correct?

A. No.

Q. It doesn't say that she had low audit numbers, correct?

A. No, it does not.

Q. It doesn't say that she was behaving in a rude or disrespectful manner to other employees, correct?

A. No, it does not.

Q. It doesn't say that she was behaving in a rude or disrespectful, excuse me, a rude or disrespectful manner to providers, correct?

A. Not on this document.

Q. Okay. Are you aware of complaints that Ms.

Harris may have made against you?

MR. GREENE: Objection. You said Ms. Harris made against you.

Q. (By Mr. Stallworth) Oh, I'm sorry, excuse me. Are you aware of any complaints that Ms. O'Neal may have made against you?

A. No, I am not.

Q. Are you aware that Ms. O'Neal made complaints about you related to harassment or discrimination?

A. No.

Q. Did Ms. O'Neal ever confront you regarding issues related to her belief that you were discriminating against her because of her disability?

A. No, she did not.

Q. Did you ever make comments that Ms. O'Neal was taking too much FML time?

A. No, I did not.

Q. Are you aware that Ms. O'Neal had made complaints to Ms. Beverlin in or around late 2016 regarding issues that she had with you?

MR. GREENE: Objection, asked and answered.

Q. (By Mr. Stallworth) You can answer.

A. No, I'm not.

Q. Do you recall in May 2016 that Ms. O'Neal



complained to you about your treatment of her?

MR. GREENE: Same objection. You can answer.

A. No, I'm not.

Q. (By Mr. Stallworth) Are you aware that Ms. O'Neal indicated that she was going to file a complaint with the Human Resources Department?

A. No, no, I didn't know anything about it.

Q. Are you aware of any complaints that Ms. O'Neal may have made against Scott Mak?

A. No, I'm not. No, I'm not.

Q. Are you aware that in June of 2015 Ms. O'Neal was given disciplinary action for attendance related to her FML leave?

A. No, I was not.

Q. Are you aware that employees of Sunflower have complained that you treated African-American employees in a hostile and disrespectful manner?

A. No, I have not.

Q. Has anyone at Sunflower ever spoken to you regarding complaints that you had treated African-American employees in a hostile and disrespectful manner?

A. No, they have not.

Q. Has Scott Mak ever spoke to you regarding



complaints that you have treated African-American employees in a hostile and disrespectful manner?

A. No, he has not.

Q. I hand you Plaintiff's Exhibit No. 12 and Plaintiff's Exhibit No. 13 as well as Plaintiff's Exhibit No. 11. Do you recognize Exhibit 11?

A. Yes.

Q. Okay. What is this document?

A. This is a report that I would get on a monthly basis from HR to coincide with the attendance tracker that Monique was claiming was FML based.

Q. Also before we go further, are you aware of any complaints that Ms. O'Neal may have made against Geraldine Thomas?

A. No, I am not.

Q. Are you aware of complaints that Ms. O'Neal may have made against Geraldine Thomas in 2013?

A. No, I'm not.

Q. So with respect to Exhibit 12, this exhibit seems to indicate dates that Ms. O'Neal was taking FML; is that right?

A. Correct.

Q. Is this your document? That may be a bad question. I guess what I'm trying to understand is, are these dates that you have entered into the system?



A. The dates are, yes.

Q. Okay. And then with respect to Exhibit 13, is this essentially the same document?

A. Yes, it's just the other side of this one, (indicating).

Q. Okay.

A. They're attached.

Q. Okay. So with respect to Exhibit 12 and the FML tracker, these indicate the dates that Ms. O'Neal has taken FML, correct?

A. Correct.

Q. And then you had compared these dates with the dates that you received from HR, which is on Exhibit 11; is that right?

A. Correct.

Q. What if there was a discrepancy between a date that was on your daily tracker versus the date that's on the documentation from HR?

A. Then I would send that date to HR and they would follow up.

Q. At that point HR would then follow up with the employee to determine whether or not FML should be taken, so to speak?

A. I don't know what they would ask. I would imagine that they would talk to the employee.

A. I have not.
Q. If you go to the second page of this exhibit, it indicates performance conduct issues. Have you seen that?
A. I was not part of this.
Q. Okay. Was it your understanding that Ms. O'Neal was not following breaks and lunch schedule? I may have phrased that incorrectly. Was it your understanding that Ms. O'Neal was not following the break and/or lunch schedules?
A. At times she was not.
Q. Do you recall how often that was occurring?
A. Not right offhand. Probably several times, I don't remember.
Q. And did you report each of those times to Ms. Beverlin?
A. Yes, because I had verbally talked to Monique in the past and it didn't do any good.
Q. Do you always report when an employee is not following the break or lunch schedules?
A. Only after I tried to talk to them.
Q. And how many times does that happen before you will report that the employee is not following the break or lunch schedules?
A. Probably a couple times because I do not like to



