**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **MONIQUE O'NEAL,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:17-CV-02172-JAR-KGS** |
| **CENTENE MANAGEMENT COMPANY, LLC D/B/A SUNFLOWER HEALTH PLAN,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Monique O'Neal brings this action against her former employer, Defendant Centene Management Company ("Centene"), alleging violations of the Americans with Disabilities Act ("ADA"), and the Family Medical Leave Act ("FMLA"). This matter comes before the Court on Centene's Motion for Summary Judgment (Doc. 41) on all of Plaintiff's claims. For the reasons discussed in detail below, the Court grants Centene's motion with respect to all claims.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a

---

[1]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a

---

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.    Uncontroverted Facts

The following material facts are uncontroverted, stipulated to for the purposes of summary judgment, or viewed in the light most favorable to Plaintiff.

### Plaintiff's Employment with Centene

Plaintiff began her employment with Centene in June 2013 as a referral specialist. Centene provides healthcare related services to patients and medical providers.  Plaintiff's duties as a referral specialist included communicating by telephone with medical providers (e.g., doctors/nurses) who are requesting authorization to provide specific and potentially time sensitive medical services to a patient.  The medical provider gives the referral specialists information such as the patients name, diagnosis, and anticipated medical procedure for which

---

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id*.; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

the authorization is sought; the referral specialists then build an authorization by inputting information into a data management system called "TruCare," and then send the authorization to a medical professional at Centene for approval. Plaintiff's hours as a referral specialist were from 8:00 a.m. to 5:00 p.m. and included a one-hour lunch break and two fifteen-minute breaks each day. While not on break, Centene expected Plaintiff to work as efficiently as possible.

Bobbie Harris, the supervisor of referral specialists, was Plaintiff's immediate supervisor. Terrie Beverlin, the Manager of Utilization Management, supervised Bobbie Harris and became Plaintiff's manager in September 2015. When Beverlin became Plaintiff's manager, Harris and another one of Plaintiff's prior managers informed her about Plaintiff's past dishonesty, past unprofessionalism, and history of excessive cell phone use.

### Centene's Rules, Policies, and Procedures

Centene's Corporate Attendance & Punctuality Policy provides that "Employees must notify their supervisor or the local human resources person within one (1) hour of their scheduled start time if they are unable to report to work or will be late."[16] For notifying Centene of FMLA leave, face-to-face is the best method. According to Scott Mak, the Human Resources Manager during Plaintiff's employment with Centene, an employee should first notify their direct manager, and should let Human Resources know they are taking FMLA leave if there is no manager on the floor.

Centene issues occurrence points on employees' attendance records when they fail to abide by attendance policies. Depending on the severity of her infraction, Plaintiff received occurrences ranging from one-half to one-point when she did not follow the attendance policy for proper notification, did not report her FML leave to Liberty Mutual and therefore did not

---

[16]Doc. 49, Ex. 1.

qualify for FML, or when she called in sick for non-FMLA related reasons.[17]  An occurrence itself is not a disciplinary action, but occurrences can ultimately lead to disciplinary action.[18]

The Daily Team Chat is an instant message system for referral specialists to communicate with others whether they were available to take calls.  Referral specialists are under a directive to record when they leave and return to their desks throughout the day in the chat.  Other referral specialists failed to log their activity in the Daily Team Chat and took extended breaks away from their desks.  No employee other than Plaintiff has been terminated or disciplined for failing to log in and out of the Daily Team Chat.

### Plaintiff's FMLA Use

Liberty Mutual, a third-party administrator, handled Centene's FMLA application, approval, denial, and usage process.  Centene managers and supervisors received notice when employees took FMLA leave.

In July 2014, Plaintiff began taking intermittent FMLA leave for "generalized anxiety disorder," "gastroesophageal reflux disease" ("GERD"), and her son's asthma.  Although Plaintiff does not recall communicating to any manager or supervisor that she had anxiety disorder, Plaintiff informed Beverlin that she had GERD.  Beverlin was unaware of the symptoms of GERD.  Whenever Plaintiff experienced generalized anxiety or GERD at work she would leave work for the entire day.

On June 15, 2015, Plaintiff emailed Rebecca Bryant regarding her "FMLA days being counted against [her] attendance."[19]  Plaintiff took FMLA leave on June 16 and June 17, 2015,

_____

[17]Doc. 45, Ex. 28.

[18]The parties do not dispute that occurrences can lead to disciplinary actions, however, neither party provides evidence that explains how this happens.

[19]Doc. 45, Ex. 13.

and called in at 7:05 am and 7:13 am respectively.  Plaintiff received a one-point occurrence for each of these dates.  Mak had previously indicated in a June 8, 2015 email that Plaintiff would be given occurrences "if she is calling in after 7am even if for FML . . . Same for if she leaves early."[20]  Plaintiff sent emails on June 15, 2015 and June 23, 2015, to HR representatives in which she questioned why she had received occurrences while on FMLA and her belief that she was being discriminated against and harassed because of FMLA use.

On January 4, 2016, Harris informed Beverlin that Plaintiff had called in that morning informing her that she was going to take FMLA leave for her son, but that she would be back into work later in the day.  Plaintiff never returned to work, and Beverlin informed HR of this event.

On June 23, 2016, Plaintiff emailed Beverlin stating she had a doctor's appointment on July 6 for her "FML paper work, at the time I will see if he will provide me with a Dr. Excuse [sic] for my excessive bathroom usage . . . I just want to cover myself" and stated she had been experiencing excessive bathroom usage related to her medical issues.[21]  Beverlin did not believe Plaintiff was disclosing a medical issue.  Also on June 23, Harris discovered that Plaintiff did not report her FMLA usage on a day she missed work for FMLA to Liberty Mutual as required.  Harris reported the conduct to Beverlin and believed Plaintiff was dishonest by representing to Centene that she was on FMLA leave when she had not informed Liberty Mutual.

### Department Expectations Meeting

On March 22, 2016, Beverlin and the human resources department held a meeting with the referral specialist group, which included Plaintiff.  The referral specialists were told that ear

---

[20]Doc. 45, Ex. 30.

[21]Doc. 45, Ex. 15.

6

buds and cell phones were not allowed. They were instructed at this meeting and subsequent meetings to (1) take one-hour lunches and 15-minute breaks on time and to return on time, (2) accurately document notes of conversations with providers in Centene's medical data management system, TruCare, and (3) enter time in the Team Chat when leaving and returning to their desk.