write people up or send anybody to have discipline, that's not my thing.
Q. What's a couple times, more than three?
A. For her?
Q. For anybody.
A. Okay. Rephrase the question again.
Q. Well, as I understand it, you said that an employee would need to not follow the policy several times before you would report them, correct?
A. (Witness nodded.)
Q. Yes?
A. Yes, sorry.
Q. And then I asked you what is a couple times, and so I'm asking more than three times?
A. I'd say approximately three times I would talk to them.
Q. Okay. And if they were still exhibiting the same behavior, at that point you would report that behavior to Terie Beverlin?
A. Correct. I would start documenting and reporting the behavior.
Q. By documenting, do you mean monitoring the behavior?
A. Yes.
Q. Okay.



A. Monitoring the chat, the productivity reports, all that stuff that I did daily.
Q. Are you aware of Ms. O'Neal having inappropriate personal topics on company equipment?
A. I heard about it but I did not -- I wasn't part of that investigation and I did not hear any calls.
Q. Have you ever heard any calls where Ms. O'Neal was having inappropriate personal topics or inappropriate conversation, so to speak?
A. No, I personally did not.
Q. Are you aware of whether or not any other employees have complained about Ms. O'Neal having inappropriate personal conversations on the phone?
A. I'm not aware that they complained of her having, whatever you just said, that type of conversation. I am aware of complaints from other employees that Monique was on her phone.
Q. Which employees?
A. Nicole Richardson, Veronica Johnson, Geraldine Thomas. Those are the only ones that come off the top of my head at this point.
Q. Did they e-mail you?
A. I can't recall. Geraldine might have e-mailed me once or sent an e-mail. A lot of times it was verbal.
Q. Okay. So as best as you can recall right now,



Geraldine may be the only employee who may have e-mailed you regarding instances of Ms. O'Neal using her phone, correct?
A. Correct.
Q. By that you mean personal cell phone?
A. Yes.
Q. Were you aware of any issues related to Ms. O'Neal's bereavement leave?
A. I knew that her aunt had passed away.
Q. Anything else?
A. I didn't believe that it was her aunt.
Q. Why was that?
A. Because she had been dishonest in the past.
Q. About what?
A. She -- to Liberty Mutual, she would call in and say it's FML but then it wouldn't be reported to FML.
Q. Explain that again.
A. On your document back here where we compared the things, like she would call me in the morning and say I'm sick, I'm going to use my FML and then when I got the report, that call in wouldn't have been documented.
Q. And you equate that to being dishonest?
A. If it didn't come back that she didn't claim it.
Q. Could that have simply been an error on her part where she just forgot to call in?

A. No, she did not.
Q. I hand you Plaintiff's Exhibit No. 23. Have you seen this document before?
A. Yes, I have.
Q. What's that, ma'am?
A. Yes, I have, sorry.
Q. Would this have been a document that you would have sent to Ms. Beverlin regarding the daily team chat?
A. If there had been issues on here, yes. I didn't just send her the daily team chat every day.
Q. Was Ms. Beverlin normally in the daily team chat herself?
A. No. Sometimes she would be and other times she was not.
Q. More often than not?
A. More often not than often.
Q. Okay. And so primarily she would have to rely upon information that you provided as to whether or not the employees were logging in or out of the team chat; is that fair to say?
A. Fair to say.
Q. Okay. Now, this particular exhibit begins the daily team chat around 8:06 a.m.; do you see that?
A. Yes.
Q. And it goes until 10:26 a.m. on the third page;

61

do you see that?
A. Uh-huh.
Q. Do you know why the remaining part of the day would not have been tracked, so to speak, or at least a screen shot of the chat tracked?
A. Not right offhand, but it could have been because the computer had issues and the chat wasn't working, you know, or my computer wasn't working or whoever that copied this. I believe I did this one.
Q. Why do you believe that?
A. I don't know why. Possibly because there was a time Monique went on break and then didn't clock back in, log back into chat.
Q. Oh, okay. My question was just why did you believe that you may have done this particular chat. That's why?
A. Why I copied it?
Q. Yes.
A. Yes.
Q. Okay. But I guess my question is more so, were you the one that actually took a screen shot of this or was it Ms. Beverlin?
A. I would -- I don't know for sure --
Q. Okay.
A. -- if I did it or she did it.