On March 28, Harris learned that Plaintiff was not documenting any notes of her conversations with medical providers. Harris emailed Plaintiff, stating there were "no notes entered by you" on the authorizations Plaintiff built.[22] After Plaintiff responded that she had entered some notes in TruCare, Harris randomly selected three authorizations that Plaintiff built and none contained notes or documentation. Harris believed Plaintiff was dishonest about documenting notes and therefore reported her conduct to Beverlin.

On or about April 22, Plaintiff's co-workers, including Nicole Richardson, complained to Harris that Plaintiff was argumentative, unprofessional, and offensive. Harris reported the complaint to Beverlin, and Beverlin believed Plaintiff was unprofessional and disrupting the workplace.

***Plaintiff's Phone Use at Work***

Centene allows employees to use their work phone for personal calls that are infrequent and not disruptive. These calls should be limited to lunch or break times as much as possible. Centene has not terminated an employee for violating the telephone usage policy besides Plaintiff.

On May 24, 2016, Beverlin listened to Plaintiff's phone calls recorded on her work phone. The first three or four phone calls she came across were Plaintiff's personal phone calls.

---

[22]Doc. 41, Ex. 3-H.

In these conversations, Beverlin heard Plaintiff discussing sexual encounters, masturbation, curse words, and drugs. Plaintiff also placed one medical provider seeking a medical authorization on hold for an extended period while Plaintiff took a personal phone call. Beverlin viewed these behaviors as unprofessional.

Plaintiff's former co-worker, Veronica Johnson, observed that Plaintiff "talked on her cell phone daily during work hours when she was at work[, that]she frequently went into the hallway and talked on her cell phone during work hours, [and] would hide in the hallway during work hours to talk on her phone."[23]

### Aunt and Bereavement Issue

On June 8, 2015, Plaintiff requested to leave work early, representing that her "aunt," Rhonda Miller, was in the hospital. Centene allowed Plaintiff to take FMLA leave to visit Miller and assessed a half-point occurrence. Plaintiff's sister, Gregshima O'Neal, who also worked at Centene, told Harris that it was Gregshima's mother-in-law that was in the hospital and "not their aunt," but indicated that Plaintiff considered her an aunt. Nonetheless, Harris believed Plaintiff was dishonest and reported her conduct to Mak. On June 10, Mak met with Plaintiff to discuss her unprofessionalism and her representations that Miller was her aunt. He counseled Plaintiff to be honest, professional and at her desk to focus on her job. He also told Plaintiff that leaving work early on June 8 counted against her attendance. On June 11, Mak communicated with management about giving Plaintiff opportunities "to correct her demeanor" and to "permanently change her behavior going forward."[24] Plaintiff received a written disciplinary action on June 12, which stated she was expected to adhere to attendance policies.[25]

---

[23]Doc. 45, Ex. 12.

[24]Doc. 41, Ex. 3-F.

[25]Doc. 43, Ex. 3-E.

On May 17, 2016, Miller passed away.  Plaintiff informed Beverlin that her aunt had passed away, but at the time did not know Miller was her biological aunt.  When Beverlin asked if the aunt was her mother's sister, Plaintiff nodded.  In a May 17 personal phone call on her work phone, Plaintiff indicated that Miller was not her aunt.  However, that night, Plaintiff discovered that Miller was in fact her father's sister.  On May 18, Plaintiff requested bereavement.

### Plaintiff's "Last Chance Agreement" and Termination

On June 1, 2016, Beverlin, with Human Resources' advice, placed Plaintiff on a "Last Chance Agreement."  Beverlin; Jacqueline Rolf, a Human Resources Specialist; and Lori Howard, Director of Utilization, met with Plaintiff.  While Plaintiff was away, Beverlin discovered that Plaintiff had discussed marijuana over the company phone, engaged in a sexual discussion on the company phone, and placed a provider on hold to take a personal call.  The "Last Chance Agreement" also cited Plaintiff for the following behaviors: (1) "Personal phone conversations up to 17 occurrences in a day, during working hours," (2) "Lack of notes/documentation in member records indicating work processes are followed," (3) "Leaving a provider to make a personal call, putting the provider on hold until the personal call was complete," (4) "Discussing personal life events . . . with persons outside of the organization excessively during phone conversations during work time," (5) "Discussing items that are potentially offensive to others including use of profanity, sexually explicit content, and involving illegal substances using company resources during business hours while on company time," and (6) "Using benefit (bereavement) to its maximum in circumstances that have questionable."[26]

---

[26]Doc. 41, Ex. 15.

At the meeting, management told Plaintiff she was lying about bereavement for her aunt, accused her of discussing a drug transaction on the company phone, and questioned her integrity and character. According to Plaintiff, management present at the meeting told her she was lying, played the phone calls, and was aggressive. When asked during her deposition whether it was reasonable for management to believe she was lying, Plaintiff responded "yes, yes."[27] Plaintiff also does not dispute discussing marijuana over the company phone.

Under the "Last Chance Agreement," the failure to make immediate improvement or a single recurrence of described behavior disruptive to work would result in immediate further disciplinary action and probable termination.[28] Although she disagreed with being placed on a "Last Chance Agreement," Plaintiff signed the document, told management she "underst[ood] the circumstances that brought [it] about," and understood that if she signed the agreement, it was her last chance to remain a Centene employee.

About a week after placing Plaintiff on her "Last Chance Agreement," Beverlin received reports that Plaintiff "was consistently being gone from her area, [that] her supervisor didn't know where she was, [and] [that] she wasn't following the process" designed for her. Beverlin spoke with Plaintiff about Plaintiff being away from her desk. Plaintiff does not dispute that she exceeded her break time and admitted to not letting others know when she returned from her desk and sometimes not letting them know when she was leaving. On or about June 14, 2016, Harris received complaints from Plaintiff's co-workers that Plaintiff was using her cell phone, disappearing from her desk, and not doing her job. On that day, Harris emailed Beverlin that Plaintiff had been taking frequent, long breaks during the day, would not log when she returned

<hr>

[27] Doc. 41, Ex. 1.

[28] Doc. 41, Ex. 15.

into the Team Chat, and was observed texting from her cell phone at her desk. On June 22, Beverlin indicated that it was getting to be an issue again that Plaintiff was being away from her desk, seen on her cell phone, and disappearing.