62

Q. Okay. I hand you Plaintiff's Exhibit 24. This appears to be a team chat from June 14th, 2016; do you see this?
A. Yes, I do.
Q. All right. Now, if you begin with Jennifer Moppin at 8:19 a.m.; do you see that?
A. I do.
Q. And then Ms. Moppin appears to return at 8:26 a.m.; do you see that?
A. I do.
Q. So is this generally speaking how employees were supposed to track their time in and out of the chat?
A. What do you mean by track their time?
Q. Well, she indicates break room at 8:19 a.m., and then indicates that she's back at 8:26 a.m.
A. That's normally when they leave and when they come back.
Q. Okay. Now, if you go to the next page, beginning at 9:05 a.m., Mary Hadi says "Be right back"; do you see that?
A. I do.
Q. Okay. Now, let's say if you go through the next two hours, it does not appear, from what I can tell, that Ms. Hadi indicates that she has returned. Do you see that?

63

A. Correct.
Q. Technically, that would be a violation of the team chat, correct?
A. Correct.
Q. Now, as I understand the policy, employees receive a one-hour lunch break and two 15-minute breaks, correct?
A. Correct.
Q. And then, of course, if they need to go to the restroom or break room or something like that, they should just let somebody know, correct?
A. Yes. They put it in the chat and then they go and come back.
Q. What's reasonable for how long an employee should be gone away from their desk when it's not their allotted 15-minute break?
A. I don't know that there's a specific time frame.
Q. Just depends?
A. Depends on what their issues are, why they needed to leave their desk.
Q. Okay. All right. So, for instance, at 9:30 a.m. you have Jennifer Moppin, she says break, and then it appears that she returns 15 minutes later at 9:45 a.m. Do you see that?
A. I do.

64

until two o'clock. I do not see where it indicates that Ms. Richardson indicated that she was returning from lunch. Do you see that?

A. I do not see it.

Q. In that instance, she is violating the work process, right, by not indicating that she has returned from lunch, correct?

A. Correct.

Q. If you look at 12:59 p.m., do you see Paula Anna?

A. Yes, I do.

Q. It says restroom or "rr," I assume that's restroom; do you see that?

A. I do.

Q. Go ahead and look at 2:30. It does not appear to indicate that -- or Ms. Anna does not appear to indicate when she's returning from the restroom, correct?

A. Correct.

Q. Now, if you look at Ms. Hadi at 1:06 p.m., do you see that, she says "lunch"; do you see that?

A. I do.

Q. All right. Go ahead and look until three o'clock. It doesn't appear to indicate when Ms. Hadi returned from lunch, right?

A. No, it does not.



Q. In that instance, that would be a violation of the work process, correct?

A. Correct.

Q. So in this one short sample that we have been provided by your counsel, it appears to indicate, as best I can tell from briefly looking at this, putting aside Ms. O'Neal's instances of not logging in and out of the chat, it appears to be that Ms. Hadi -- do you pronounce it Hadi or Hadi?

A. She pronounces it Hadi.

Q. It appears to be that Ms. Hadi violated the policy by not checking back in at 9:05 a.m. this morning. It also appears to be that Ms. Hadi violated the policy by never indicating when she returned from lunch. It also appears to be that on this day Ms. Sampson violated the policy by not indicating when she was leaving, though she indicated when she was returning. It also appears that Ms. Richardson did not indicate when she returned from lunch. It further indicates that Ms. Anna didn't indicate when she returned from the restroom. So as I count it, these are five instances of the team daily chat work process being violated, correct?

A. Correct.

Q. Did you begin monitoring Ms. Hadi at any point to determine whether or not she was continually violating



the work process of logging in and out of the chat?

A. No, I did not.

Q. Why not?

A. Because I verbally talked to her.

Q. Okay.

A. And hopefully that corrected her issue.

Q. Okay. Did you begin monitoring Ms. Elizabeth Sampson to ensure that she was properly logging in and out of the chat?

A. No, I did not because there wasn't a history of Elizabeth not doing it, and so I verbally would talk to her as well.

Q. Were you looking?

A. Was I looking, excuse me?

Q. Were you looking to determine whether or not Ms. Sampson was indicating when she was leaving or returning to her desk?

A. No, I was not.

Q. Were you looking to determine whether or not Ms. Hadi was leaving or returning to her desk?

A. No, I was not.

Q. What about Ms. Richardson, were you monitoring to determine whether or not Ms. Richardson was leaving or returning to her desk pursuant to the work process?

A. No, I was not.



Q. What about Ms. Paula Anna, were you monitoring whether or not she was returning -- whether or not she was indicating when she was away from her desk pursuant to the work process?