On June 29, 2016, Harris emailed Human Resources reporting on Plaintiff's activities for the day. Her email stated, "Monique started off today by calling in at 6:55am and stating she was sick and using FML and going to the doctor and might be in later. Monique came in at 1:09pm. Did not clock in through ADP and did not mention anything about a Dr.'s Appointment, nor did she bring in a Dr.s excuse stating that she was seen today."[29]

On June 30, Beverlin received complaints that Plaintiff was "away from her desk" outside allotted breaktime, and that this "happen[ed] during the workday almost everyday."[30] Geraldine Thomas, the lead referral specialist, reported to Beverlin and Harris on July 1 that Plaintiff had been taking excessive breaks and was using her cell phone.[31] On July 1 at around 4:30 p.m., Beverlin also learned that Plaintiff said she was going to the restroom, but went up the stairwell to the fourth floor. Beverlin knew Plaintiff had been discovered on that "stairwell before talking on her cell phone when she should be working."[32] Beverlin believed Plaintiff was disappearing from her desk to talk on her cell phone.

***Plaintiff's Termination***

On Friday, July 1, 2016, Beverlin decided to terminate Plaintiff. That afternoon, she emailed a "Termination Review Form" and excel spreadsheet documenting Plaintiff's conduct to Human Resources, seeking approval. Based on Plaintiff's history, Beverlin believed Plaintiff

---

[29]Doc. 45.

[30]Doc. 45, Ex. 3, 3-M.

[31]Doc. 41, Ex. 3-N

[32]Doc. 41, Ex. 3.

was excessively using work time to talk on her cell phone and engaging in other unprofessional conduct.  Beverlin planned to meet with Plaintiff to terminate her on Tuesday, July 5.

On the morning of July 5, Plaintiff orally informed Thomas that she would need to use FMLA leave to pick her son up from camp because of his asthma.  Plaintiff reported her FMLA usage to Liberty Mutual and clocked out of work.[33]  Plaintiff emailed Beverlin and Harris, neither of whom were in the building, but did not inform Human Resources of her need to leave early.  After receiving Plaintiff's email, Beverlin forwarded the email to Mak and wrote "You should have my stuff from last week, can we get her termed today?"[34]  When Beverlin arrived at work the morning of July 5, Plaintiff had already left work.  Therefore, on July 6, Beverlin terminated Plaintiff's employment with Human Resources' approval.

Along with reiterating the issues on the "Last Chance Agreement," Plaintiff's "Termination Review Form" indicated Plaintiff's performance issues were (1) "Making excessive personal phone calls during work hours on the company phone" and (2) "Using company designated working time for personal benefit while shirking work responsibilities."[35]  Beverlin testified that Plaintiff's termination resulted from her consistently being gone from her area, not documenting when she was away or returning from her desk, and not fixing the issue after a conversation about her behavior.[36]  She denies terminating Plaintiff due to FMLA use.[37]  Mak testified that Plaintiff's termination was based on the "overall picture of the integrity and dishonesty issues [and] time stealing" by being away from her desk.[38]

---

[33]Doc. 45, Ex. 11, 17.

[34]Doc. 45, Ex. 17.

[35]Doc. 45, Ex. 19.

[36]Doc. 45, Ex. 3.

[37]Doc. 41, Ex. 3.

[38]Doc. 45, Ex. 2.

*Other Personnel Issues at Centene*

On June 14, 2016, seven employees, not including Plaintiff, failed to check in and out of the Daily Team Chat when they were away from their desk. On this day, Plaintiff failed to log her time away from her desk six times.

While on a "Last Chance Agreement," Mari Hadi had attendance issues, failed to take breaks and lunch at scheduled times, spent most of her day talking to a co-worker, made personal calls on the company phone, and had low audit scores. Hadi received a second "Last Chance Agreement" on October 21, 2016 for her behavior, specifically for: (1) "Personal phone conversations up to 25 occurrences in a month, during working hours," (2) "Discussing personal life events, plans, etc. with persons inside and outside of the organization excessively during work time," and (3) "Using company time and resources for personal benefit and not for the purposes of completing work processes and responsibilities."[39]

Nicholas Shephard received a verbal warning for excessive cell phone use, and David Nguyen received a verbal warning for excessive cell phone usage that disrupted his performance.

## III. Discussion

### A. FMLA Claims

The FMLA guarantees eligible employees substantive rights of up to twelve weeks of unpaid leave for serious health conditions and reinstatement to their former position or an equivalent position upon return from that leave.[40] Plaintiff asserts her FMLA claims under two theories: (1) interference under § 2615(a)(1), and (2) retaliation under § 2615(a)(2). The Court discusses each in turn.

---

[39]Doc. 45, Ex. 27.

[40]*See* 29 U.S.C. §§ 2612(a)(1), 2614(a).

### 1. FMLA Interference

Under § 2615(a)(1), an employer may not interfere with, restrain, or deny the existence of or the attempt to exercise any rights under the FMLA.[41]  To prevail on an interference claim under the FMLA, a plaintiff must demonstrate that (1) she was entitled to FMLA leave; (2) some adverse action by the employer interfered with that right to take FMLA leave; and (3) the employer's action was related to the exercise or attempted exercise of his FMLA rights.[42] "Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent."[43]  The FMLA, however, is not a strict liability statute.[44]  Even if there is a prima facie case of interference, the employer will prevail if it shows the plaintiff would have been dismissed regardless for the request or taking of FMLA leave.[45]

### a. Adverse Employment Actions

Plaintiff first contends Centene interfered with her FMLA rights when she received occurrences and a write-up in June 2015 while on FMLA leave.  Centene responds that the occurrences do not constitute an adverse employment action.  To demonstrate an action is adverse, plaintiff must demonstrate that the employer's action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[46]  The court examines claims of adverse action through a "case-by-case approach, examining the unique factors relevant to the situation at hand."[47]  The materiality of a claimed adverse action is determined

---

[41]*See* § 2615(a)(1).

[42]*DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1159 (10th Cir. 2009).

[43]*Id.* (internal quotations and citation omitted).

[44]*Grimes v. Fox & Hound Rest. Grp.*, 984 F. Supp. 2d 1125, 1138 (D. Kan. 2013).

[45]*Sabourin v. Univ. of Utah*, 676 F.3d 950, 958 (10th Cir. 2012).

[46]*Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (internal quotation omitted)).