A. Was I monitoring her?

Q. Yes, ma'am.

A. No, I was not.

Q. Okay. Let me ask you. How many days were you monitoring Ms. O'Neal to determine whether or not she was properly logging when she was away from her desk on the team chat?

A. Ms. O'Neal was so blatant and sat so close to me that I could see when she wasn't at her desk, so I would look at the chat, if I knew it wasn't a scheduled break or lunch time, just to see where she was at because she did it so frequently.

Q. You didn't do that for other employees?

A. No, because they weren't an issue as Monique was.

Q. Could you see all employees from your desk?

A. No, not all of them.

Q. Okay. Well, we just looked at a small sample size of one day and in one day Ms. Hadi violated the policy twice, or excuse me, the work process twice by not indicating when she was leaving or returning from her

desk, correct?
A. Correct.
Q. Okay. And it's your testimony that you never began monitoring Ms. Hadi at any point related to that particular work process or the team daily chat, correct?
A. No, I haven't.
Q. Okay. Just to be clear, did you monitor any of your referral specialists to the extent that you took screen shots of the team daily chat and provided those screen shots to Ms. Beverlin?
A. Not that I recall.
Q. Let me hand you Plaintiff's Exhibit No. 25. This is an e-mail that you sent to Ms. Beverlin on June 14th, and this is the same day that we just reviewed, which was June 14th, 2016. And in this e-mail you indicate, among other things, whether or not Ms. O'Neal was logging in and out of the chat, or rather whether or not she was indicating that she returned or was leaving her desk; is that fair to say?
A. That is because she sat so close to me and it was so obvious when Monique was not at her desk.
Q. Okay. Just to be clear, you never sent any e-mails related to any other employees regarding whether -- excuse me, let me start over. You never sent any e-mail to Ms. Beverlin regarding any other employees



who may or may not have been tracking their time away from their desk in the daily team chat, correct?
A. Not that I can recall at this time.
Q. All right. You do agree with me that you want to make sure that you treat all employees in a fair and consistent manner, correct?
A. Correct.
Q. Okay. Let me go back to that previous exhibit, Ms. Harris.
A. This one?
Q. Yes, ma'am. That's Exhibit --
A. 25.
Q. -- 25. The bottom is an e-mail from Ms. Thomas to yourself, correct, and in this e-mail it appears to be Ms. Thomas telling you that she did not put in the chat that she returned. Do you know if in this instance Ms. Thomas is referencing Ms. O'Neal?
A. I do not.
Q. Okay. I'm handing you Plaintiff's Exhibit No. 27. Do you recognize this document?
A. Yes, I do.
Q. Did you draft this document?
A. I believe I did.
Q. Okay. This appears to indicate that Ms. Hadi was on her cell phone during the entire meeting on



February 29th, 2016; do you see that?
A. Yes, I do.
Q. Okay. Would this be the type of counseling you were talking about if an employee was on their cell phone?
A. I would have a verbal discussion.
Q. And the second paragraph, Ms. Hadi indicates that if every team member went to HR, things would change; do you see that?
A. I do.
Q. What is she referring to?
A. I don't recall.
Q. She goes on to state that "Terie is aware of the issues because she had previously discussed things with Terie before Terie was a manager. Also stated that Patty did not do anything either." Do you know what she is referencing?
A. I don't recall what she was referencing at the time.
Q. The third paragraph talks about the fact that Mary comes in around 8:05, logs into the phone and then gets up and goes to the break room?
A. Correct.
Q. Is that in relation to this getting up from her desk without letting someone know that she's gone?



A. I don't recall.
Q. Okay. I hand you Plaintiff's Exhibit No. 28. This appears to be an e-mail that you sent to Ms. Rolf on October 20 of 2016. Do you see that in the middle of the page?
A. Yes.
Q. All right. The first paragraph, you indicate that Ms. Hadi is already on her last chance for attendance; do you see that?
A. Yes, I do.
Q. So is that fair to say that on October 20th, 2016, Ms. Hadi was already on a last chance for attendance, correct?
A. Yes.
Q. Okay. However, you say she is "Still arriving late, called in." At that point would Ms. Hadi further -- or, rather, should Ms. Hadi receive further disciplinary action because she was already on a last chance for attendance but was still arriving late?
A. That is not a decision that I made. That is a decision that the manager in HR had to make.
Q. Okay. As I understand it, decisions with respect to terminations occur in conjunction with the manager of Utilization Management, which would have been Ms. Beverlin, in connection with conversations with HR,