[47]*McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006).

objectively as "petty slights, minor annoyances, and simple lack of good manners" will not deter "a reasonable worker from making or supporting a [claim]."[48]  The Tenth Circuit has emphasized that deciding whether an employer's actions are "materially adverse" is a case-specific exercise that requires an objective inquiry that does not turn on a plaintiff's personal feelings.[49]

The record does not support Plaintiff's assertion that occurrences or the write-up rise to the level of an adverse employment action.  Mak described how an occurrence itself is not disciplinary action.  Importantly, Plaintiff offers no evidence to the contrary that receiving an occurrence would dissuade an employee from taking FMLA leave or making a claim based on an entitlement to FMLA, nor does she present facts that indicate how occurrences relate to later disciplinary actions.  Furthermore, there is no evidence to suggest that the occurrences led to Plaintiff receiving any type of discipline, especially since she admits Centene did not terminate her for attendance issues.  As for the write-up, Plaintiff also fails to present evidence of how a write-up made following a meeting about her conduct would dissuade a reasonable worker from making a claim regarding to FMLA; she simply asserts that she received a written warning related to attendance, while on FMLA leave.  Like the connection between the occurrences and her termination, Plaintiff cannot demonstrate a connection between receiving the write-up in June 2015 and her termination, which did not occur until July 2016 after a "Last Chance Agreement" had been put in place for Plaintiff.  Therefore, the occurrences and write-up cannot constitute an adverse action.

Even if the June 2015 occurrences and write-up constitute adverse employment actions, the evidence shows that Centene did not take these actions in response to Plaintiff taking FMLA

---

[48]*Id.* (quoting *Burlington*, 548 U.S. at 68).

[49]*Semsroth v. City of Wichita*, 555 F.3d 1182, 1184–85 (10th Cir. 2009).

leave, but her for failure to follow Centene's Attendance and Punctuality Policy. Employees who take intermittent FMLA leave must follow the employer's procedures for notice and procedural requirements unless an emergency or other condition prevents compliance.[50] Here, Plaintiff failed to follow Centene's call-in procedural requirement that employees notify a supervisor within one hour of their scheduled start time if they are unable to report to work or will be late. Plaintiff does not dispute that she called in sick after 7:00 a.m., less than one hour before her 8:00 a.m. start time, on June 16 and 17, 2015 the dates Plaintiff received occurrences for, nor does she present evidence to suggest that these absences were for emergencies or allege that she could not comply with Centene's procedures for some reason. Similarly, the write-up does not address issues with respect to Plaintiff taking FMLA leave, and simply states that she is expected to abide by attendance policies. Therefore, because Plaintiff did not follow Centene's procedures for notifying of absenteeism while on FMLA leave, Centene issuing these occurrences and the write-up do not amount to an adverse action that interfered with her FMLA rights.[51]

Second, Plaintiff asserts that Centene interfered with her FMLA rights when her supervisor required her to bring a doctor's excuse. Plaintiff, however, cites no evidence that would allow a reasonable jury to infer that she was ever required to submit a doctor's note. She

---

[50]*See* 29 C.F.R. § 825.302(d) ("Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied."); *see also Holmes v. Boeing Co.*, No. 98-3056, 1999 WL 9760, at *3, (10th Cir. 1999) ("[T]he FMLA does not prohibit an employer from requiring its employees to give notice to specific company supervisors on the day the employee is going to be absent in a nonemergency situation."); *Ortega v. San Juan Coal Co.*, No. 12-CV-0501MV/RHS, 2013 WL 12116377, at *23 (D.N.M. Oct. 3, 2013) (finding that a plaintiff who suffered debilitating migraines created a question of fact with respect to whether he could comply with his employer's policy when he presented evidence that his physical condition prevented him from complying with his employer's notice requirements).

[51]*See Alexander v. Kellogg USA, Inc.*, 674 F. App'x 496, 500 (6th Cir. 2017) (employee on intermittent leave properly terminated due to his failure to abide by the call-in policy).

relies on a June 29, 2016 email. In this email, Harris, after noting that Plaintiff called in sick, told Human Resources that Plaintiff was using FML and going to the doctor, and stated that when Plaintiff returned she did not mention a doctor's appointment or bring in a doctor's note. There is no evidence that Harris spoke with Plaintiff regarding this email or required her to submit a doctor's excuse prior or subsequent to her taking FMLA leave that morning. The Court finds that a lone email, not directed to Plaintiff that reports attendance behavior is insufficient for a reasonable jury to infer that Harris required Plaintiff to provide a doctor's excuse to take FMLA leave.

Finally, Plaintiff contends that Centene interfered by denying her FMLA leave on July 6, and denying her the opportunity to renew her twelve-week FMLA leave by terminating her. Centene terminated Plaintiff on July 6, the day she previously had informed Centene that she was planning to see a doctor to renew her FMLA paperwork for the upcoming year. This action is sufficient to satisfy the first two elements of a prima facie claim for interference.[52]

### b. Causation

The final element of a prima facie case of FMLA interference requires a showing that the adverse action was related to the exercise or attempted exercise of the employee's FMLA rights.[53] When an employee requests and can demonstrate an entitlement to FMLA leave, she has no greater rights than the employee who reports to work.[54] Therefore, an employee may be terminated, even if the termination interferes with her ability to take FMLA leave, so long as she

---

[52]*See Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1227 (10th Cir. 2012) (noting that close timing between a request for leave and termination can be suggestive for determining whether termination relates to an employee exercising FMLA rights); *see also Peterson v. Garmin Intern., Inc.*, 833 F. Supp. 2d 1299, 1312 (D. Kan. 2011) (finding an employer interfered with an employee's FMLA rights the day before FMLA leave was to commence).

[53]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006).

[54]*See Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998).

would have been terminated regardless.[55]  The employer must demonstrate that the employee would have been terminated irrespective of her request for, or taking of FMLA leave.[56]  The timing of the termination "has significant probative force," in evaluating whether there is a causal relation between the exercise of FMLA rights and termination.[57]  Centene argues that the overwhelming evidence shows that it terminated Plaintiff because of unprofessional and dishonest conduct, and not because she took FMLA leave.  Plaintiff argues this contention is without merit and that factual issues exist on whether Centene would have terminated Plaintiff regardless of her entitlement to FMLA leave.  The Court disagrees.

Centene offers evidence that at the time of her termination, Plaintiff had been on a "Last Chance Agreement" since June 1 for a variety of performance issues.  Even though she disagreed with being placed on the agreement, it is undisputed that Plaintiff understood that abiding by the "Last Chance Agreement" represented her last opportunity to remain employed at Centene.  Between placing Plaintiff on the "Last Chance Agreement" and terminating her, Plaintiff's supervisors continued to witness her taking breaks to talk on her cell phone and failing to document her time away from her desk in the Daily Team Chat.  Beverlin, her immediate supervisor, addressed these issues with Plaintiff, but the issues and complaints continued.  Ultimately on July 1, Beverlin decided to terminate Plaintiff, and she terminated her on July 6.

Plaintiff argues that Centene applied its discipline program inconsistently to Plaintiff's detriment, and that Centene has not terminated or disciplined anyone other than Plaintiff for violating the Daily Team Chat and cell phone policies for which she was ultimately terminated.

---

[55]*Id.*

[56]*See Metzler*, 464 F.3d at 1180 (citation omitted); *see also* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

[57]*See DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1160 (10th Cir. 2009).

However, there is uncontroverted evidence that Plaintiff had a history of violating these policies and unprofessionalism while working at Centene, and that even after discussions with supervisors, she failed to correct her behavior. Plaintiff only points to two others who violated phone policies, but she does not provide evidence that they continued to violate these policies after being given verbal warnings as she did. She also provides a summary of a single day where others who failed to log in and out of the Daily Team Chat, but does not offer evidence that these individuals were already on a "Last Chance Agreement" for this behavior or had violations of similar severity to hear. Therefore, she fails to point to others with a similar history of issues at work that would create a factual dispute as to whether Centene would have terminated Plaintiff regardless of her FMLA leave.

Ultimately, Plaintiff's claim for FMLA interference fails because Centene has offered uncontroverted evidence, upon which a reasonable jury would find that Centene would have terminated Plaintiff irrespective of her invocation of FMLA rights.

### 2. FMLA Retaliation

Plaintiff also claims that Centene retaliated against her for her attempted exercise of FMLA rights. The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."[58] Plaintiff's FMLA retaliation claim is analyzed under the *McDonnell Douglas* framework.[59] Under this analysis, plaintiff bears the initial burden of establishing a prima facie case of FMLA retaliation. To do so, plaintiff must demonstrate that: (1) she availed himself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and

---

[58]*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1004 (10th Cir. 2011) (citing 29 U.S.C. § 2615(a)(2)).

[59]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

(3) there is a causal connection between the two actions.[60]  Once plaintiff establishes a prima facie case of FMLA retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.[61]  Once the defendant has satisfied this burden of production, the burden shifts back to the plaintiff to present evidence that the defendant's proffered reason is pretextual.[62]

### a. Prima Facie Case of FMLA Retaliation

Plaintiff makes four arguments to establish a prima facie case of retaliation: (1) receiving occurrences and a written warning after taking FMLA leave in 2015; (2) complaining about discrimination in June 2015; (3) complaining of discriminatory acts by her supervisor; and (4) being disciplined by Centene after requesting and taking FMLA.[63]

First, Plaintiff argues that after taking approved FMLA leave, Centene disciplined her by giving her occurrences and a written warning in June 2015.  However, as discussed above, these do not amount to adverse employment actions and the parties do not dispute that they did not lead to Plaintiff's termination in July 2016.  Even if considered adverse actions, Centene issued them for the legitimate, non-discriminatory reason of Plaintiff failing to abide by the policies for reporting absences.

Second, Plaintiff also claims she engaged in protected conduct by complaining of discrimination multiple times in 2015.  She cites to emails in which she alleges to have complained about being discriminated against for being on FMLA.  Plaintiff, however, does not point to an adverse employment action that arose from these alleged complaints. She merely

---

[60]*Ney v. City of Hoisington, Kan.*, 508 F. Supp. 2d 877, 886 (D. Kan. 2007).

[61]*See Metzler*, 464 F.3d at 1170.

[62]*See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323–25 (10th Cir. 1997).

[63]Doc. 45.

alleges her belief, which Centene denies, that her complaints were not investigated and that Centene did not provide further training to employees regarding FMLA leave. Construing the facts in a light most favorable to Plaintiff, and assuming the adverse action she attempts to connect these alleged complaints to is her termination, Plaintiff offers no facts to establish a causal connection. The nearly one-year time period between these activities and her termination in July 2016 is too long to establish an inference of causation.[64] Thus, the Court finds these complaints are insufficient to establish a prima facie case of FMLA retaliation.

Third, Plaintiff argues that she complained of discriminatory acts by her supervisor that resulted in adverse actions against her. Similar to the above, however, Plaintiff misses the mark on alleging facts to establish these complaints resulted in an adverse action. Plaintiff describes how she informed Beverlin of issues she had with her immediate supervisor at the time, Harris, with respect to how she would respond when Plaintiff took FMLA leave. Centene controverts both the nature and the content of these discussions. While it is undisputed that Harris was not disciplined following Plaintiff and Beverlin's discussion, this is not enough to infer that Plaintiff then suffered an adverse action. Similarly, Plaintiff made what she believed to be an anonymous complaint to a hotline in June 2016 about harassment and discrimination issues she experienced with Harris and Thomas. While the parties dispute whether the complaint was properly investigated, this has no bearing on whether an adverse action resulted from it. Nowhere does Plaintiff point to facts that could lead to an inference that her supervisors knew she made the anonymous complaint and then terminated her for doing so.

---

[64]*Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (finding that a three-month period, standing alone, is insufficient to establish causation).

Plaintiff, however, can establish a prima facie case of FMLA retaliation based on the events in the weeks immediately prior to her termination. First, on July 5, 2016, Plaintiff utilized FMLA leave to care for her son's asthma. She argues that Centene wrongfully asserts she failed to follow company policy when she needed to utilize FMLA to leave work early on July 5, 2016.[65] On that date, Plaintiff informed her team leader and emailed her two supervisors, neither of whom were in the building at the time, of her requested absence. Plaintiff did not contact Human Resources. When Beverlin received Plaintiff's email, she sent a follow-up request to Human Resources to terminate Plaintiff after deciding and requesting to terminate Plaintiff on July 1. Although the parties dispute whether Plaintiff followed company policy on July 5, it is immaterial because a reasonable jury could infer that Beverlin sent in the request because of her July 5 absence invoking FMLA.

Similarly, on July 6, the day Plaintiff planned to renew her FMLA paperwork, Centene terminated Plaintiff. Plaintiff emailed her supervisor on June 23 stating that she planned to renew her FMLA paperwork on July 6 after a meeting with her doctor. Viewed in a light most favorable to Plaintiff, the record indicates that Centene knew of Plaintiff's intent to continue invoking her FMLA rights. Temporal proximity between protected conduct and termination suffices as evidence of a causal connection and can "justify an inference of retaliatory motive"[66] if the "termination is *very closely* connected in time to the protected activity."[67] Thus, less than two-week time period between Centene learning of Plaintiff renewing FMLA and her

---

[65]In her response to the motion for summary judgment, Plaintiff raises this argument in her claim for FMLA interference. As Plaintiff provides no facts suggesting how this action interfered with her FMLA rights since Plaintiff still took FMLA leave on July 5, the Court addresses this argument as part of Plaintiff's claim for FMLA retaliation.

[66]*Metzler*, 464 F.3d at 1171 (quoting *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1228 (10th Cir. 2006)).

[67]*Id.* (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original)).

termination is sufficiently close to establish an inference of a causal connection.  Therefore, Plaintiff can establish a prima facie case of FMLA retaliation based on her termination from Centene.

### b.     Legitimate, Non-Discriminatory Motive and Pretext

Assuming for the purposes of summary judgment that Plaintiff establishes a prima facie case of FMLA retaliation, the burden shifts to Centene to articulate a legitimate, nondiscriminatory reason for the discharge.  Centene states that it terminated Plaintiff for dishonesty and unprofessionalism, and has set forth numerous instances to support this contention.  Because Centene has offered a legitimate, non-retaliatory reason for Plaintiff's termination, the burden reverts to Plaintiff to show the proffered explanation is a pretext for retaliation.

Typically, a plaintiff attempts to demonstrate pretext in one or more of three ways:

> (1) With evidence that the defendant's stated reason for the adverse employment action was false, (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.[68]

Pretext can be shown by pointing out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons."[69]  The relevant issue is not

---

[68]*Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)) (quotations and citations omitted).

[69]*Temple v. Auto Banc of Kan., Inc.*, 76 F. Supp. 2d 1124, 1132 (D. Kan. 1999) (citing *Anderson*, 181 F.3d at 1179).

whether the stated reasons were wise, fair, or correct but whether the defendant honestly believed in those reasons and acted in good faith.[70]  Plaintiff offers a variety of ways in an attempt to establish pretext, however, this Court ultimately finds that her arguments fail.

Plaintiff first argues that the disciplinary actions underlying her "Last Chance Agreement" that she received about one month prior to her termination are without merit.  The Court disagrees.  The uncontroverted facts demonstrate the validity of the "Last Chance Agreement."  Plaintiff received a "Last Chance Agreement" on June 1, 2016; she claims that the reasons for this pertaining to bereavement leave and inappropriate phone use lack support.  With respect to the bereavement leave, on May 17, 2016, Plaintiff informed Beverlin that her aunt had died, and at the time, Plaintiff did not recognize this individual as her aunt.  Beverlin discovered this while listening to recordings on Plaintiff's work phone.  Despite discovering the evening of May 17 that the individual was in fact her biological aunt and requesting bereavement leave for her the following day, Plaintiff admitted it was reasonable for management to believe that she way lying.  Similarly, Centene provides evidence supporting that Plaintiff had unprofessional conversations on her work phone, including attestations that these conversations were recorded.  Indeed, Plaintiff admitted she had a personal conversation regarding marijuana on the company phone, during business hours, and does not controvert that she also discussed sexual innuendos and used curse words during personal conversations on her work phone.

Plaintiff next argues that Centene's reasons for her termination are inconsistent with its disciplinary process.  Inconsistencies may show pretext.[71]  Plaintiff argues that Centene's primary reason for terminating her was "allegedly stealing time, by not documenting when she

---

[70]*Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2014).

[71]*Temple*, 76 F. Supp. 2d at 1132 (citing *Anderson*, 181 F.3d at 1179).

was away, or returning, from her desk in the Daily Team Chat,"[72] but this is not inconsistent with dishonestly and unprofessionalism, general descriptions that certainly include activities such as "stealing time" and abusing the company's phone policy.

Plaintiff alleges that Centene enforced its polices against her more stringently than other employees. A plaintiff can demonstrate pretext by showing the employer enforced company polices more strictly against the plaintiff than other similarly situated employees.[73] Employees are similarly situated when they "'share the same supervisor' or decision maker,"[74] and must have committed violations of "comparable seriousness."[75] Plaintiff argues that other similarly situated employees who engaged in similar conduct received verbal warnings for excessive phone usage and that no one has ever been terminated for violating the policy. She also argues that Centene enforced its policy more strictly against Plaintiff than others who also failed to track their activity in the Daily Team Chat because they tracked her with more scrutiny after she was placed on a "Last Chance Agreement" and took FMLA leave on June 6. Plaintiff, however, fails to identify other employees who were on a "Last Chance Agreement" with a similar extended history of dishonesty and unprofessionalism.

Plaintiff specifically points to Mary Hadi as a similarly situated employee. Plaintiff and Hadi shared the same supervisor, Harris; however, Plaintiff does not present facts that can establish she and Hadi had violations of comparable seriousness. While on a "Last Chance Agreement," Hadi continued to have issues relating to attendance, phone usage, taking breaks, and audit scores. For her continued violations, Hadi received a second "Last Chance

---

[72]Doc. 45.

[73]*See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007).

[74]*Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540 (10th Cir. 2014) (citation omitted).

[75]*Id.* (citation omitted).

Agreement" for her three types of behavior: (1) personal phone conversations, (2) excessive personal discussions during working hours, and (3) use of company time and resources for personal benefit.

Plaintiff's "Last Chance Agreement," however, contained more and different violations than Hadi. With respect to the Daily Team Chat, Plaintiff had twice as many failures as other employees and accounted for almost 50% of the failures on a given day. Additionally, Plaintiff's personal phone conversations were up to seventeen occurrences on a given day. Plaintiff also was cited for leaving a call with a provider to make a personal call, discussing items that were potentially offensive to others, and using bereavement to its maximum in circumstances with questionable application. Following the issuance of Plaintiff's "Last Chance Agreement," Beverlin learned Plaintiff continued to have issues. She received reports of Plaintiff consistently being gone from her area, her supervisor not knowing where she was, and not following the process designed for her. She also received complaints from co-workers that Plaintiff was using her cell phone, disappearing from her desk and not doing her job. Beverlin discussed these issues with Plaintiff prior to her termination, but Plaintiff did not change her behavior, and on July 1, Beverlin ultimately made the decision to terminate her. Therefore, even taking these facts in a light most favorable to the Plaintiff, the extent of Plaintiff's shortcomings and her failure to remedy them prevent a finding that there is a factual issue as to whether they were similarly situated because the comparators violations were not of comparable seriousness.

Plaintiff also attempts to argue that similarly-situated employees who engaged in excessive cell phone use received verbal warnings and were not terminated. Although it is undisputed that no employees had been terminated for violating the phone usage policy, Plaintiff does not point to facts that suggest they were similarly situated. Plaintiff offers no evidence that

they shared the same supervisor or had violations and a disciplinary record of comparable seriousness to Plaintiff. Therefore, like above, there is insufficient evidence to create a factual issue as to whether these individuals were similar to Plaintiff.

Lastly, Plaintiff argues that pretext can be inferred from Centene shifting its reasons for termination. Plaintiff points to Centene's facts about Plaintiff's cell phone records and use, that had not been cited to as a basis for Plaintiff's termination. Prior to her termination, Plaintiff's supervisors suspected her of violating cell phone policies by using her cell phone at her desk and disappearing to talk on her cell phone, and documented their suspicions. Evidence of continued cell phone use, after having discussions with supervisors about it being an issue, sheds light on Plaintiff's unprofessional behavior in the work place. Therefore, contrary to her arguments, Plaintiff's cell phone record is not being cited as a new reason for termination, but as support for her supervisors' contentions that Plaintiff used her cell phone during the workday. Plaintiff's cell phone usage was addressed by her supervisors prior to her termination, specifically referenced in her "Termination Review Form, and is a clear example of unprofessional behavior. Thus, it is insufficient to establish pretext.

Therefore, as Plaintiff fails to point to material issues of fact that would allow a reasonable jury to find Centene's reasons for terminating Plaintiff are pretextual, this Court grants summary judgment on Plaintiff's FMLA retaliation claim.

### B. ADA Claims

### 1. Discrimination on the Basis of Disability

The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability."[76] Discrimination under the ADA includes "not making

---

[76] 42 U.S.C. § 12112(a).

reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."[77] The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*[78] applies to ADA discrimination claims.[79] Under this framework, a plaintiff must first establish a prima facie under the ADA by showing that: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability.[80] Establishing a prima facie case is "not onerous,"[81] and "summary adjudication may be improper when the employee has presented evidence she could perform the essential functions of her position" with the aid of an accommodation.[82]

Centene argues that Plaintiff has failed to prove the elements of her prima facie claim, and that even if she could, the record is clear that its decision to terminate Plaintiff's employment is not pretextual. The Court finds that as a matter of law Plaintiff cannot establish a prima facie case of disability discrimination because she cannot establish she was disabled under the ADA. Even if Plaintiff could establish a prima facie case of discrimination, for the same reasons as discussed above as to FMLA retaliation, Plaintiff cannot establish Centene's reason for terminating her were pretextual.

---

[77]*Id.* § 12112(b)(5)(A).

[78]411 U.S. 792 (1973).

[79]*Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011).

[80]*Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004) (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003)).

[81]*Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (quotation omitted).

[82]*Mason*, 357 F.3d at 1124.

### a. Disability

Under the ADA, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such impairment."[83] Plaintiff alleges Centene discriminated against her based on an actual disability or perceived disability. However, the Court finds that as a matter of law, Plaintiff was not disabled under the ADA.

### i. Actual Disability

To suffer from an actual impairment as recognized by the ADA under paragraph (A), Plaintiff "must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities."[84]

The 2008 amendments to the ADA make the establishment of a disability easier for plaintiffs. Plaintiff must present sufficient evidence to prove (1) that she has a condition (2) that substantially limits at least one of her identified major life activities.[85] Whether or not an impairment "substantially limits" a major life activity "is not meant to be a demanding standard," and "should not demand extensive analysis."[86] To show that her disability substantially limits her ability to perform these major life activities, Plaintiff must show that she is substantially limited in her ability to perform the major life activity "as compared to most people in the general population."[87] This analysis requires an "individual assessment."[88] "A medical

---

[83] 42 U.S.C. § 12102(1).

[84] *Carter*, 662 F.3d at 1142 (internal quotation marks and citation omitted).

[85] *Felkins v. City of Lakewood*, 774 F.3d 647, 651 (10th Cir. 2014).

[86] 29 C.F.R. § 1630.2(j)(1)(i),(iii).

[87] *Id.* § 1630.2(j)(1)(ii).

[88] *Id.* § 1630.2(j)(1)(iv).

diagnosis is insufficient; rather, the ADA requires a plaintiff to offer evidence that the extent of the limitation cause by her impairment in terms of their own experience is substantial."[89]

Plaintiff suffers from both generalized anxiety disorder and GERD.  Centene disputes that generalized anxiety disorder and GERD are recognized impairments because the Tenth Circuit has not recognized either as impairments.  Assuming, however, that the Tenth Circuit would recognize general anxiety disorder and GERD as impairments, there must be evidence that Plaintiff's generalized anxiety disorder or GERD significantly limits a major life activity.  Centene argues that Plaintiff's failure to provide medical evidence that her generalized anxiety disorder or GERD significantly limits a major life activity is fatal to a finding of an actual impairment.  The Court agrees.  Plaintiff contends that her conditions affected her ability to eat, walk, and work.  While these are major life activities, Plaintiff fails to provide admissible evidence to show how her impairment limits these, or that her limitations are significant.  She simply relies on her own contentions.

In *Felkins v. City of Lakewood*, the Tenth Circuit determined that a plaintiff's "declarations are admissible insofar as they describe her injuries and symptoms, such as pain and difficulties walking, standing, and lifting [but are inadmissible] insofar as they . . . state how that condition causes limitations on major life activities [because] those are matters 'beyond the realm of common experience . . . and require the special skill and knowledge of an expert witness.'"[90]  Here, Plaintiff's only evidence of this exists in the form of her personal contentions; she does not offer expert testimony.  Further, based on Centene's memorandum in support of summary judgment, Plaintiff had notice of the need to provide admissible evidence after Centene

---

[89]*Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010).

[90]*Felkins*, 774 F.3d at 652; *see also Russell v. Phillips 66 Co.*, 687 F. App'x 748, 755  (10th Cir. 2017).

challenged her status as impaired. In response to Centene's motion for summary judgment, it is Plaintiff's burden to "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for [her]."[91] Plaintiff has not satisfied this burden. Therefore, as a matter of law, this Court cannot find that Plaintiff had an actual disability under the ADA.

### ii.　　　Perceived Disability

Plaintiff also argues that she satisfies the requirements for having a "regarded as" impairment under the ADA. A "regarded as" impairment need not limit or even be perceived as limiting a major life activity—the employer need only regard the employee as being impaired."[92] To show that the employer regarded her as having an impairment, Plaintiff must show that (1) she has an actual or perceived impairment, (2) the impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action.[93] Here, the issue arises with respect to Centene's knowledge of Plaintiff's impairment at the time of her discipline and termination.

There is not sufficient evidence to support a finding that Centene was aware Plaintiff had an actual or perceived impairment. First, with respect to her generalized anxiety disorder, Plaintiff does not recall informing anyone at Centene she suffered from it, and none of her supervisors indicate they were aware of it. As for GERD, although Plaintiff informed her manager, Beverlin, that that she had GERD, Beverlin did not know what GERD was or how it impacted Plaintiff, and Plaintiff does not offer evidence to contradict this testimony. Plaintiff

---

[91]*Felkins*, 774 F.3d at 653 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[92]*Sharp v. Owens Corning Insulating Sys., LLC*, No. 17-CV-2463-JWL, 2018 WL 3831527, at *7 (D. Kan. Aug. 13, 2018) (quoting *Adair v. City of Muskogee*, 823 F.3d 1297, 1305 (10th Cir. 2016)).

[93]*Adair*, 823 F.3d at 1306.

also points to her taking of intermittent FMLA leave from 2014 through 2016 and Centene's knowledge of this as indication that Centene was aware of Plaintiff's impairment. However, the approval of FMLA requests alone do not support an inference that an employer regarded an employee as disabled.[94] Furthermore, as Liberty Mutual approved Plaintiff's FMLA, Centene was not involved in the approval of Plaintiff's FMLA leave and was only aware of when she would take FMLA leave. The record also indicates that Plaintiff told Mak that her co-workers questioned her use and need for FMLA, and that Harris suspected Plaintiff faked her sickness and questioned the necessity of her FMLA use. This is not enough evidence for a reasonable jury to infer that Centene perceived Plaintiff's impairment at the time of the alleged discriminatory action. As such, this Court finds that Plaintiff cannot establish Centene regarded her as disabled. Therefore, as a matter of law, Plaintiff cannot establish a prima facie case of disability discrimination as she cannot establish she was disabled as defined by the ADA.

### b. Failure to Provide a Reasonable Accommodation

Plaintiff's response to the motion for summary judgment argues that her FMLA leave requests should have been construed as requests for reasonable accommodation for her disability.[95] This argument fails. Plaintiff's failure to accommodate claim first was not included in the Pretrial Order.[96] In fact, the Pretrial Order excluded claims or allegations that support Plaintiff's theory that Centene failed to provide reasonable accommodations and thus discriminated against Plaintiff. As the Court deems claims not included in the Pretrial Order as

---

[94]*Jennings v. AAON, Inc.*, No. 14-CV-0347-CVE-PJC, 2015 WL 3465894, *6 (N.D. Okla. 2015) (citing *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1219–20 (10th Cir. 2007)) (finding that an employer did not regard an employee as disabled under the ADAAA or ADA when the employee was placed on FMLA leave and the employer was also aware that the employee had breathing difficulties at work that caused her to feel faint and lightheaded).

[95]Doc. 45.

[96]Doc. 37.

waived,[97] Plaintiff is excluded from relying on a theory of failure to provide reasonable accommodation.

Plaintiff's failure to provide reasonable accommodation theory also fails even if not waived.  Under the ADA, a failure to accommodate claim arises when an employer fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."[98]  Plaintiff cannot establish that Centene failed to provide reasonable accommodation as a matter of law due to Centene's lack of knowledge.[99]  As discussed above, Plaintiff cannot establish, as a matter of law, she was considered disabled under the ADA. Centene lacked knowledge of Plaintiff's alleged disability which prevents it from being liable for not accommodating Plaintiff.[100]  Therefore, this Court grants Centene's motion for summary judgment on Plaintiff's claim of ADA discrimination.

### 2.    ADA Retaliation

Under 42 U.S.C. § 12203(b), "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, . . . any right granted or protected by [the ADA]."  The *McDonnell Douglas* framework applies to claims of retaliation under the ADA.[101]  A prima facie case of

---

[97] *Sunderman v. Westar Energy*, 520 F. Supp. 2d 1259, 1278 (D. Kan. 2007).

[98] *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017) (quoting 42 U.S.C.  12112(b)(5)(A)) (alterations in original).

[99] *Felkins v. City of Lakewood*, 774 F.3d 647, 649 (10th Cir. 2014) (declining to address failure to accommodate issue where plaintiff failed to show evidence of a disability).

[100] *Punt*, 862 F.3d at 1048 (citing *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171–72 (10th Cir. 1999)) (en banc) ("The employer must of course know of the employee's disability and of the accommodation the employee wishes to receive in order to have any responsibility for providing such an accommodation.").

[101] *McDonnell Douglas*, 411 U.S. at 802; *see e.g.*, *Smothers*, 740 F.3d at 538.

retaliation under the ADA requires: "(1) that [an employee] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[102]

Plaintiff cannot establish a prima facie case of ADA retaliation. Plaintiff's claim for ADA retaliation is wrapped in her claim for denial of reasonable accommodation with respect to FMLA leave. Plaintiff alleges Centene is liable for actions taken against Plaintiff while on FMLA leave, which amounted to a request for reasonable accommodation for an employee's disability and protected activity. She essentially argues she was terminated for seeking to renew her accommodation request in the form of FMLA leave. Plaintiff also points to the occurrences received while on FMLA leave as an alleged adverse action. However, as discussed, Plaintiff cannot establish a claim for reasonable accommodation, and occurrences do not amount to an adverse action. Therefore, as a matter of law, Plaintiff cannot establish a prima facie case of ADA retaliation.

Even if Plaintiff could establish a prima facie case of retaliation, this Court has already found that Plaintiff fails to point to material facts from which a reasonable jury could infer Centene's legitimate, nondiscriminatory reasons for its actions are pretextual. Therefore, this Court grants Centene's Motion for Summary Judgment on Plaintiff's claim of ADA Retaliation.

**IT IS THEREFORE ORDERED BY THE COURT** that Centene's Motion for Summary Judgment (Doc. 41) is GRANTED.

**IT IS SO ORDERED.**

---

[102] *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012).

Dated: September 27, 2018

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE